IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROCKY BIXBY, LAWRENCE ROBERTA,
SCOTT ASHBY, CHARLES ELLIS, MATTHEW
HADLEY, CARLOS AVALOS, JESUS BRUNO,
COLT CAMPREDON, STEPHEN FOSTER, BYRON
GREER, KELLY HAFER, DENNIS JEWELL,
STEPHEN MUELLER, VITO PACHECO, JOHN
RYDQUIST, KEVIN STANGER, RONALD
BJERKLUND, ADANROLANDO GARCIA, BRIAN
HEDIN, LEWIS MARTIN, and CHARLES SEAMON,
     Plaintiffs,

CV 09-632-PK

AMENDED OPINION
v.                           AND ORDER

KBR, INC., KELLOGG, BROWN & ROOT SERVICE,
INC., KBR TECHNICAL SERVICES, INC.,
OVERSEAS ADMINISTRATION SERVICES, LTD.,
and SERVICE EMPLOYEES INTERNATIONAL, INC.,
     Defendants.

PAPAK, Magistrate Judge:

    Plaintiffs Rocky Bixby, Lawrence Roberta, Scott Ashby, Charles Ellis, and Matthew

Hadley filed this action against defendants KBR, Inc., Kellogg, Brown & Root Service, Inc.,

KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees

International, Inc., on June 8, 2009. On September 8, 2009, plaintiffs amended their complaint,

adding Carlos Avalos, Jesus Bruno, Colt Campredon, Stephen Foster, Byron Greer, Kelly Hafer, Dennis Jewell, Stephen Mueller, Vito Pacheco, John Rydquist, and Kevin Stanger as additional plaintiffs. Plaintiffs amended their pleading a second time on February 2, 2010, adding Ronald Bjerklund, Adanrolando Garcia, Brian Hedin, Lewis Martin, and Charles Seamon as additional plaintiffs. In their second amended complaint, plaintiffs allege defendants' liability for negligence and for fraud arising out of plaintiffs' exposure to sodium dichromate and resultant hexavalent chromium poisoning while stationed as Oregon National Guardsmen in Iraq and assigned to duty at the Qarmat Ali water plant in 2003.

Now before the court is defendants' motion (#45) to dismiss for lack of subject-matter jurisdiction. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, the motion is denied.

## LEGAL STANDARDS

The federal courts are courts of limited jurisdiction. *See, e.g., Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005), *citing Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). As such, the courts presume that causes of action "lie[] outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377; *see also, e.g., Vacek v. United States Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006).

A motion under Federal Civil Procedure Rule 12(b)(1) to dismiss for lack of subject-matter jurisdiction may be either "facial" or "factual." *See Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), *citing White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack on subject-matter jurisdiction, the moving party asserts that a plaintiff's allegations are

insufficient on their face to invoke federal jurisdiction, whereas in a factual attack, the moving

party disputes the factual allegations that, if true, would give rise to subject-matter jurisdiction.

Where a defendant raises a facial challenge to subject-matter jurisdiction, the factual allegations

of the complaint are presumed to be true, and the motion may be granted only if the plaintiff fails

to allege an element necessary for subject matter jurisdiction. *See Savage v. Glendale Union

High Sch.*, 343 F.3d 1036, 1039 n.1 (9th Cir. 2003). By contrast, where a defendant raises a

factual challenge to federal jurisdiction, "the district court may review evidence beyond the

complaint without converting the motion to dismiss into a motion for summary judgment," *Safe

Air v. Meyer*, 373 F.3d at 1039, *citing Savage*, 343 F.3d at 1039 n.2, and "need not presume the

truthfulness of the plaintiff's allegations," *id.*, *citing White*, 227 F.3d at 1242.

"Defective allegations of jurisdiction may be amended, upon terms, in trial or appellate

courts." 28 U.S.C. § 1653. It is improper to dismiss an action based on a defective allegation of

jurisdiction without leave to amend "unless it is clear, upon de novo review, that the complaint

could not be saved by amendment." *Snell v. Cleveland, Inc.*, 316 F.3d 822, 828 n.6 (9th Cir.

2002), *citing Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001).

## FACTUAL BACKGROUND

### I.    The Parties

The plaintiffs are current or former members of the Oregon National Guard who were

allegedly injured by exposure to sodium dichromate while deployed in Kuwait and Iraq in 2003.

Defendant KBR is a corporation organized under the laws of the State of Delaware with

its principal place of business in Houston, Texas. KBR is the corporate parent of defendants

Kellogg Brown & Root Services, Inc., KBR Technical Services, Inc., Overseas Administration

Services, Ltd., and Service Employees International, Inc.

Defendant Kellogg Brown & Root Services, Inc. ("KB&RS"), is a corporation organized under the laws of the State of Delaware with its principal place of business in Houston, Texas. KB&RS is the operating company and contracting entity for KBR's Government and Infrastructure ("G&I") business unit, which is an engineering, construction, and services contractor for public sector and private clients. This is the entity that directly contracted with the United States Government to provide logistical support to the military in the Middle East.

Defendant KBR Technical Services, Inc. ("KBRTS"), is a corporation organized under the laws of the State of Delaware with its principal place of business in Houston, Texas. KBRTS is an employment company that hires individuals who perform work domestically and abroad for KBR-related companies.

Defendant Overseas Administration Services, Ltd. ("OAS"), is a corporation organized under the laws of the Cayman Islands with its principal place of business in Dubai, United Arab Emirates. OAS is an employment company that hires employees who perform work abroad under contracts awarded by various clients to KBR-related companies.

Defendant Service Employees International, Inc. ("SEI"), is a corporation organized under the laws of the Cayman Islands with its principal place of business in Dubai, United Arab Emirates. SEI is an employment company that hires employees who perform work abroad under contracts awarded by various clients to KBR-related companies.

II.    **Underlying Facts**

On March 3, 2003 – before combat operations began in Iraq – the U.S. Army Corps of Engineers entered into Contract No. DACA63-03-D-0005 (also known as the "Restore Iraqi Oil"

or "RIO" contract) with KBR. Under the RIO contract, KBR and/or its subsidiaries agreed to provide services to the U.S. military in connection with efforts to restore the infrastructure underlying the Iraqi oil industry. Also under the RIO contract, the U.S. Army Corps of Engineers issued various "task orders" for KBR to perform.

Combat operations in Iraq began on March 19, 2003. On March 20, 2003, the Corps of Engineers issued "Task Order 3," which governed the services to be provided by KBR and ts subsidiaries at Qarmat Ali and other facilities. Under Task Order 3, the U.S. military would declare a given worksite to be "benign" before KBR would begin operations there.[1]

Task Order 3 provides that KBR was responsible for providing the Corps of Engineers with an environmental assessment of any facility in which it undertook operations. The obligation to provide such assessments included the obligation to report and evaluate any environmental hazards. According to Sumner's and Gen. Crear's deposition testimony, KBR was not merely permitted but required under Task Order 3 and the RIO contract to take all necessary

---

[1] The parties dispute the meaning of the term "benign" for purposes of Task Order 3. According to the deposition testimony of Robert Crear (retired Brigadier General of the U.S. Army Corps of Engineers) and of Gordon Sumner (retired U.S. Army Corps of Engineers Contracting Officer and regional director of contracting), "benign" referred to freedom from combatant activity and from nuclear or chemical weapons, and did not foreclose the possibility of environmental hazards, including hazardous (but not weaponized) chemicals. Support for this interpretation can be found in the provisions of Task Order 3, which suggest that pronouncement of a site as "benign" did not, for example, foreclose the need for environmental assessment. Nevertheless, defendants take the position that a "benign" designation necessarily meant freedom from known hazards, including environmental hazards, and support for defendants' position may also be found in the language of Task Order 3, which indicates that a facility must be cleared of environmental and industrial hazards before it may be pronounced "benign." Because I do not find this issue to be material to the analyses I am called upon to undertake in connection with the political question doctrine, the government contractor defense, or the combatant activities exception, the parties' dispute over the definition of "benign" need not be resolved at this stage of these proceedings.

precautions to safeguard personnel who might potentially be exposed to environmental hazards at worksites, including the wearing of protective gear and/or the closing down of operations at any unsafe site.

In addition, the RIO contract sets forth specific health and safety requirements KBR was required to comply with in performing services under the contract, including Overseas Environmental Baseline Guidance Document 4715.5-G (Mar. 2000), relevant OHSA standards, industry standards, CERCLA requirements, environmental assessment requirements, Army safety regulations, and Army Corps of Engineers safety standards. These requirements were never waived. The RIO contract further provides that the U.S. government will indemnify KBR for any claims involving bodily injury or death arising out of KBR's provision of services under the contract.

The United States military was involved in active, major combat operations in Iraq between March 19, 2003, and May 1, 2003, when then-President Bush declared an end to major combat activities in Iraq. The KBR defendants' involvement in work at Qarmat Ali began at some time after May 1, 2003.

KBR personnel apparently became aware of the presence of sodium dichromate at Qarmat Ali shortly after commencing operations at that location, because in May 2003, before the Oregon National Guard began sending soldiers to that location, KBR advised one subcontractor performing work at Qarmat Ali that some areas within the site were contaminated with sodium dichromate. It appears that no KBR defendant advised the Oregon National Guard or any Oregon National Guard soldier of the presence of sodium dichromate at the site at any time prior to August 2003.

In May 2003, the Oregon National Guard was assigned to the Doha Operations Center in Kuwait. Beginning some time after May 1, 2003, the KBR defendants, or some of them, would contact the Doha Operations Center and request assistance with security issues on a regular, perhaps daily basis, in accordance with the provisions of the RIO contract and Task Order 3. On some occasions, members of the Oregon National Guard would receive security assignments to the Qarmat Ali water plant, where they were allegedly exposed to sodium dichromate.

In addition to preexisting sodium dichromate, it appears that defendants brought additional sodium dichromate to the site in June 2003, and continued storing and working with it at the site. In an internal email, a KBR employee discussed sodium dichromate contamination at Qarmat Ali in June 2003, and recommended that appropriate remedial measures be taken.

Defendants did not advise the Oregon National Guard of the presence of sodium dichromate at Qarmat Ali until August 12, 2003, when KBR issued an official report to the army conceding the chemical's presence. The report indicated that sodium dichromate at Qarmat Ali constituted a serious health hazard.

The Qarmat Ali site was shut down September 9, 2003. Plaintiffs have allegedly been seriously harmed by their exposure to sodium dichromate at the Qarmat Ali plant.

## ANALYSIS

Before the court is defendants' challenge to the court's exercise of subject-matter jurisdiction over this action. Defendants argue that this court lacks subject-matter jurisdiction by operation of the political question doctrine, by operation of the so-called "government contractor defense," and by operation of the combat activities exception to the Federal Tort Claims Act.

## I.     Political Question Doctrine

Disputes involving certain political questions lie outside the jurisdiction of the federal

courts. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *Corrie*

*v. Caterpillar*, 503 F.3d 974, 982 (9th Cir. 2007). The Supreme Court has set forth six

independent tests for determining whether the presence of a political question deprives the

federal courts of jurisdiction over a particular case:

> Prominent on the surface of any case held to involve a political question is found
> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding without
> an initial policy determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution without
> expressing lack of the respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.
>
> **Unless one of these formulations is inextricable from the case at bar, there**
> **should be no dismissal for nonjusticiability on the ground of a political**
> **question's presence.** The doctrine of which we treat is one of "political
> questions," not one of "political cases." The courts cannot reject as "no law suit" a
> bona fide controversy as to whether some action denominated "political" exceeds
> constitutional authority. **The cases we have reviewed show the necessity for**
> **discriminating inquiry into the precise facts and posture of the particular**
> **case, and the impossibility of resolution by any semantic cataloguing.**

*Baker v. Carr*, 369 U.S. 186, 217 (1962) (emphasis supplied). The Supreme Court has opined

that the six *Baker* tests are "probably listed in descending order of both importance and

certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004).

The Ninth Circuit applied the political question doctrine to bar a suit against a civilian

manufacturer of bulldozers bought by the Israeli Defense Forces but paid for directly by the

United States government and used by the IDF to bulldoze Palestinian homes in the West Bank.

*See Corrie*, 503 F.3d 974. The Ninth Circuit reasoned as follows:

> The decisive factor here is that Caterpillar's sales to Israel were paid for by the United States. Though mindful that we must analyze each of the plaintiffs' "individual claims," . . . each claim unavoidably rests on the singular premise that Caterpillar should not have sold its bulldozers to the IDF. Yet these sales were financed by the executive branch pursuant to a congressionally enacted program calling for executive discretion as to what lies in the foreign policy and national security interests of the United States. . . .
>
> Allowing this action to proceed would necessarily require the judicial branch of our government to question the political branches' decision to grant extensive military aid to Israel. It is difficult to see how we could impose liability on Caterpillar without at least implicitly deciding the propriety of the United States' decision to pay for the bulldozers which allegedly killed the plaintiffs' family members.

*Id.* at 982.

By contrast, in a case arising out of the shooting down of a civilian aircraft by a United States warship, *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), the Ninth Circuit found the political question doctrine inapplicable, noting that "governmental operations are a traditional subject of damage actions in the federal courts," *Koohi*, 976 F.2d at 1331, and holding that "the lawsuit [was not] rendered judicially unmanageable because the challenged conduct took place as part of an authorized military operation" because "federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians," *id.* The court explained:

> A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions. *Compare Gilligan v. Morgan*, 413 U.S. 1, 11, 37 L. Ed. 2d 407 , 93 S. Ct. 2440 (1973) (refusing to take cognizance of a suit seeking judicial supervision of the

operation and training of the Ohio National Guard in the wake of the Kent State shootings) with *id.* at 5 (suggesting that the court might allow a suit against the national guard for damages) and *Scheur*, 416 U.S. 247 at 247-49 (allowing such a suit). In sum, the federal courts are competent to determine both the merits of the plaintiffs' suit and the extent of the relief to which plaintiffs would be entitled.

In addition, because the plaintiffs seek only damages, the granting of relief will not draw the federal courts into conflict with the executive branch. Damage actions are particularly nonintrusive. *See Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 120-21, 70 L. Ed. 2d 271 , 102 S. Ct. 177 (1981) (Brennan, J., concurring in the judgment) ("There is little room for the 'principle of comity' in actions at law where, apart from matters of administration, judicial discretion is at a minimum."). For example, while federal courts are restrained from enjoining on-going state criminal proceedings, *see Younger v. Harris*, 401 U.S. 37, 27 L. Ed. 2d 669 , 91 S. Ct. 746 (1971), there is no such restraint on federal damage actions arising from state criminal proceedings, *see Giulini v. Blessing*, 654 F.2d 189, 193 (2d Cir. 1981). As the Supreme Court has noted, "historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 395, 29 L. Ed. 2d 619 , 91 S. Ct. 1999 (1971).

*Id.* at 1332.

In a case brought against a government contractor arising out of the deaths of three army soldiers while being transported by the contractor in Afghanistan in 2004, the Eleventh Circuit similarly found that the political question doctrine did not deprive the court of jurisdiction to hear the plaintiffs' wrongful death action. *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331 (11th Cir. 2007) ("*McMahon II*"). Following analysis of the terms and conditions of the contract between the contractor and the U.S. Army and of the six *Baker* factors, the *McMahon II* court upheld the decision of the district court below that the political question doctrine was inapplicable, on the ground that the action required evaluation of the contractor's performance of the contract rather than evaluation of any government decision or policy. *See id.* at 1357-65.

The Fifth Circuit has likewise found the political question doctrine inapplicable to tort

actions brought against government contractors providing services in support of the United States military. On consolidated appeal from three district court decisions that the political question doctrine deprived the court of jurisdiction to consider claims arising out of injuries suffered in Iraq by civilian employees of KBR and various of its subsidiaries that were caused when trucks driven by the civilian employees came under attack by Iraqi insurgents, *see Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008), the Fifth Circuit reversed the district courts' decisions and remanded for further proceedings. Addressing the district courts' finding that the first *Baker* test – a "textually demonstrable constitutional commitment" to a branch of government – mitigated against federal subject-matter jurisdiction, the *Lane* court reasoned as follows:

> The district court first found that the issues raised by the Plaintiffs' claims implicated a textually demonstrable constitutional commitment to the Executive Branch, namely, that war and foreign policy decisions are for the Executive. . . . Of course, the Constitution commits to Congress the power to raise and support an army and navy, and to the Executive the responsibilities of commanding those armed forces. . . . The decisions whether and under what circumstances to employ military force are constitutionally reserved for these two branches. . . . The strategy and tactics employed on the battlefield are clearly not subject to judicial review. . . .

> We disagree with the district court's textual commitment analysis because at this stage we cannot find that all plausible sets of facts that could be proven would implicate particular authority committed by the Constitution to Congress or the Executive. Examples of cases that implicate a textual commitment of constitutional authority to the Executive Branch include a challenge to the President's decision to deploy troops in a foreign land, *Eisentrager*, 339 U.S. at 789, or mine the harbors of another country in the course of a war against that country, *DaCosta v. Laird*, 471 F.2d 1146, 1153-57 (2d Cir. 1973); so too has such a textual commitment been involved when a suit seeks judicial oversight of training procedures employed by the National Guard, *Gilligan*, 413 U.S. at 5-10, requests an injunction of all nuclear testing, *Pauling v. McNamara*, 118 U.S. App. D.C. 50, 331 F.2d 796 (D.C. Cir. 1963), or requires the resolution of a territorial dispute between foreign sovereigns, *Occidental*, 577 F.2d at 1202-03. These are matters that the President is constitutionally privileged to address.

In addition, as these cases suggest, the first *Baker* formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government. *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359 (11th Cir. 2007). KBR is not part of a coordinate branch of the federal government. Therefore, to invoke the "textual commitment" factor, KBR faces a "double burden." *Id.* "First, [KBR] must demonstrate that the claims against it will require reexamination of a decision *by the military*. Then, it must demonstrate that the military decision at issue is . . . insulated from judicial review." *Id.* at 1359-60 (emphasis in original; citation omitted).

Contrary to the situations regarding matters of war, there is no textual commitment to the coordinate branches of the authority to adjudicate the merits of the Plaintiffs' claims against KBR for breach of its duties. In fact, when faced with an "ordinary tort suit," the textual commitment factor actually weighs in favor of resolution by the judiciary. *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49-50 (2d Cir. 1991). It is an extraordinary occasion, indeed, when the political branches delve into matters of tort-based compensation. *See, e.g.,* September 11th Victim Compensation Fund of 2001, Pub. L. No. 107-42, §§ 401-409, 115 Stat. 230, 237-41 (2001). Viewing the facts in a light most favorable to the Plaintiffs, their claims challenge actions taken and omissions made only by KBR. That company's conduct can be examined by a federal court without violating the Constitution's separation of powers.

*Lane*, 529 F.3d at 559-560 (some citations, internal modifications, internal quotation marks omitted). Addressing the district courts' disposition of the second *Baker* factor – a lack of judicially discoverable and manageable standards – the *Lane* court held that the plaintiffs' claims "primarily raise legal questions that may be resolved by the application of traditional tort standards." *Id.* at 563. Addressing the district courts' disposition of the third *Baker* factor – the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion – the *Lane* court held as follows:

To recover, the Plaintiffs may not need a court to evaluate the Executive's longstanding policy of employing civilian contractors in combat-support roles. KBR's intended defense has not been shown as legitimately implicating this broad, policy-based decision. All parties accept that the Executive acted within his discretionary authority to employ KBR to support the military mission in Iraq. The court will be asked to judge KBR's policies and actions, not those of the

military or Executive Branch.

*Id.*

Numerous district courts have likewise found the political question doctrine inapplicable to tort actions brought against government contractors in the military context. In a case arising out of injuries sustained in Iraq in March 2004 by an army soldier escorting a commercial truck convoy owned and operated by KBR, *Lessin v. Kellogg Brown & Root*, Case No. H-05-01853, 2006 U.S. Dist. LEXIS 39403 (S.D. Tex. June 12, 2006), KBR argued, as it does here, that the case should be dismissed as nonjusticiable under the political question doctrine. The *Lessin* court squarely rejected KBR's arguments:

> With respect to the first *Baker* factor, Defendant argues that Plaintiffs' claims necessarily involve issues committed to the executive branch, including military decision-making and the conduct of military operations. Defendant contends that, because Lessin was injured while attempting to assist the malfunctioning convoy truck, adjudicating Plaintiffs' claims will require an inquiry into whether Lessin was trained properly on civilian equipment, whether he complied with applicable military regulations and directives regarding civilian contractor convoys, and whether these military regulations were adequate to prevent his injury. Defendant additionally asserts that the executive branch has exercised its constitutional authority over military conduct by investigating Lessin's injury and adopting new procedures that prohibit military personnel from assisting civilian convoys, except when authorized by the convoy escort commander.

> Defendant also argues that Plaintiffs' claims in this case will implicate the second *Baker* factor, because they are not susceptible to resolution by judicially discoverable standards. According to Defendant, this case will necessarily require a determination of whether the military exercised reasonable judgment in permitting the civilian truck at issue to be a part of the military convoy, whether it was reasonable for the military to stop the convoy in a combat zone to attempt to repair the truck, whether it was appropriate for Lessin to assist in the truck's repair, and whether the military exercised an appropriate level of maintenance over the truck. Defendant urges that these determinations will depend upon an analysis of military needs and priorities, which the Court is not equipped to undertake.

Lastly, Defendant argues that the third and fourth *Baker* factors apply to this case, which it contends will require the Court to undertake an initial policy decision concerning the interaction between military personnel and civilian contractors in a combat zone, and to express a lack of respect due to the coordinate branches of government that oversee such war efforts. Defendant cites several district court cases, in which Defendant asserts that the courts held the political question doctrine to bar adjudication of cases analogous to the one at bar. *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993); *Zuckerbraun v. Gen. Dynamics Corp.*, 755 F. Supp. 1134 (D. Conn. 1990); *Nejad v. United States*, 724 F. Supp. 753 (C.D. Cal. 1989).

Defendant's cited cases, in addition to not being controlling authority for this Court, are distinguishable from the case at bar. In each of these cases, the court explicitly recognized that military decision-making or policy would be a necessary inquiry, inseparable from the claims asserted. In *Bentzlin*, the plaintiffs' decedents had been killed by missiles fired by a U.S. Air Force aircraft, and the court found that the resulting claims "necessarily require inquiry into military strategy and, more specifically, orders to A-10 pilots and ground troops." 833 F. Supp. at 1497. *Nejad* also involved alleged manufacturing defects with respect to missiles that had been fired by a U.S. military vessel. 724 F. Supp. at 754-55. Because the decedents in *Nejad* had been killed by fire from a U.S. warship, the court found it "indubitably clear that plaintiffs' claim calls into question the Navy's decisions and actions in execution of those decisions." *Id.* at 755. In *Zuckerbraun*, in which a U.S. warship was fired upon by a foreign aircraft, the court found that it would be required to "examine the appropriateness of the rules of engagement and the standing orders," as well as "the appropriateness of the reaction of the [warship] crew to the [incident]." 755 F. Supp. at 1142. This Court agrees that, where the military's strategy, decision-making, or orders are necessarily bound up with the claims asserted in a case, the political question doctrine is implicated, and the case is inappropriate for judicial inquiry.

Here, however, Plaintiffs' claims that Defendant acted negligently are not certain to implicate such topics, or any others that are committed to the political branches. The incident at issue in this case was, essentially, a traffic accident, involving a commercial truck alleged to have been negligently maintained, as well as a civilian truck driver who was allegedly negligent in operating the truck and insufficiently trained. Claims of negligence arising from this type of incident are commonly adjudicated by courts, using well-developed judicial standards. While the actions taken by Lessin, a military officer, in assisting the truck will likely be relevant to causation, it is by no means clear that the policies or decisions of the military or of the executive branch itself will be implicated in this case. It does not follow, therefore, that the case will require initial policy decisions committed to the discretion of the political branches, or that adjudication of the case will

evince a lack of respect for the political branches.

> A finding that this case will necessarily involve nonjusticiable political questions, particularly before discovery has been completed and all parties properly joined, would expand the political question doctrine beyond its current applications and boundaries. Because the Court cannot conclude that one of the political question formulations set forth in *Baker* will be "inextricable from the case at bar," it cannot dismiss Plaintiffs' claims on political question grounds. *Baker*, 369 U.S. at 217. Should discovery reveal additional facts pertinent to Defendant's assertion of the political question doctrine, Defendant may renew its motion to dismiss at that time.

*Lessin*, 2006 U.S. Dist. LEXIS 39403 at *4-10 (footnote omitted).

In a case arising out of the death of an army soldier in Iraq in January 2008 who was electrocuted in the shower while using a shower facility maintained by KB&RS pursuant to a contract with the U.S. Army, *Harris v. Kellogg, Brown & Root Servs.*, 618 F. Supp. 2d 400 (W.D. Pa. 2009), KB&RS argued, as it does here, that the case should be dismissed under the political question doctrine. The *Harris* court rejected KB&RS' argument, finding that resolution of the plaintiffs' claims would require the court to evaluate, not the military's decision to delegate maintenance responsibilities to KB&RS, but rather KB&RS' performance of the work it undertook to perform under the contract, *see Harris*, 618 F. Supp. 2d at 422-427, that traditional principles of negligence law provided controlling judicially discoverable and manageable standards, *see id.* at 427-430, that the issues raised by the case could be "resolved without implicating military judgments or policy determinations," *id.* at 430, and that adjudication of the claims would "not cause embarrassment nor show a lack of respect to the coordinate branches" of government, *id.* at 431. *See also, e.g., Norwood v. Raytheon Co.*, 455 F.Supp.2d 597 (W.D. Tex. 2006) (political question doctrine did not bar claims of American and German servicemen against government contractors that manufactured radar detectors for physical injuries resulting

from exposure to x-rays during their military service); *Getz v. Boeing Co.*, Case No. 07-6396, 2008 U.S. Dist. LEXIS 87557 (N.D. Cal July 8, 2008) (soldiers' estates design and manufacturing defect claims against contractor arising from helicopter crash in Afghanistan were not barred by political question doctrine); *Flanigan v. Westwind Technologies*, Case No. 07-1124, 2008 U.S. Dist. LEXIS 82203 (W.D. Tenn. Sept. 15, 2008) (political question doctrine did not bar civilian helicopter pilot's design defect suit against contractors that manufactured the helicopter flown by and the helmet worn by the pilot); *Al Shimari v. CACI Premier Technology, Inc.*, Case No. 08-827, 2009 U.S. Dist. LEXIS 29995 (E.D. Va. Mar. 18, 2009) (political question doctrine did not bar Iraqi citizens' claims that they were allegedly tortured at Abu Ghraib prison in Iraq by government contractors).

However, in cases in which the courts determined that the government contractor lacked any discretion in the provision of support services to the military, some courts have found that the political question doctrine could operate to deprive the federal courts of subject-matter jurisdiction over tort actions arising out of such provision of services. *See e.g., Carmichael v. Kellogg, Brown & Root Services, Inc.*, 564 F.Supp.2d 1363 (N.D. Ga. 2008) (political question doctrine barred claims of a soldier's estate against private military contractor for negligent operation of a convoy vehicle as the military controlled all aspects of the convoy operation); *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) (political question doctrine barred claims of a soldier's estate alleging that the soldier's death was caused by negligent operation of convoy vehicle by KBR because the Army controlled all aspects of the convoy operation); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993) (political question doctrine barred claims of a soldier's estate against contractor alleging design

defects in missile system after soldiers were killed in battle by friendly fire).

Here, defendants argue that each of the first through fourth and the sixth *Baker* tests mitigates in favor of applying the political question doctrine. I find defendants' arguments unpersuasive. As in *Lessin, supra,* and by direct contrast with *Corrie, supra,* in which the Ninth Circuit found the political question doctrine applicable, the matter fundamentally at issue here is defendants' performance of its contractual obligations to the government and to the plaintiffs rather than the advisability of any governmental policy-related decision.

Turning specifically to the six tests enumerated in *Baker*, there can be no serious argument that there has been any constitutional commitment of issues raised by plaintiffs' claims to any political department other than the judiciary. Plaintiffs' claims therefore do not implicate the first *Baker* test (a textually demonstrable constitutional commitment of the issue to a coordinate political department) in any degree.

With regard to the second *Baker* test (a lack of judicially discoverable and manageable standards), analysis of the provisions of the RIO contract establishes that it provides multiple relevant standards, as discussed above. Moreover, traditional principles of tort law provide additional such standards, and the fact that the torts at issue here were committed in the context of services performed under a contract with the military does nothing to render those standards inapplicable. Because defendants' conduct may by analyzed under the standards of care set forth in or incorporated by reference into the RIO contract and under general principles of negligence law and tort law, plaintiffs claims are not inextricable from the second *Baker* formulation.

As to the third *Baker* test (the impossibility of deciding the case without an initial policy determination of a kind clearly for nonjudicial discretion), it is clear that to determine whether

defendants may be liable for negligence and/or for fraud will not require the court to second-guess any governmental or military policy decision. The provisions of the RIO contract may be taken at face value without need for any inquiry into the propriety of the government's decision to enter into such a contract with a private contractor. For the same reasons, the fourth *Baker* test (the impossibility of undertaking resolution of the claims without expressing lack of the respect due coordinate branches of government) is likewise not inextricably linked with plaintiffs' claims: plaintiffs' claims allege defendants' negligence and fraud in connection with the provision of services under a contract. The government's decision to enter into the contract, the priority the government placed on the restoration of Iraqi oil production capacity, the government's decision to initiate military operations, the government's decision to restore Qarmat Ali and the like are simply not material to the question whether these defendants were negligent or committed fraud in the course of performing their contractual obligations.

All parties agree that the fifth *Baker* test (an unusual need for unquestioning adherence to a political decision already made) is inapplicable to plaintiffs' claims. I agree with the parties that the fifth test is inapplicable here.

Finally, as to the sixth *Baker* test (the potential for embarrassment due to multiple pronouncements by various departments on one question), adjudication of plaintiffs' claims would not raise any clear risk of multiple conflicting pronouncements on the same question. No governmental department has issued any pronouncement bearing on the question of defendants' liability. On the facts currently available in the record, there is therefore no indication that plaintiffs' claims could be inextricably linked with the sixth *Baker* test.

Because none of the *Baker* formulations is inextricable from the issues raised by

plaintiffs' claims, the political question doctrine does not deprive this court of subject-matter jurisdiction. *See Baker*, 369 U.S. at 217. Defendants' motion to dismiss is therefore denied to the extent premised on the political question doctrine.

## II.    Government Contractor Defense

Under the so-called "government contractor defense," where certain conditions are met a government contractor enjoys derivative sovereign immunity against tort actions arising out of the contractor's provision of services to the government:

> The government contractor defense is by now an established component of federal common law, but it was first recognized by the Supreme Court less than twenty years ago in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988). The defense is intended to implement and protect the discretionary function exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), which was enacted after World War II. **The defense allows a contractor-defendant to receive the benefits of sovereign immunity when a contractor complies with the specifications of a federal government contract.** *Boyle*, 487 U.S. at 511-12.

*Hanford Nuclear Reservation Litig. v. E.I. DuPont de Nemours & Co.*, 534 F.3d 986, 1000 (9th Cir. 2008) (emphasis supplied).[2]

---

[2] The *Hanford* court further described the history of the defense as follows:

> In 1940, the Supreme Court arguably planted the seeds of the government contractor defense in *Yearsley v. WA. Ross Constr. Co.*, 309 U.S. 18, 20-21, 60 S. Ct. 413, 84 L. Ed. 554 (1940). It held that an agent of the government could not be held liable under the Takings Clause for the defective construction of a dam that damaged land, as long as the agent followed government specifications for the dam's construction. **The Court limited the applicability of the defense to principal-agent relationships where the agent had no discretion in the design process and completely followed government specifications.** Nothing in *Yearsley* extended immunity to military contractors exercising a discretionary governmental function. *See Boyle*, 487 U.S. at 524-25. (J. Brennan, dissenting) (*Yearsley* is "a slender reed on which to base so drastic a departure from precedent" . . . . "[It] has never been read to immunize the discretionary acts of those who perform service contracts for the Government").

The government contractor defense was analyzed at length in *Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1136-1139 (D. Haw. 2008). The *Griffin* defendant was a subcontractor to a U.S. military contractor, tasked with providing security services at the Nimitz-MacArthur Command Center in Hawaii. *See Griffin*, 654 F. Supp. 2d at 1125. The *Griffin* plaintiffs were employees of the subcontractor who were terminated after allegedly blowing the whistle on violations of the subcontractor's obligations under the primary contract. *See id.*, at 1125-1128. When the plaintiffs brought an action against the subcontractor for wrongful termination, the subcontractor asserted the government contractor defense. *See id.* at 1136. The court found that "the government contractor defense is limited in its application to suits where precise government specifications as to the subject of the contract exist, and those specifications are the subject of the suit." *Id.*

The *Griffin* court analyzed the Ninth Circuit's application of the government contractor defense, as well as law review articles on the subject, and concluded that:

> The Ninth Circuit seems to limit the application of the defense to contracts involving specifications for the design or production of military equipment or operation of military facilities. *See In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 811 (9th Cir. 1992) ("That *Boyle* speaks of the military contractor defense as immunizing contractors only with respect to the military equipment they produce for the United States is consistent with the purposes the Court ascribes to that defense."); *In re Hanford Nuclear Reservation Litigation*, 534 F.3d 986, 1000 (9th Cir. 2008) ("[T]he government contractor defense applies not only to claims challenging the physical design of a military product, but also to the process by which such equipment is produced."). However, the Ninth Circuit also cites to *Yearsley* with approval, which did not involve a contract with the military.
>
> ---
>
> While some circuit courts began extending the *Yearsley* doctrine to military contractors as early as the 1960s, *see McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448-49 (9th Cir. 1983) (citing cases), other circuits held that *Yearsley* was clearly limited to principal-agent relationships and did not apply to military contractors, *see, e.g., Bynum v. FMC Corp.*, 770 F.2d 556, 564 (5th Cir. 1985).

*Hanford*, 534 F.3d at 1001 (emphasis supplied).

See *McKay* [*v. Rockwell Intern. Corp.*], 704 F.2d [444,] 448 [(9th Cir. 1983)] (citing to *Yearsley* as the first case to articulate the government contractor defense, which "protects a government contractor from liability for acts done by him while complying with government specifications during execution of performance of a contract with the United States").

*Id.* at 1137, n. 30. The *Griffin* court further noted that:

The first requirement for application of the government contractor defense is the existence of "reasonably precise specifications" which are approved by the government. [*Boyle*, 487 U.S.] at 512; *see also McKay v. Rockwell Intern. Corp.*, 704 F.2d 444, 451 (9th Cir. 1983). There must be a "'back and forth dialogue culminating in approval,' and '[a] continuous exchange between the contractor and the government' . . . [in order] to satisfy *Boyle*'s first condition[.]" *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 585 (9th Cir. 1986) (*quoting Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 702 (4th Cir. 1989)).

*Id.* at 1138 (first modification supplied; subsequent modifications original).

Defendants here assert that their "provision of engineering and logistical support services at Qarmat Ali" took place pursuant to the specifications of a contract with the government, and that they did not exceed their authority under those specifications. On this basis, defendants argue that they were merely "executing the will of the United States" and are entitled to the benefits of derivative sovereign immunity. The evidentiary record belies both of defendants' assertions.

The rationale underlying the government contractor defense is easy to understand. Where the government hires a contractor to perform a given task, and specifies the manner in which the task is to be performed, and the contractor is later haled into court to answer for a harm that was caused by the contractor's compliance with the government's specifications, the contractor is entitled to the same immunity the government would enjoy, because the contractor is, under those circumstances, effectively acting as an organ of government, without independent discretion. Where, however, the contractor is hired to perform the same task, but is allowed to exercise

discretion in determining how the task should be accomplished, if the manner of performing the task ultimately causes actionable harm to a third party the contractor is not entitled to derivative sovereign immunity, because the harm can be traced, not to the government's actions or decisions, but to the contractor's independent decision to perform the task in an unsafe manner. Similarly, where the contractor is hired to perform the task according to precise specifications but fails to comply with those specifications, and the contractor's deviation from the government specifications actionably harms a third party, the contractor is not entitled to immunity because, again, the harm was not caused by the government's insistence on a specified manner of performance but rather by the contractor's failure to act in accordance with the government's directives.

Assuming without deciding that the Ninth Circuit would apply the government contractor defense to the provision of the kinds of services KBR contracted to provide in Iraq under RIO and Task Order 3 – likely a justifiable assumption, *cf. Yearsley v. WA. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448-49 (9th Cir. 1983) – analysis of the RIO contract and of Task Order 3 fails to establish that the defendants' actions alleged to have caused plaintiffs' injuries were taken in direct compliance with any "reasonably precise" government directive. Quite to the contrary, defendants were contractually obliged to perform an environmental assessment of Qarmat Ali and to report any environmental hazards to the Army Corps of Engineers.[3] Defendants were under no contractual obligation to put their employees or third parties providing security in connection with defendants' operations into situations involving

---

[3] The fact that Task Order 3 mandated that the U.S. military pronounce a site "benign" before KBR commenced operations there is immaterial in this connection, since the "benign" designation did not obviate the need for independent environmental assessment by KBR.

the risk of environmental harm, to refrain from requiring employees or third parties to use appropriate protective gear and clothing when placed into such situations, or to withhold material information regarding such risk from persons placed into such situations.

Moreover, assuming *arguendo* that the government's specifications regarding defendants' obligations in connection with operations to be performed in an environmentally contaminated worksite were sufficiently precise to trigger the defense, plaintiffs have offered evidence tending to establish that the defendants violated those contractual duties, by failing to report the contamination at Qarmat Ali and by permitting the Oregon National Guard to perform duties at the site without appropriate protective gear.

Because defendants did not conduct operations at Qarmat Ali in accordance with precise government specifications and without independent discretion as to the manner in which the operations were to be performed, defendants are not entitled to the government contractor defense. *See Hanford Nuclear*, 534 F.3d at 1000. Defendants' motion to dismiss is therefore denied to the extent premised on the government contractor defense.

## III.    Combat Operations Exception

The Federal Tort Claims Act (the "FCTA") provides a waiver of sovereign immunity for claims against the government sounding in tort. One exception to that waiver is the combatant activities exception, codified at 28 U.S.C. § 2680(j), which expressly preserves the United States' sovereign immunity in connection with "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The Ninth Circuit has specified that he combatant activities exception is to be applied neither strictly nor liberally, but rather according to its plain language. *See Johnson v. United States*, 170 F.2d 767,

769 (9th Cir. 1948).

The *Johnson* court further clarified that, for the exception to apply, the alleged tortfeasor "must not only have been actually engaged in 'combatant activities' at the time covered by the complaint, but such 'combatant activities' must be shown to have taken place 'during time of war.'" *Id.* at 769-770. The *Johnson* court analyzed the exception as follows:

> 'Combat' connotes physical violence; 'combatant,' its derivative, as used here, connotes pertaining to actual hostilities; the phrase 'combatant activities,' of somewhat wider scope, and superimposed upon the purpose of the statute, would therefore include not only physical violence, but **activities both necessary to and in direct connection with actual hostilities.** The act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity,' but this fact does not make necessary a conclusion that all varied activities having an incidental relation to some activity directly connected with previously ended fighting on active war fronts must, under the terms of the Act, be regarded as and held to be a 'combatant activity.' To so hold might lead to results which need not here be considered.

> The rational test would seem to lie in the degree of connectivity. Aiding others to swing the sword of battle is certainly a 'combatant activity,' but the act of returning it to a place of safekeeping after all of the fighting is over cannot logically be cataloged as a 'combat activity.'

*Id.* at 770 (footnotes omitted; emphasis supplied).

In *Koohi*, discussed *supra* (arising out of the shooting down of a civilian aircraft by a United States warship), the Ninth Circuit clarified that "time of war" "has come to mean periods of significant armed conflict rather than times governed by formal declarations of war" for purposes of the combatant activities exception. *Koohi*, 976 F.2d at 1334. The *Koohi* court concluded that the armed conflict in which the civilian aircraft was mistaken for an enemy combatant aircraft was shut down constituted a time of war, and that shooting it down constituted a combatant activity. *See id.* at 1334-1336. The *Koohi* court found that the combatant activities

exception therefore applied to bar claims arising out of those combatant activities. *See id.* at 1335.

Although the combat activities exception to the FTCA by its own terms operates to *preserve* the federal government's independently existing sovereign immunity, and in no way suggests that involvement in the "combatant activities of the military or naval forces, or the Coast Guard" could *confer* sovereign immunity on any private actor that, absent such involvement, would lack such immunity,[4] defendants argue that, because they were purportedly integrated with and performing a common mission with the military at Qarmat Ali, within a wartime "theater of operation," the combatant activities exception operates to deprive this court of subject-matter jurisdiction over plaintiffs' claims on grounds of sovereign immunity. At least one court has expressly rejected defendants' theory that the combatant activities exception could operate in a manner analogous to field preemption, extending a shield of immunity over private, non-governmental actors when claims against them arise out of combatant activities:

> Whether the [small minority of courts that have applied the combatant activities exception to the FTCA to shield private contractors from state tort law liability] unwittingly confused the government contractor defense and the combatant activities exception to the FTCA, or whether they crafted an entirely new defense based on sovereign immunity and federal preemption, this Court declines to endorse such a defense for private contractors based solely on the fact that Defendants were operating in a combat zone. This Court can find no persuasive authority for the conclusion that the combatant activities exception preempts state tort law claims. The combatant activities exception to the FTCA is an explicit legislative preservation of sovereign immunity, while the government contractor defense is a judicially recognized affirmative defense, grounded in federal preemption and the discretionary function exception to the FTCA. The latter defense shields contractors only in military equipment

---

[4] Note in this regard the Ninth Circuit's specification that the words of the combatant activities exception should receive neither a strict nor a liberal interpretation but rather should be construed as meaning "exactly what they say. . . ." *Johnson*, 170 F.2d at 769.

procurement contracts and only when the government dictates design specifications. Private contractors are not entitled to sovereign immunity unless they are characterized as government employees, which Defendants are not. *Foster v. Day & Zimmermann, Inc.*, 502 F.2d 867, 874 (8th Cir. 1974) ("The doctrine of sovereign immunity may not be extended to cover the fault of a private corporation, no matter how intimate its connection with the government."). There is no express authority for judicially intermixing the government contractor defense and the combatant activities exception; nor is there authority for bestowing a private actor with the shield of sovereign immunity. Until Congress directs otherwise, private, non-employee contractors are limited to the government contractor defense and *Boyle*'s preemption analysis. Unless they qualify as employees or agents of the Government, private contractors may not bootstrap the Government's sovereign immunity.

*McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1330 (M.D. Fla. 2006) (footnote omitted) ("*McMahon I*"); *see also McMahon II*, 502 F.3d at 1366 (affirming *McMahon I* and formally declining to reach defendant's theory of preemption based on the combatant activities exception but expressly casting "considerable doubt" on its validity). However, other courts, including the D.C. Circuit, have interpreted the combatant activities exception as "embod[ying]" a "policy" of "the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit." *Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009). The *Saleh* court determined that "the policies of the combatant activities exception are equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military's control," and on that basis interpreted the combatant activities exception as embodying a policy to preempt state tort claims against private contractors where the tort claims arise out of combatant activities. *Id.*; *see also Taylor v. Kellogg Brown & Root Servs.*, Case No. 09-341, 2010 U.S. Dist. LEXIS 50610, *30, *31-32 (E.D. Va. Apr. 16, 2010) (in a case arising out of the electrocution of the plaintiff when

employees of KBR turned on a generator at a military base in Iraq in July 2007 while plaintiff was conducting repairs on it, combatant activities exception barred the plaintiff's claim because the generator was necessary for tank maintenance and tank maintenance was both necessary to and performed in direct connection with combatant activities); *but cf. Harris*, 618 F. Supp. 2d at 434 (in a case arising out of the electrocution of an army soldier in Iraq in January 2008 while using a shower facility maintained by KB&RS pursuant to a contract with the U.S. Army, combatant activities exception inapplicable because the maintenance services provided bu KB&RS at the military basis were not in direct connection with combatant activities); *Lessin*, 2006 U.S. Dist. LEXIS 39403 at *13-14 (in a case arising out of injuries sustained in Iraq in March 2004 by an army soldier escorting a commercial truck convoy owned and operated by KBR, combatant activities exception held inapplicable because KBR was engaged in conducting convoys in Iraq with military escorts rather than the manufacture of weapons).

Assuming without deciding that the Ninth Circuit would agree with the D.C. Circuit's decision in *Saleh*, construing the combatant activities exception as evidence of Congressional intent to preempt tort claims arising out of combatant activities, and would disagree with the *McMahon I* court's opinion that the plain language of the exception cannot be construed as conferring derivative sovereign immunity onto private contractors, the prerequisites for its application are not present here. While Qarmat Ali was undoubtedly a dangerous place to work, the operations defendants conducted there cannot accurately be characterized as constituting combatant activities, as necessary to combatant activities, or as undertaken in direct connection with combatant activities. The governing consideration here is necessarily that identified by the Ninth Circuit in *Johnson*: the "degree of connectivity" between the contractor's operations and

any "actual hostilities" undertaken by the military. *Johnson*, 170 F.2d at 770. The defendants' operations were undertaken in support of the goal of restoring Iraqi oil-production capacity, manifestly a foreign-policy-related goal rather than a combatant activity. That is, the defendants' operations were more akin to restoring the battlefield to productive use after the battle has ended than to aiding warriors to "swing the sword." *Id.* In this, defendants' operations were clearly more akin to providing base maintenance services (*see Harris*, 618 F. Supp. 2d at 434) or to conducting truck convoys through hostile territory with military escorts (*see Lessin*, 2006 U.S. Dist. LEXIS 39403 at *13-14) than to repairing a generator necessary for the performance of maintenance on the engines of war (*see Taylor*, 2010 U.S. Dist. LEXIS 50610, *30, *31-32).

Because the KBR defendants' operations at Qarmat Ali were neither necessary to nor in direct connection with actual hostilities involving the military, but rather were performed in support of the foreign-policy goal of restoring Iraqi oil production, plaintiffs' claims cannot be preempted in connection with the combatant activities exception to the FTCA waiver of sovereign immunity. Defendants' motion to dismiss is therefore denied to the extent premised on the combatant activities exception.

## CONCLUSION

For the reasons set forth above, defendants' motion (#45) to dismiss for lack of subject-matter jurisdiction is denied. The Court finds that this Order is appropriate for immediate appeal pursuant to 28 U.S.C. § 1292(b). The Order involves a controlling question of law as to which

/ / /

/ / /

/ / /

there is substantial ground for difference of opinion, and an immediate appeal from this Order

may materially advance the ultimate termination of the litigation.


Dated this 22nd day of October, 2010.

Honorable Paul Papak
United States Magistrate Judge