IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROCKY BIXBY, LAWRENCE ROBERTA,
SCOTT ASHBY, CHARLES ELLIS, MATTHEW
HADLEY, CARLOS AVALOS, JESUS BRUNO,
COLT CAMPREDON, STEPHEN FOSTER, BYRON
GREER, KELLY HAFER, DENNIS JEWELL,
STEPHEN MUELLER, VITO PACHECO, JOHN
RYDQUIST, KEVIN STANGER, RONALD
BJERKLUND, ADANROLANDO GARCIA, BRIAN
HEDIN, LEWIS MARTIN, CHARLES SEAMON,
RANDY KEIPER, MATT KUHNEL, DENNIS
ROSGEN, AARON ST. CLAIR, KEVIN WILSON,
JASON BLAIN, JAMES BORJA, DEVIN FIELDS,
LESLIE ING, RICHARD LAWRENCE, JAY
LOUISIANA, JAMES McGOWAN, DONALD
YEARGIN, JASON ARNOLD, CHRISTOPHER
WANGELIN, and MICHAEL O'RIELLY,

       Plaintiffs,

                                       3:09-CV-632-PK

v.

                                       FINDINGS AND
                                       RECOMMENDATION

KBR, INC., KELLOGG, BROWN & ROOT SERVICE,
INC., KBR TECHNICAL SERVICES, INC.,
OVERSEAS ADMINISTRATION SERVICES, LTD.,
SERVICE EMPLOYEES INTERNATIONAL, INC.,
HALLIBURTON COMPANY and HALLIBURTON
ENERGY SERVICES, INC.,

       Defendants.

PAPAK, Magistrate Judge:

      Plaintiffs Rocky Bixby, Lawrence Roberta, Scott Ashby, Charles Ellis, and Matthew

Page 1 - FINDINGS AND RECOMMENDATION

Hadley filed this action against defendants KBR, Inc., Kellogg, Brown & Root Service, Inc., KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc. (collectively, the "KBR defendants"), on June 8, 2009.  On September 8, 2009, plaintiffs amended their complaint, adding Carlos Avalos, Jesus Bruno, Colt Campredon, Stephen Foster, Byron Greer, Kelly Hafer, Dennis Jewell, Stephen Mueller, Vito Pacheco, John Rydquist, and Kevin Stanger as additional plaintiffs.  Plaintiffs amended their pleading a second time on February 2, 2010, adding Ronald Bjerklund, Adanrolando Garcia, Brian Hedin, Lewis Martin, and Charles Seamon as additional plaintiffs.  On June 25, 2010, plaintiffs amended their complaint a third time, adding Randy Keiper, Matt Kuhnel, Dennis Rosgen, Aaron St. Clair, and Kevin Wilson as further additional plaintiffs.  On October 27, 2010, plaintiffs amended their complaint a fourth time, adding Jason Blain, James Borja, Devin Fields, Leslie Ing, Richard Lawrence, Jay Louisiana, James McGowan, and Donald Yeargin as further additional plaintiffs, and adding Halliburton Company and Halliburton Energy Services, Inc. (collectively, the "Halliburton defendants"), as additional defendants.  Plaintiffs amended their complaint a fifth time on January 10, 2011, adding as additional plaintiffs Jason Arnold, Thomas Barella, Daniel Grover, Christopher Wangelin, and Michael O'Rielly.  Plaintiffs voluntarily dismissed Barella as a plaintiff in this action on the following day, January 11, 2011, and voluntarily dismissed Grover as a plaintiff in this action on February 25, 2011.  In their fifth amended complaint, plaintiffs allege defendants' liability for negligence and for fraud arising out of plaintiffs' exposure to sodium dichromate and subsequent hexavalent chromium poisoning while stationed as Oregon National Guardsmen in Iraq and assigned to duty at the Qarmat Ali water plant between May and September 2003.

Page 2 - FINDINGS AND RECOMMENDATION

Now before the court are the Halliburton defendants' motion (#145) to dismiss for lack of personal jurisdiction and the Halliburton defendants' motion (#172) to dismiss for lack of subject-matter jurisdiction. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, the Halliburton defendants' motion to dismiss for lack of personal jurisdiction should be granted, and the Halliburton defendants' motion to dismiss for lack of subject-matter jurisdiction should be denied as moot.

## LEGAL STANDARDS

A motion to dismiss for lack of personal jurisdiction is governed by Federal Civil Procedure Rule 12(b)(2). *See* Fed. R. Civ. P. 12(b)(2). "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008), *citing Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *citing Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, "the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Id.*, *quoting Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). In the absence of such an evidentiary hearing, the court accepts uncontroverted allegations contained within the plaintiff's complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor. *See id.*

Page 3 - FINDINGS AND RECOMMENDATION

## FACTUAL BACKGROUND

**I.      The Halliburton Defendants and their Contacts with Oregon**

**A.      Halliburton Company**

Halliburton Company ("the "Halliburton parent") is a corporation organized under the laws of the State of Delaware with its principal place of business in Houston, Texas.  The Halliburton parent, a publicly traded holding company, is and at all material times was the corporate parent of Halliburton Energy Services, Inc., and in 2003 and 2004 was also the corporate parent of the KBR defendants.  Although plaintiffs allege that the Halliburton parent is registered to do business in Oregon and maintains a registered agent for service of process in Salem, OR, the Halliburton defendants offer evidence that the Halliburton parent is not registered to do business in Oregon, does not do business in Oregon, maintains no registered agent for service of process in Oregon, has no employees in Oregon, and owns no property in Oregon.

**B.      Halliburton Energy Services, Inc.**

Halliburton Energy Services, Inc. ("HESI"), is a corporation organized under the laws of the State of Delaware with its principal place of business in Houston, Texas.  As noted above, HESI is now, and at all material times was, wholly owned by the Halliburton parent.

HESI is registered to do business in Oregon, and maintains a registered agent for service of process in Oregon. However, HESI has no offices or employees in Oregon, and does not do business in Oregon, except that it has made a small number of sales in Oregon.  The Halliburton defendants offer uncontroverted evidence that less than 0.1% of HESI's sales between 2006 and 2010 took place in Oregon.

HESI employees worked at the Qarmat Ali water treatment plant during the 2003-2004

Page 4 - FINDINGS AND RECOMMENDATION

timeframe, apparently as subcontractors working under Kellogg, Brown & Root Service, Inc,

pursuant to the Interorganization Agreement discussed below.

## II.    Underlying Facts

Kellogg, Brown & Root Service, Inc. ("KB&RS") entered into Contract No. DACA63-

03-D-0005 – known as the "Restore Iraqi Oil" or "RIO" contract – with the U.S. Army Corps of

Engineers on March 8, 2003, pursuant to which KB&RS would perform tasks as ordered by the

U.S. Army Corps of Engineers in connection with efforts to restore the infrastructure underlying

the Iraqi oil industry.

Combat operations in Iraq began shortly thereafter, on March 19, 2003.

On March 20, 2003, the Corps of Engineers issued "Task Order 3," which governed the

services to be provided by KB&RS at Qarmat Ali and other facilities.  Under Task Order 3, the

U.S. military would declare a given worksite to be "benign" before KB&RS would begin

operations there.  According to the deposition testimony of retired Brigadier General of the U.S.

Army Corps of Engineers Robert Crear and of retired U.S. Army Corps of Engineers employee

Gordon Sumner, "benign" referred in this context to freedom from combatant activity and from

nuclear or chemical weapons, and did not foreclose the possibility of environmental hazards,

including hazardous (but not weaponized) chemicals.  Support for this interpretation can be

found in the provisions of Task Order 3, which suggest that pronouncement of a site as "benign"

did not, for example, foreclose the need for environmental assessment.

It appears from the language of Task Order 3 that KB&RS was responsible for providing

the Corps of Engineers with an environmental assessment of any facility in which they undertook

operations.  The obligation to provide such assessments included the obligation to report and

evaluate any environmental hazards.  According to the deposition testimony of General Crear and of Sumner, KB&RS was not merely permitted but required under Task Order 3 and the RIO contract to take all necessary precautions to safeguard personnel who might potentially be exposed to environmental hazards at worksites, including the wearing of protective gear and/or the closing down of operations at any unsafe site.

In addition, the RIO contract sets forth specific health and safety requirements with which KB&RS was required to comply in performing services under the contract, including Overseas Environmental Baseline Guidance Document 4715.5-G (Mar. 2000), OHSA standards, industry standards, CERCLA requirements, environmental assessment requirements, Army safety regulations, and Army Corps of Engineers safety standards.  These requirements were never waived.

In addition, the RIO contract provides that the U.S. government will indemnify KB&RS for any claims involving bodily injury or death arising out of KB&RS' provision of services under the contract.

On March 21, 2003, KB&RS entered into a contract styled as an "Interorganization Agreement" with Halliburton Worldwide Limited (a Cayman Island corporation with its principal offices in Houston, Texas), "including any of its subsidiaries performing work or services" under the Interorganization Agreement, for the purpose of fulfilling KB&RS' obligations under the RIO contract.  According to the testimony of James Gregory Badgett, who in 2003 and 2004 acted as the Deputy Project Manager for Project Rio, the Halliburton defendants and KBR defendants set up "contract teams" within which "the different Halliburton subsidiaries [which at this time included the KBR defendants] operated as a single operating unit whose function was to

implement the RIO contract."  Badgett Depo., Sugerman Decl. Exh. 7, at 11.  Badgett expressly

testified that, despite their "different corporate names," the Halliburton subsidiaries in these

contract teams acted as a single operating unit for the purpose of fulfilling the RIO contract.

*Id.* at 11-12.  He expressly testified that this was true of the work performed at Qarmat Ali.  *Id.* at

12.

      In April 2003, the KBR defendants and HESI began performing work at Qarmat Ali in

fulfillment of KB&RS' obligations under the RIO contract.  According to the testimony of Ralph

Stephenson, a KBR environmental manager, KBR personnel were aware of the presence of

sodium dichromate at the Qarmat Ali site even before these operations began.  *See* Stephenson

Depo., Sugerman Decl. Exh. 8, at 72-73.

      On May 1, 2003,  then-President Bush declared an end to major combat activities in Iraq.

      In May 2003, the Oregon National Guard was assigned to the Doha Operations Center in

Kuwait.  Beginning some time after May 1, 2003, the KBR defendants, or some of them, would

contact the Doha Operations Center and request assistance with security issues on a regular,

perhaps daily basis, in accordance with the provisions of the RIO contract and Task Order 3.  On

some occasions, members of the Oregon National Guard would receive security assignments to

the Qarmat Ali water plant, where they were allegedly exposed to sodium dichromate.

      In addition to sodium dichromate already present at Qarmat Ali at the time oil-restoration

operations began, it appears that defendants brought sodium dichromate to the site in or before

June 2003, and continued storing and working with the chemical at the site rather than employ

alternative, less hazardous anti-corrosives.

      In an internal email, in June 2003 a KBR employee discussed sodium dichromate

Page 7 - FINDINGS AND RECOMMENDATION

contamination at Qarmat Ali and recommended that remedial measures be taken, including excavating and placing in drums all contaminated soil. On August 7, 2003, KBR personnel performed a limited environmental assessment and collected samples of soil potentially contaminated with sodium dichromate at the Qarmat Ali worksite.  The assessors reported that sodium dichromate was present over large areas of the site.  The assessors recommended that the entire worksite be closed off other than to "critical personnel performing critical operations," and that such personnel should wear USEPA Level C personal protective equipment when on site.

Defendants advised the Oregon National Guard of the presence of sodium dichromate at Qarmat Ali on or around August 12, 2003, when KBR issued an official report to the army detailing the chemical's presence.  The KBR report indicated that sodium dichromate at Qarmat Ali constituted a serious health hazard.

In or around August 23 to 25, it appears that medical and legal personnel employed by one or more Halliburton-related entities coordinated a unified medical and legal response to the sodium dichromate issues on behalf of the companies performing work at Qarmat Ali.  The defendants' coordinated medical response included testing all "KBR RIO personnel" deployed in the Qarmat Ali region, and their coordinated legal response included advising all employees of the defendants deployed to Qarmat Ali of the possibility that they had been exposed to hazardous chemicals, including sodium dichromate.

The Qarmat Ali site was shut down September 9, 2003.

Plaintiffs are members of the Oregon National Guard allegedly exposed to sodium dichromate at Qarmat Ali in 2003 and who have allegedly been harmed by their exposure.

## ANALYSIS

As noted above, the Halliburton defendants challenge this court's exercise of personal jurisdiction over them, as well as this court's exercise of subject-matter jurisdiction over plaintiffs' claims.

**I.      Motion to Dismiss for Lack of Personal Jurisdiction**

"When no federal statute governs personal jurisdiction, the district court applies the law of the forum state." *Id.*, *citing Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Oregon's long-arm statute creates a standard co-extensive with federal jurisdictional standards, *see* Or. R. Civ. P. 4L, so a federal court sitting in the District of Oregon may exercise personal jurisdiction wherever it is possible to do so within the limits of federal constitutional due process, *see*, *e.g.*, *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990).

Federal due process jurisprudence requires that, to be subject to the personal jurisdiction of a federal court, a nonresident defendant must have at least "'minimum contacts'" with the court's forum state such that "the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Two forms of personal jurisdiction are available for application to a nonresident defendant: general personal jurisdiction and specific personal jurisdiction. For the reasons set forth below, the court may not properly exercise either general or specific personal jurisdiction over either Halliburton defendant, and the Halliburton defendants' motion to dismiss for lack of personal jurisdiction should be granted.

A.        **General Personal Jurisdiction**

"For general jurisdiction to exist over a nonresident defendant . . . , the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Schwarzenegger*, 374 F.3d at 801, *quoting Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) and *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000). "This is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Id.*, *citing Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986).

It is plaintiffs' burden to establish general personal jurisdiction over each defendant. *See Boschetto*, 539 F.3d at 1015. Here, plaintiffs do not assert that the court may exercise general personal jurisdiction over the Halliburton defendants and, indeed, neither Halliburton defendant's contacts with Oregon constitute the kind of "continuous and systematic general business contacts . . . that approximate physical presence in the forum state" required to establish general personal jurisdiction.

I nevertheless note the Ninth Circuit's recent decision in *Bauman v. DaimlerChrysler Corp.*, Case No. 07-15386, 2011 U.S. App. LEXIS 10010 (9th Cir. 2011), in which the Ninth Circuit affirmed that a corporate parent may be subject to a federal court's general personal jurisdiction where the corporate parent lacks the requisite continuous and systematic business contacts with the forum in which the court is located, but a subsidiary (including a non-party subsidiary) of the parent has such contacts. *See Bauman*, 2011 U.S. App. LEXIS 10010 at *26-28. Where a corporate subsidiary is subject to general personal jurisdiction in a given forum

based on its business contacts, the subsidiary's parent is likewise subject to general personal jurisdiction in the forum under the so-called agency theory of personal jurisdiction where "the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the [parent] corporation that if it did not have a *representative* to perform them, the [parent] corporation's own officials would undertake to perform substantially similar services," *id.* at *27-28 (emphasis original), *quoting Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) (*per curiam*), *quoting Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994), and where the parent has some cognizable right to control the subsidiary's operations (regardless of whether the right to control is actually exercised), *see id.* at *34-38. Here, however, plaintiffs have not met their burden to produce evidence sufficient to establish that either Halliburton defendant is the corporate parent of any subsidiary with continuous and systematic business contacts approximating physical presence in Oregon.

For the foregoing reasons, on the basis of the current evidentiary record, the court may not properly exercise general personal jurisdiction over either of the Halliburton defendants at this time.

### B.    Specific Personal Jurisdiction

The courts of the Ninth Circuit apply a three-pronged test for determining whether the exercise of specific personal jurisdiction over a nonresident defendant may be appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice,
*i.e.* it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802, *quoting Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).

The plaintiff bears the burden of satisfying the first two prongs of the test, whereupon the burden

shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not

be reasonable." *Id.*, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

In the context of cases that sound primarily in tort, courts have considered it sufficient to

satisfy the first prong of the test where the *only* contact a nonresident defendant had with the

forum state was "the 'purposeful direction' of a *foreign* act having *effect* in the forum state."

*Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986)

(emphasis original), *citing Calder v. Jones*, 465 U.S. 783, 789 (1984).  This "'effects' test requires

that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the

forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum

state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  "The requirement is but a

test for determining the more fundamental issue of whether a 'defendant's conduct and connection

with the forum state are such that he should reasonably anticipate being haled into court there.'"

*Id.*, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Under the

effects test, "jurisdiction may be exercised with a *lesser showing of minimum contact* than would

otherwise be required if considerations of reasonableness dictate." *Haisten*, 784 F.2d at 1397

(emphasis original), *citing Burger King*, 471 U.S. at 476-477.

The second prong of the test requires that the plaintiff's claim arise out of the nonresident

defendant's forum-related activities.  *See Boschetto*, 539 F.3d at 1016.

At the third prong of the test, as noted above, the burden shifts to the defendant to present a "compelling case" to rebut the presumption that the exercise of specific personal jurisdiction would be reasonable.  *See id.*

> In determining reasonableness, th[e] [courts of the Ninth] [C]ircuit examine[] seven factors:  the extent of purposeful interjection; the burden on the defendant to defend the suit in the chosen forum; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in the dispute; the most efficient forum for judicial resolution of the dispute; the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and the existence of an alternative forum.

*Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386 (9th Cir. 1990), *citing Federal Deposit Ins. Corp. v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir. 1987).  "The court[s] must balance the seven factors to determine whether the exercise of jurisdiction would be reasonable."  *Id.*, *citing British-American*, 828 F.2d at 1442.

Plaintiffs' fifth amended complaint contains no allegations that either Halliburton defendant performed any intentional act directed toward Oregon or toward any plaintiff in this action, or otherwise took any action to avail itself of the privilege of conducting activities in Oregon.  However, at oral argument on the Halliburton defendants' motions plaintiffs advanced the argument that the court could exercise specific personal jurisdiction over the Halliburton defendants on the basis of evidence that the Halliburton defendants took part in preparing a unified medical and legal response to the sodium dichromate exposure situation at Qarmat Ali. However, plaintiffs' evidence that the defendants prepared such a unified medical and legal response indicates that defendants began coordinating their response in or around August 23, 2003, after the plaintiffs had already learned that they had been potentially exposed to sodium dichromate at the Qarmat Ali site.  In consequence, there appears to be no basis for concluding

Page 13 - FINDINGS AND RECOMMENDATION

that any aspect of the defendants' unified response was purposefully directed into Oregon.

Moreover, there is no sense in which the plaintiffs' claims against the Halliburton defendants

arise out of the unified response prepared in August 23-25, 2003.  I therefore conclude that the

court may not properly exercise specific personal jurisdiction over the Halliburton defendants on

the basis of the defendants' unified medical and legal response to the sodium dichromate

exposure situation at Qarmat Ali.

      Plaintiffs take the position that the Halliburton defendants may nevertheless be subject to

specific personal jurisdiction in Oregon based on the alleged Oregon-directed activities of the

KBR defendants, over which the court has already determined that it may appropriately exercise

specific personal jurisdiction.  *See* Opinion and Order (#44) dated April 12, 2010.  Specifically,

plaintiffs take the position that the KBR defendants' Oregon-directed activities may properly be

imputed to the Halliburton defendants based on either the theory that the Halliburton defendants

and the KBR defendants were engaged in a joint venture at Qarmat Ali, and were thus in a

relationship of mutual agency, or the theory that the KBR defendants otherwise acted as the

Halliburton defendants' agents when they took their Oregon-directed actions.

      The legal principles underpinning plaintiffs' agency theory of specific personal

jurisdiction are theoretically sound.  "For purposes of personal jurisdiction, the actions of an

agent are attributable to the principal."  *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990),

*citing Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 419 (9th Cir. 1977).  Thus,

the court may, as plaintiffs argue, exercise specific personal jurisdiction over the Halliburton

defendants if plaintiffs can establish that the KBR defendants acted as the Halliburton

defendants' agents and within the scope of their agency when they allegedly intentionally

Page 14 - FINDINGS AND RECOMMENDATION

misrepresented conditions at the Qarmat Ali site to the plaintiffs and allegedly intentionally

withheld from them the information that the site was contaminated with hexavalent chromium.

"While the mere existence of a parent-subsidiary relationship has been held in itself to

constitute insufficient evidence of control so as to subject the parent to service for the acts of the

subsidiary under the agency rationale. . . , if a common law agency is found to exist, the parent

may properly be served [on the basis of the agent/subsidiary's actions]." *Wells Fargo*, 556 F.2d

at 420 (citations omitted).  Moreover, "establishment of the requisite 'agency' control may be

even easier when a parent-subsidiary relationship is involved. . . ." *Id.* at 419 (citations omitted).

Regarding the agency relationship, Oregon law provides that:

Agency is the fiduciary relationship that

> "results from the manifestation of consent by one person to another that
> the other shall act on his behalf and subject to his control, and consent by
> the other so to act." *Rough & Ready Lumber v. Blue Sky Forest Products*,
> 105 Or App 227, 231, 804 P2d 498 (1991) (quoting *Restatement (Second)
> Agency* § 1 (1958)).
>
> An agency relationship may be evidenced by an express agreement between the
> parties, or it may be implied from the circumstances and the conduct of the
> parties. *Durham v. Warnberg*, 62 Or App 378, 382, 660 P2d 208 (1983).  In all
> cases, however, both the principal's consent to the agency and the principal's right
> to control the agent are essential elements of the relationship. *Cain v. Rijken*, 300
> Or 706, 713, 717 P2d 140 (1986); *Mid-River Transportation Services, Inc. v.
> VanPelt*, 121 Or App 532, 536, 854 P2d 506, *rev den* 318 Or 97 (1993).

*Larrison v. Moving Floors*, 127 Or. App. 720, 723 (1994).

In Oregon, "[a] joint venture is a partnership for a single transaction.  Partnership law

controls joint ventures." *Susitna, Ltd. v. Pacific First Federal*, 118 Or. App. 126, 130, n. 3

(1993), *citing Dority v. Driesel*, 75 Or. App. 180, 183 (1985).  Oregon law recognizes that "joint

venturers are agents of each other and . . . the act of a joint venturer within the scope of the

venture is binding on the joint venture." *Stone-Fox, Inc. v. Vandehey Dev. Co.*, 290 Or. 779, 786 (1981) (citations omitted). Under Oregon law, the existence of a joint venture may not be assumed, but rather the burden of establishing that a joint venture exists is on the party alleging its existence. *See Dean Vincent, Inc. v. Russell's Realty, Inc.*, 268 Or. 456, 464 (1974). Although "a contract of joint adventure need not be express, but may be implied in whole or in part from the conduct of the parties," *id.* at 465 (citations omitted), the existence of a joint venture will not be found in the absence of an express joint venture agreement, an agreement to share losses and profits arising out of the venture, an agreement that each venturer may exert control over the joint venture, *see Susitna*, 118 Or. App. at 130, or some other evidence that each purported venturer has "the right . . . to share in the profits, . . . liability to share losses, and the right to exert some control over the business" of the venture, *Stone-Fox*, 290 Or. at 783.

Plaintiffs' evidentiary support for their joint venture theory is largely if not exclusively limited to the Interorganization Agreement, the Halliburton parent's 2003 10-K Annual Report, and Badgett's testimony regarding the organization of the entities working with KB&RS to fulfill Take Order 3 into "contract teams" operating as "a single operating unit whose function was to implement the RIO contract." The RIO contract provides that KB&RS would perform tasks as ordered by the U.S. Army Corps of Engineers in connection with efforts to restore the infrastructure underlying the Iraqi oil industry. KB&RS entered into the "Interorganization Agreement" with Halliburton Worldwide Limited ("Halliburton Worldwide"), "including any of its subsidiaries performing work or services" under the Interorganization Agreement, for the purpose of fulfilling KB&RS' obligations under the RIO contract. Far from providing for sharing of profits and losses arising out of the performance of KB&RS' contractual obligations under the

Page 16 - FINDINGS AND RECOMMENDATION

RIO contract, the Interorganization Agreement expressly provides to the contrary that KB&RS would pay Halliburton Worldwide for its provision of services, materials, products, or supplies under the agreement according to a schedule of rates specified in advance, and that Halliburton Worldwide would issue invoices to KB&RS for all such payments. Moreover, the Interorganization Agreement specifies that Halliburton Worldwide (including its subsidiaries performing work under the agreement) was, rather than a joint venturer with KB&RS, "an independent contractor with respect to all work done and services performed" under the agreement, that neither Halliburton worldwide "nor anyone used or employed by [Halliburton Worldwide] shall be deemed for any purpose to be the agent, servant, or representative of [KB&RS] in the performance of such work or services," and that KB&RS would "have no direction or control of [Halliburton Worldwide] or its employees and agents except in the results to be obtained." It thus appears that the Interorganization Agreement establishes that the relationship among KB&RS and the other KBR defendants and Halliburton defendants lacked the essential characteristics of a joint venture, including the elements of profit-sharing, joint liability for losses, and mutual agency and control.

The Halliburton parent's 2003 10-K Annual Report to the SEC indicates that the Halliburton parent is involved in five "business segments," one of which – the Engineering and Construction Group – "operat[es] as KBR." The report additionally refers to the employees of the KBR defendants and of HESI as though they were employees of the Halliburton parent itself and likewise describes the profits generated by KB&RS in connection with the RIO contract as profits earned by the Halliburton parent. Plaintiffs argue that the report constitutes evidence that the KBR defendants and the Halliburton defendants were "effectively one." However, the

Page 17 - FINDINGS AND RECOMMENDATION

manner in which the Halliburton parent elects to report the collective profits and operations to the SEC is not dispositive as to whether the KBR defendants and Halliburton defendants were engaged in a joint venture at Qarmat Ali. While profits earned by a Halliburton subsidiary entity such as KB&RS may increase the value of shares in the Halliburton parent, the evidence is that KB&RS' profits under the RIO contract were not pooled among the other KBR defendants and the Halliburton defendants, but rather were earned and retained by KB&RS. Under the Interorganization Agreement, KB&RS' payments to the other defendants were made according to a pre-established schedule of rates rather than as proportional shares of profits from the contract.

Badgett's testimony does not suggest that the conduct of the parties on the ground effected any material alteration of the parties' contractual relationship. Although Badgett testified that the KBR defendants and HESI set up "contract teams" within which "the different Halliburton subsidiaries [including the KBR defendants] operated as a single operating unit whose function was to implement the RIO contract," he did not indicate that the different subsidiaries shared profits or liability for losses, or that each defendant was permitted to exert control over the fulfillment of KB&RS' contractual obligations.

In the absence of any evidence from which a trier of fact could reasonably conclude that the KBR defendants and Halliburton defendants were engaged in a joint venture at Qarmat Ali, plaintiffs have failed to meet their burden to establish the existence of such a joint venture. In consequence, plaintiffs are unable to meet their burden to establish specific personal jurisdiction over the Halliburton defendants on a joint ventureship theory.[1]

---

[1] At oral argument plaintiffs raised the question whether the Halliburton defendants may be estopped from denying that the defendants were engaged in a joint venture at Qarmat Ali, on the theory that the defendants expressly adopted the position that they were engaged in a joint

Page 18 - FINDINGS AND RECOMMENDATION

The provisions of the RIO contract, Task Order 3, and the Interorganization Agreement similarly undercut plaintiffs' theory that the KBR defendants acted within the scope of their agency as the Halliburton defendants' agents when they allegedly intentionally misrepresented conditions at the Qarmat Ali site to the plaintiffs and allegedly intentionally withheld from them the information that the site was contaminated with hexavalent chromium. Under the controlling agreements, KB&RS was the contractor with primary responsibility to perform services for the Corps of Engineers at Qarmat Ali, and all remaining defendants were independent contractors providing work, services, materials, products and supplies as ordered by KB&RS. No party had any right to exert control over any other party, except insofar as KB&RS had the right to exert control over all other parties' work "in the results to be obtained." Plaintiffs point to no evidence that, contrary to these provisions, KB&RS and/or the other KBR defendants were subject to the control of either Halliburton defendant, or both of them, for purposes of performing work at Qarmat Ali. Plaintiffs therefore have not met their burden to establish specific personal jurisdiction over the Halliburton defendants on an agency theory.

For the foregoing reasons, the court may not properly exercise specific personal jurisdiction over either of the Halliburton defendants.

## II.    Subject-Matter Jurisdiction

The Halliburton defendants challenge the court's exercise of subject-matter jurisdiction over the claims in this action. The Halliburton defendants argue that this court lacks subject-

---

venture in connection with previously conducted arbitral proceedings, that such position was essential to their case in those proceedings, and that they received a favorable result in consequence of having adopted that position. I do not address this argument, however, as plaintiffs offer no evidence in support of their assertions regarding the arbitral proceedings or defendants' legal position espoused therein.

matter jurisdiction over plaintiffs' claims by operation of the combatant activities exception to the

Federal Tort Claims Act, under the political question doctrine, and under principles of derivative

sovereign immunity.

In light of my finding that this court lacks personal jurisdiction over the Halliburton

defendants and my recommendation that the Halliburton defendants' motion to dismiss for lack

of personal jurisdiction be granted, I further find that the court need not consider the Halliburton

defendants' later-filed motion to dismiss for lack of subject-matter jurisdiction and therefore

recommend that the motion to dismiss for lack of subject-matter jurisdiction be denied as moot.[2]

## CONCLUSION

For the reasons set forth above, the Halliburton defendants' motion (#145) to dismiss for

lack of personal jurisdiction should be granted, the Halliburton defendants' motion (#172) to

dismiss for lack of subject-matter jurisdiction should be denied as moot, and plaintiffs' claims

should be dismissed to the extent alleged against the Halliburton defendants.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation.  If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

/ / /

---

[2]  In so recommending, I note that I have previously addressed a similar, indeed largely identical motion to dismiss for lack of subject-matter jurisdiction filed by the KBR defendants, which I denied on its merits in my Opinion and Order (#89) dated August 30, 2010.  My analysis of the Halliburton defendants' motion to dismiss for lack of subject-matter jurisdiction reveals no grounds to support the conclusion that my previous disposition was in error.

Page 20 - FINDINGS AND RECOMMENDATION

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 16th day of June, 2011.

 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 21 - FINDINGS AND RECOMMENDATION