IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROCKY BIXBY, LAWRENCE ROBERTA,
SCOTT ASHBY, CHARLES ELLIS, MATTHEW
HADLEY, JESUS BRUNO,COLT CAMPREDON,
STEPHEN FOSTER, BYRON GREER, KELLY
HAFER, DENNIS JEWELL, STEPHEN
MUELLER, VITO PACHECO, JOHN RYDQUIST,
KEVIN STANGER, RONALD BJERKLUND,
ADANROLANDO GARCIA, BRIAN HEDIN,
CHARLES SEAMON, RANDY KEIPER, MATT
KUHNEL, DENNIS ROSGEN, AARON
ST. CLAIR, KEVIN WILSON, JASON BLAIN,
JAMES BORJA, DEVON FIELDS,  LESLIE ING,
RICHARD LAWRENCE, JAY LOUISIANA,
 JAMES McGOWAN, DONALD YEARGIN,
JASON ARNOLD, and MICHAEL O'RIELLY,

   Plaintiffs,

               3:09-CV-632-PK

v.              OPINION AND
               ORDER

KBR, INC., KELLOGG, BROWN & ROOT SERVICE,
INC., KBR TECHNICAL SERVICES, INC.,
OVERSEAS ADMINISTRATION SERVICES, LTD.,
and SERVICE EMPLOYEES INTERNATIONAL, INC.,

   Defendants.

PAPAK, Magistrate Judge:

   Plaintiffs Rocky Bixby, Lawrence Roberta, Scott Ashby, Charles Ellis, and Matthew

Hadley filed this action against defendants KBR, Inc., Kellogg, Brown & Root Service, Inc.,

Page 1 - OPINION AND ORDER

KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc. (collectively, the "KBR defendants"), on June 8, 2009. On September 8, 2009, plaintiffs amended their complaint, adding Carlos Avalos, Jesus Bruno, Colt Campredon, Stephen Foster, Byron Greer, Kelly Hafer, Dennis Jewell, Stephen Mueller, Vito Pacheco, John Rydquist, and Kevin Stanger as additional plaintiffs. Plaintiffs amended their pleading a second time on February 2, 2010, adding Ronald Bjerklund, Adanrolando Garcia, Brian Hedin, Lewis Martin, and Charles Seamon as additional plaintiffs. On June 25, 2010, plaintiffs amended their complaint a third time, adding Randy Keiper, Matt Kuhnel, Dennis Rosgen, Aaron St. Clair, and Kevin Wilson as further additional plaintiffs. On October 27, 2010, plaintiffs amended their complaint a fourth time, adding Jason Blain, James Borja, Devin Fields, Leslie Ing, Richard Lawrence, Jay Louisiana, James McGowan, and Donald Yeargin as further additional plaintiffs, and adding Halliburton Company and Halliburton Energy Services, Inc. (collectively, the "Halliburton defendants"), as additional defendants. Plaintiffs amended their complaint a fifth time on January 10, 2011, adding as additional plaintiffs Jason Arnold, Thomas Barella, Daniel Grover, Christopher Wangelin, and Michael O'Rielly. By and through their fifth amended complaint, plaintiffs allege all defendants' liability for negligence and for fraud arising out of plaintiffs' exposure to sodium dichromate and subsequent hexavalent chromium poisoning while stationed as Oregon National Guardsmen in Iraq and assigned to duty at the Qarmat Ali water plant between May and September 2003.

The parties stipulated to the dismissal of Barella as a plaintiff in this action on January 11, 2011, and to the dismissal of Grover as a plaintiff in this action on February 25, 2011. On June 16, 2011, I recommended that plaintiffs' claims against the Halliburton defendants be

dismissed for lack of personal jurisdiction, and on July 20, 2011, Judge Hernandez adopted my recommendation without modification.

On September 30, 2011, the remaining defendants (specifically, the KBR defendants) moved for summary judgment as to the limited issue of causation only. On November 7, 2011, plaintiffs' expert witness Dr. Arch Carson provided an expert report ostensibly to supplement an expert report he had previously provided on June 7, 2011. On November 14, 2011, plaintiffs filed an opposition to defendants' summary judgment motion in significant reliance on Carson's November 2011 report. On December 16, 2011, the parties stipulated to the dismissal of Avalos, Martin, and Wangelin as plaintiffs in this action.

Now before the court is defendants' motion (#225) for imposition of sanctions in connection with Carson's November 2011 report and related declaration, which defendants characterize as untimely with respect to plaintiffs' June 10, 2011, deadline (#189) for designation of experts. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, defendants' motion for imposition of sanctions is granted in part and denied in part as set forth below.

## LEGAL STANDARDS

Disclosure of expert testimony is governed by Federal Civil Procedure Rule 26(a)(2). Rule 26(a)(2) provides in relevant part as follows:

(A)     *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B)     *Witnesses Who Must Provide a Written Report.* **Unless otherwise stipulated or ordered by the court, this disclosure must be**

**accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case** or one whose duties as the party's employee regularly involve giving expert testimony.  The report must contain:

> (i)     a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)    the facts or data considered by the witness in forming them;
>
> (iii)   any exhibits that will be used to summarize or support them;
>
> (iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi)    a statement of the compensation to be paid for the study and testimony in the case.

> \* \* \*

> (D)    *Time to Disclose Expert Testimony.* A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
>
> > (i)     at least 90 days before the date set for trial or for the case to be ready for trial; or
> >
> > (ii)    if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.
>
> (E)    *Supplementing the Disclosure.* **The parties must supplement these disclosures when required under Rule 26(e).**

Fed. R. Civ. P. 26(a)(2) (bolded emphasis supplied).

Regarding a party's duty to supplement expert disclosures, Federal Civil Procedure Rule

26(e)(2) provides that "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B),

the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Under Federal Civil Procedure Rule 26(a)(3), pretrial disclosures are due "at least 30 days before trial," unless the court orders otherwise.

Federal Civil Procedure Rule 37(c) authorizes, *inter alia*, the imposition of sanctions against a party who fails to identify a witness or to provide information required under Federal Civil Procedure Rule 26(a) or (e), including in particular the exclusion sanction (except where the failure was "substantially justified" or "harmless"):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)  may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)  may inform the jury of the party's failure; and
>
> (C)  may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).[1]

---

[1] The orders listed in Federal Civil Procedure Rule 37(b)(2)(A)(i)-(vi) are as follows:

(i)  directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

## FACTUAL BACKGROUND

### I.    Relevant Factual History[2]

Kellogg, Brown & Root Service, Inc. ("KB&RS") entered into Contract No. DACA63-03-D-0005 – sometimes referred to as the "Restore Iraqi Oil" or "RIO" contract – with the U.S. Army Corps of Engineers on March 8, 2003, pursuant to which KB&RS would perform tasks as ordered by the U.S. Army Corps of Engineers in connection with efforts to restore the infrastructure underlying the Iraqi oil industry.

Combat operations in Iraq began on March 19, 2003.

On March 20, 2003, the Corps of Engineers issued "Task Order 3," which governed the services to be provided by KBR and its subsidiaries at Qarmat Ali and other facilities. Under Task Order 3, the U.S. military would declare a given worksite to be "benign" before KBR would begin operations there. According to the deposition testimony of retired Brigadier General of the U.S. Army Corps of Engineers Robert Crear and of retired U.S. Army Corps of Engineers employee Gordon Sumner, "benign" referred to freedom from combatant activity and from nuclear or chemical weapons, and did not foreclose the possibility of environmental hazards,

---

(iii)    striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part; [or]

(vi)    rendering a default judgment against the disobedient party. . . .

Fed. R. Civ. P. 37(b)(2)(A).

[2] The following recitation of facts constitutes my construal of the current evidentiary record in connection with the motion now before the court only, and should not be interpreted as binding on the parties for purposes of future motions or of trial.

including hazardous (but not weaponized) chemicals.  Support for this interpretation can be found in the provisions of Task Order 3, which suggest that pronouncement of a site as "benign" did not, for example, foreclose the need for environmental assessment.

It appears from the language of Task Order 3[3] that KBR was responsible for providing the Corps of Engineers with an environmental assessment of any facility in which they undertook operations.  The obligation to provide such assessments included the obligation to report and evaluate any environmental hazards.  According to the deposition testimony of General Crear and of Sumner, KBR was not merely permitted but required under Task Order 3 and the RIO contract to take all necessary precautions to safeguard personnel who might potentially be exposed to environmental hazards at worksites, including the wearing of protective gear and/or the closing down of operations at any unsafe site.

In addition, the RIO contract sets forth specific health and safety requirements KBR was required to comply with in performing services under the contract, including Overseas Environmental Baseline Guidance Document 4715.5-G (Mar. 2000), OHSA standards, industry standards, CERCLA requirements, environmental assessment requirements, Army safety regulations, and Army Corps of Engineers safety standards.  These requirements were never waived.

The RIO contract further provides that the U.S. government will indemnify KBR for any claims involving bodily injury or death arising out of KBR's provision of services under the contract.

---

[3] Moreover, the army briefed the Senate on December 22, 2008, that KBR was required to perform an initial site assessment of Qarmat Ali "in order to establish an environmental baseline."

In April 2003, the KBR defendants began operations at Qarmat Ali. According to the testimony of Ralph Stephenson, a KBR environmental manager, KBR personnel were aware of the presence of sodium dichromate at the Qarmat Ali site before these operations began. *See* Stephenson Depo. at 72-73.

In May 2003, the Oregon National Guard was assigned to the Doha Operations Center in Kuwait. Beginning some time after May 1, 2003, the KBR defendants, or some of them, would contact the Doha Operations Center and request assistance with security issues on a regular, perhaps daily basis, in accordance with the provisions of the RIO contract and Task Order 3. On some occasions, members of the Oregon National Guard would receive security assignments to the Qarmat Ali water plant, where they were allegedly exposed to sodium dichromate.

In addition to preexisting sodium dichromate, it appears that defendants brought additional sodium dichromate to the site in and/or prior to June 2003, and continued storing and working with it at the site.

In an internal email, in June 2003 a KBR employee discussed sodium dichromate contamination at Qarmat Ali and recommended that remedial measures be taken, including excavating and placing all contaminated soil in drums.

Defendants did not advise the Oregon National Guard of the presence of sodium dichromate at Qarmat Ali until August 12, 2003, when KBR issued an official report to the army detailing the chemical's presence. The report indicated that sodium dichromate at Qarmat Ali constituted a serious health hazard.

The Qarmat Ali site was shut down September 9, 2003.

Plaintiffs are members of the Oregon National Guard allegedly exposed to sodium

dichromate at Qarmat Ali in 2003 who have allegedly been harmed by their exposure.

## II.    Relevant Procedural History

On or around January 21, 2011, the parties agreed to split the costs of gathering plaintiffs' medical records. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Exclude ("Opposition"), Exh. 1. Pursuant to the parties' agreement, the records would be gathered by a records service called "KEAIS," and the parties would each pay an agreed proportion of KEAIS' fees. *See id.* In connection with that agreement, on January 31, 2011, the parties clarified their expectations as to what KEAIS' fees would be, and agreed to stipulate as to the authenticity of records obtained through KEAIS. *See* Opposition, Exh. 2. The parties made no agreement to stipulate to the authenticity of records obtained other than through KEAIS.

By minute order (#189) dated May 31, 2011, the court ordered plaintiffs to designate expert witnesses by not later than June 10, 2011, and ordered defendants to designate their defendants by not later than August 25, 2011. On June 7, 2011, plaintiffs produced to defendants the report of their expert witness Dr. Arch Carson, a physician and toxicologist with expertise in industrial chemical exposure. Carson's report of June 7, 2011 (Carson's "June report"), expressly indicated that it was intended to summarize preliminary results only, suggesting without stating explicitly that further results would be forthcoming following additional examinations:

> During the past year, I have had the opportunity to oversee the interviews and physical examinations of more than 150 of the military servicemen who performed protection services for KBR personnel and contractors at the Qarmat Ali Plant in 2003. **At the time of this report, those exams are continuing, but preliminary results will be summarized here.** The examinations for each individual consisted of: a self-administered questionnaire to obtain demographic and health history information; a physician interview regarding details of workplace exposures and activities; symptom chronologies and medical interventions; a physical examination by a licensed physician; blood testing for

general indicators of illness; and a review of available medical records. **Not all parts of this examination are complete for all individuals at this time.**

Carson's June Report (Sugerman Decl., Exh. 67) at 6 (emphasis supplied). In his June report, Carson described the conditions under which the plaintiffs were exposed to sodium dichromate, *see id.* at 1-2, described the toxicological properties of sodium dichromate/hexavalent chromium, *see id.* at 2-3, and described the symptoms experienced by the plaintiffs since that time in collective, general terms, noting that there was a "great deal of consistency" in the plaintiffs' "strikingly similar" reports of "acute irritation symptoms on their skin and in their respiratory systems when they were in the exposure environment" and of the "ongoing and persistent health effects" that followed, *id.* at 3. Carson reported that:

> Of 35 former guardsmen from Oregon who were examined by me, 25.7% have persistent lower respiratory symptoms and 34.3% have persistent upper respiratory symptoms. In this cohort, 17.1% have a medical diagnosis of asthma, reactive airways disease or chronic obstructive pulmonary disease (COPD). **This is more than double the age/race/gender-adjusted background rate for these diagnoses.** Also, 8.6% reported persistent nosebleeds since their assignments at Qarmat Ali; 31.4% report gastrointestinal diagnoses such as gastroesophageal reflux disease (GERD), irritable bowel syndrome (IBS) or hiatal hernia; 17,1% report chronic skin disease that significantly affects their ability to engage in certain activities; and 2.9% report a diagnosis of leather sensitivity or leather allergy.

*Id.* at 3-4 (emphasis supplied). Following a lengthy discussion of the mechanisms of sodium dichromate poisoning, *see id.* at 4, Carson opined as follows:

> **The military personnel who experienced chemical irritation symptoms during their service at the Qarmat Ali Water Treatment Plant were injured in this way,** experiencing transformation injury to some of their cells that were directly contacted by sodium dichromate or the hexavalent chromium it contained. For that reason, these persons have a higher risk of developing malignant tumors over time.
>
> **In my opinion,** based upon the examinations and record reviews that I performed

to date and upon my training and experience as an occupational medicine physician and medical toxicologist. **much of the persistent respiratory complaints, digestive problems, persistent skin rashes and precancerous lesions currently present in military personnel who served at the Qarmat Ali Water Treatment Plant in 2003 is due to their exposures to sodium dichromate and the hexavalent chromium it contained.** Their service there resulted in these exposures, from which they were not appropriately protected. These opinions are held with respect to reasonable medical probability and are consistent with the scientific findings established by published research on this and related areas. The conclusions expressed in the individual summaries, provided under separate cover, are also arrived at with respect to reasonable medical probability, and are incorporated as a part of this opinion.

*Id.* at 4-5 (emphasis supplied).  The "individual summaries" that were "provided under separate cover" to the defendants contemporaneously with the June report stated only that each examined plaintiff's symptoms were "consistent with" hexavalent chromium poisoning, and did not contain any opinion that the symptoms were, to a reasonable degree of medical certainty, *caused by* exposure to sodium dichromate.  *See* Sugerman Decl., Exh. 19.

Other than the statement quoted above characterizing the results summarized in the June report as "preliminary," the statement quoted above that Carson's opinion was based on "record reviews . . . performed to date," and the purely implicit suggestion that after examination and review was "complete," final results would be forthcoming, plaintiffs did not expressly advise defendants that a formal supplemental expert report would issue.

On September 30, 2011, defendants filed a motion for summary judgment as to the narrow issue of causation only.  On October 11, 2011, plaintiffs requested additional time to respond to defendants' motion, without reference to any contemplated supplemental report by Carson.  On October 13, 2011, I granted plaintiffs' email request, resetting the deadline for plaintiffs' opposition to November 14, 2011.

On November 8, 2011, less than one week before their summary judgment opposition was due, plaintiffs provided to defendants a second report authored by Carson and signed by him on November 7, 2011 (Carson's "November report"). In the introductory paragraphs of his November report, Carson stated as follows:

> I offer this report to supplement and clarify my prior June 7, 2011 Report. In this Supplemental Report, I address the following issues:
>
> I.     My review of materials made available to me since the completion of my June 7, 2011 Report.
>
> II.    The proper interpretation of my June 7, 2011 report and my in-person medical exams and interviews as they relate to my opinion regarding the Oregon Veterans' remote-exposure injuries.
>
> III.   Clarification of my June 7, 2011 report as it stands in relation to the Oregon Veterans' remote-exposure injuries.
>
> IV.    Clarification of my June 7, 2011, report as it stands in relation to the Oregon Veterans' current exposure-related illnesses.
>
> V.     Whether the conclusions reached by USACHPPM undermine the clinical evaluation underlying this Supplemental Report.
>
> VI.    The need for medical monitoring for Oregon Veterans who served at Qarmat Ali.
>
> **When I wrote my first report, I did not have the prior medical records on many of the Oregon Veterans. I have now received and have had an opportunity to review those records. In addition to the substantial documentary evidence that was made available to me since the issuance of my June 7, 2011 report, this Supplemental Report relies upon the differential diagnoses performed by way of my in-person medical interviews and medical exams of the Oregon Veterans,** as well as the medical records available. During these exams and interviews, I obtained medical history information regarding the Veterans that included occupational exposures, exposures to other chemical hazards, and family histories. Furthermore, I and assisting physicians conducted physical clinical examinations and ordered lab work on each Veteran. The lab work performed on each Veteran was done primarily to rule out other potential causes for the various illnesses and symptoms that they are currently experiencing.

\* \* \*

> The injuries attributable to Kevin Stanger and Jay Louisiana were excluded from
> my June 7, 2011 report. Mr. Stanger was in in-patient treatment for post
> traumatic stress disorder, and Mr. Louisiana was on deployment, which prevented
> me from examining them prior to June 7, 2011. Mr. Stanger and Mr. Louisiana
> were examined by Dr. Seres in Portland, Oregon, and I have since had an
> opportunity to interview Mr. Stanger and Mr. Louisiana and conduct a clinical
> evaluation to support my differential diagnosis discussed below.

Carson's November Report (Sugerman Decl., Exh. 68) at 1-2. Carson further stated in his

November report that it was his "intention" that his "June 7, 2011 report would provide a global

opinion regarding exposure and distant injury and that, following further review of medical

records and documents concerning Qarmat Ali, [he] would provide more detailed opinions for

each [plaintiff]." *Id.* at 5.

In his November report, Carson indicated that extensive, relevant documentary materials

had been made available to him only subsequent to issuance of his June report, including the

following:

A.   The medical exam reports and interview notes of Kevin Stanger and Jay
     Louisiana;

B.   The September 28, 2011 United States Department of Defense Inspector
     General Report, Exposure to Sodium Dichromate at Qarmat Ali in 2003;

C.   Medical Records (from Veterans Administration and private provider
     sources) of the following Oregon Veterans who are Plaintiffs in the
     litigation underlying this Supplemental Report:

     A.   Arnold, Jason
     B.   Ashby, Scott
     C.   Avalos, Carlos
     D.   Bixby, Rocky
     E.   Bjerklund, Ronald
     F    Blain, Jason
     G.   Borja, James

| | |
|---|---|
| H. | Bruno, Jesus |
| I. | Campredon, Colt |
| J. | Ellis, Charles |
| K. | Fields, Devin |
| L. | Foster, Stephen |
| M. | Garcia, Adan |
| N. | Greer, Byron |
| O. | Hadley, Matthew |
| P. | Hafer, Kelly |
| Q. | Hedin, Brian |
| R. | Ing, Leslie |
| S. | Jewell, Dennis |
| T. | Keiper, Randy |
| U. | Kuhnel, Matt |
| V. | Lawrence, Richard |
| W. | Louisiana, Jay |
| X. | McGowan, James |
| Y. | Mueller, Stephen |
| Z. | O'Rielly, Michael |
| AA. | Pacheco, Vito |
| BB. | Roberta, Lawrence |
| CC. | Rosgen, Dennis |
| DD. | Rydquist, john |
| EE. | Seamon, Charles |
| FF. | St Clair, Aaron |
| GG. | Stanger, Kevin |
| HH. | Wilson, Kevin |
| II. | Yeargin, Donald |

D.   Material Data Safety Sheet - Sodium Dichromate;

E.   KBR Trip Report August 7 - 9, 2003;

F.   Young Lee, August 11, 2003 Email;

G.   August 3, 2003 Project RIO Qarmat Ali Report;

H.   October 2, 2003 Minutes of Meeting;

I.   October 5, 2003 Bagnoche Email;

J.   Award Fee Contract Self-Evaluation September 2003 - 9 March 2004;

K.     The Expert Report of Dr. Herman Gibb;

L.     August 8, 2003 Meeting Minutes;

M.     August 25, 2003 Van Ostrand Email;

N.     September 9, 2003 Chuck Adams Email;

O.     September 16, 2003 Meeting Minutes;

P.     September 26, 2003 Jerry Balcom Email;

Q.     Summary of Qarmat Ali Timeline and Activities;

R.     Information Paper;

S.     September 17, 2003 Basra Water Treatment Plant Chern Spills;

T.     The Deposition Transcript of Edward Blacke;

U.     June 22, 2010 Department of Veterans Affairs Undersecretary for Health Information Letter Medical Surveillance Program for Sodium Dichromate;

V.     The two photographs attached to this Supplemental Report; and,

W.     The USACHPPM Report on Sodium Dichromate Exposure at Qarmat Ali.

*Id.* at 2-4. Defendants characterize the documentary evidence they made available to plaintiffs and to Carson subsequent to June 7, 2011, including the foregoing, as amounting to in excess of 16,000 pages of materials.

In connection with clarification of his prior report in connection with the "two classes of injuries . . . sustained [by plaintiffs] as a result of their exposure to Sodium Dichromate at Qarmat Ali," Carson opined generally that "it cannot be seriously disputed that the below-discussed symptoms typically associated with Sodium Dichromate exposure documented by Oregon Veterans were, in fact, caused by the extensive Sodium Dichromate contamination at

Qarmat Ali and are demonstrative of an injury to the Veterans, including to their cellular DNA,"
*id.* at 9, and that "it cannot be seriously questioned that symptoms typically associated with
harmful levels of Sodium Dichromate exposure visited upon the Oregon Veterans stationed at
Qarmat Ali were, in fact, caused by the extensive Sodium Dichromate contamination found and
documented at Qarmat Ali," *id.* at 12. After indicating that he reached the conclusions that
followed with respect to each plaintiff "to a standard of a reasonable degree of medical
probability," *id.* at 12, Carson then summarized the symptoms of each individual plaintiff, and
opined that all or some set of each plaintiff's symptoms "were caused by" the plaintiff's "exposure
to Sodium Dichromate while serving at the Qarmat Ali Water Treatment Plant," *id* at 13 *et
passim*. With respect to a small minority of plaintiffs, Carson additionally opined that the
etiology of some subset of the presented symptoms could not be attributed to a reasonable degree
of medical probability to sodium dichromate exposure. *See id.* at 14 (Avalos, Carlos), 15
(Bjerklund, Ronald; Blain, Jason), 24 (Yeargin, Donald).

Finally, in his November report Carson addressed the U.S. Army Center for Health
Promotion and Preventive Medicine's report regarding exposure to sodium dichromate at Qarmat
Ali, detailing certain flaws in the USACHPPM's methodology and assumptions, *see id.* at 24-28,
and the need for medical monitoring of the plaintiffs as a consequence of their exposure to
sodium dichromate, *see id.* at 29.

Plaintiffs filed their opposition to defendants' dispositive motion as to causation on
November 14, 2011, just seven days after Carson signed his November report. Plaintiffs'
argument as to causation relies heavily, but not exclusively, on Carson's November report, and on
Carson's declaration of November 7, 2011 (Carson's "November declaration"), which is largely

Page 16 - OPINION AND ORDER

duplicative of his November report.  In addition, plaintiffs attach as Exhibit 69 to the declaration

of David Sugerman selected medical records of each plaintiff, and rely in part on Carson's June

report.

On November 30, 2011, defendants moved pursuant to Federal Civil Procedure Rule

37(c) for imposition of sanctions in connection with plaintiffs' purportedly untimely provision of

Carson's November report, seeking in particular an order to exclude Carson's November report

and November declaration from consideration.

## ANALYSIS

Defendants take the position that, because plaintiffs provided them with Carson's

November report after the June 10, 2011, deadline for designation of plaintiffs' expert witnesses,

it is untimely under Federal Civil Procedure Rule 26(a) and (e), and for that reason subject to

sanctions under Federal Civil Procedure Rule 37(c), including in particular the exclusion

sanction.  Plaintiffs take the contrary position that Carson's November report contains, not new

opinion. but rather opinion supplemental to the opinions expressed in his June report, and that

such supplemental opinion is warranted in light of defendants' production of in excess of 16,000

pages of documents relating to plaintiffs' medical records after the expert disclosure deadline,

and therefore not merely permitted but required under Rule 26(e).  On this basis, plaintiffs argue

that the November report is not untimely, and therefore not within the scope of Rule 37(c).  In the

alternative, plaintiffs argue that sanctions are inappropriate under Rule 37(c) because the

November report's untimeliness was substantially justified and/or harmless.

## I.    Timeliness of the November Report

As noted above, Federal Civil Procedure Rule 37(c) authorizes the imposition of

sanctions against a party who fails to identify a witness or to provide information as required

under Federal Civil Procedure Rule 26(a) or (e).  The threshold question in analyzing the merits

of defendants' motion is therefore whether the November report was untimely for purposes of

Rule 26(a) or (e).  Because it is undisputed that the November report was provided to the

defendants after the applicable June 10, 2011, expert disclosure deadline, the November report is

clearly untimely to the extent it contains new rather than supplemental expert opinion, and to the

extent that any supplemental expert opinion it contains could have issued on the basis of

information available to plaintiffs prior to expiration of the deadline.

    As to the first of these issues, defendants take the position that the November report is a

"wholly new, different, and broader report" than the June report, adducing in support of this

position the facts that the November report is several times longer than the June report and,

unlike the June report, relies upon organizational subject headings.  I am unpersuaded by

defendants' forceful rhetoric on this issue.  Comparative analysis of the two reports establishes

that the two reports espouse identical underlying theories as to the causation of plaintiffs' injuries,

and that the November report differs from the June report only in the significantly increased

specificity of the opinions expressed in the later report and in the significantly greater detail

recruited by Carson in support of those opinions.  It is, therefore, unhelpfully hyperbolic to

characterize the November report as "wholly" new and different from the June report.

    I need not determine whether the increased specificity and greater detail of the November

report are in such great contrast with the June report as to amount to a qualitative difference

between the two reports, however, in light of plaintiffs' all-but-complete failure to provide

contrary evidence in response to the evidence proffered by defendants in support of their position

that the opinions expressed in Carson's November report could have issued on the basis of information available to plaintiffs prior to June 10, 2011. Defendants concede that plaintiffs were provided with in excess of 16,000 pages of documents following expiration of the expert disclosure deadline, but argue that none of the causation opinions expressed in the November report depend necessarily on information contained within those documents that had not previously been made available to plaintiffs, either in the more than 20,000 pages of documents provided to plaintiffs through the discovery process prior to the deadline or, whether actually or constructively, in plaintiffs' own medical records.

Plaintiffs make no showing that any causation opinion expressed in the November report depended necessarily or even substantially on information unavailable to plaintiffs prior to the June 10, 2011, deadline. Indeed, at oral argument on defendants' motion, plaintiffs' counsel expressly declined to take the position that the opinions contained in the November report could not have issued prior to expiration of the deadline. To the contrary, the evidence of record appears to establish that the medical records of at least some of the plaintiffs had been produced to plaintiffs in their entirety prior to the deadline, strongly suggesting that at least some of the purportedly supplemental opinions articulated for the first time in the November report could have been articulated without qualification or other modification before the expert disclosure deadline.

Because plaintiffs have not met their burden to respond to defendants' arguments with evidence establishing that the specific, detailed causation opinions contained in the November report could not have issued in the absence of information that only became available to plaintiffs after expiration of the expert disclosure deadline, I conclude that Carson's November report was

Page 19 - OPINION AND ORDER

untimely provided to defendants under Rule 26(a) and (e).  I therefore turn to Rule 37(c) to

determine whether the untimeliness of the November report merits the imposition of sanctions.

## II.    Substantial Justification and Harmlessness

As noted above, sanctions are justified under Federal Civil Procedure Rule 37(c) in

connection with an untimely provided expert report only if the untimeliness of the report was

neither substantially justified nor harmless.  *See* Fed. R. Civ. P. 37(c)(1).  Plaintiffs argue that the

untimeliness of the November report was substantially justified in light of defendants' post-

deadline production of more than16,000 pages of documents.  Plaintiffs' argument is

unpersuasive in light of plaintiffs' failure to make any showing that any portion of Carson's

November 2011 causation opinion was dependent in any necessary or substantial part on

information that was not available to plaintiffs prior to the post-deadline production.  Plaintiffs'

argument is undercut still further by plaintiffs' complete failure expressly to advise either

defendants or this court that a formal, supplemental opinion as to causation would be

forthcoming following the expert disclosure deadline, failure to request extension of the expert

disclosure deadline prior to its expiration, and failure to advise either defendants or this court in

connection with plaintiffs' requests for extension of time within which to respond to defendants'

summary judgment motion that the extra time would be employed for the purpose of preparing a

supplemental expert report on causation.  Finally, I agree with the defendants that the

organizational structure of the November report appears in some respects to track the arguments

advanced by defendants in their currently pending motion for summary judgment, raising the

troubling suggestion that the November report may have been drafted in part to respond to

defendants' summary judgment arguments.  I therefore conclude that plaintiffs' untimely

Page 20 - OPINION AND ORDER

provision of the November report was not substantially justified.[4]

Plaintiffs further argue that the untimeliness of the November report was necessarily harmless, in that defendants cannot colorably claim to have been surprised by the opinions expressed therein, which espouse the identical underlying theory of causation alleged by plaintiffs in their pleading and expressed by Carson in his prior June report. In addition, plaintiffs note that trial is scheduled to begin in this matter more than seven months after the date the November report issued, and argue on that basis that defendants would not be prejudiced by consideration of the untimely report.

While I agree with plaintiffs that the November report contained no novel theory of causation, I do not find that any portion of the harmlessness inquiry ends with that fact. While it may be correct that little new fact discovery may be necessary for defendants to respond to the late-provided report, defendants made elections regarding their own experts and their own experts' reports on the basis of plaintiffs' designation of Carson and proffer of his June report, and inclusion of the November report would almost certainly require defendants to instruct their experts to produce supplemental reports, and possibly to designate additional or alternative

---

[4] Defendants argue that the untimeliness of the November report was not substantially justified for the additional reason that plaintiffs were purportedly obliged under Federal Civil Procedure Rule 11(b)(3) to have collected all of their own medical records material to the causation element of their claims for damages prior to filing their initial complaint in this action. I do not find this argument persuasive. Prior to signing any pleading on plaintiffs' behalf, plaintiffs' counsel was required under Rule 11(b)(3) to undertake an inquiry reasonably calculated to establish only that plaintiffs' factual contentions would "likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Plaintiffs' conceded failure to obtain and review the entire universe of potentially material medical records prior to initiating suit does not imply that plaintiffs' failed to comply with their Rule 11(b)(3) obligation. Moreover, the parties made joint arrangements for obtaining and authenticating plaintiffs' medical records, and it was not unreasonable for plaintiffs to rely on those arrangements.

Page 21 - OPINION AND ORDER

experts. Additional expert disclosures at this date could conceivably require postponement of

trial, which would not be harmless for purposes of Rule 37(c). *See Wong v. Regents of the Univ.*

*of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005). Moreover, at minimum the untimeliness of the

November report has caused defendants to incur attorney fees by filing at least one and arguably

two motions that either would not have been filed, or would have been filed in substantially

different form, but for plaintiffs' late proffer of Carson's November 2011 causation opinions. I

therefore conclude that the untimeliness of the November report was not harmless. Rule 37(c)

sanctions are therefore appropriate here.

### III.   Appropriate Sanctions Under Federal Civil Procedure Rule 37(c)

Under the express language of Federal Civil Procedure Rule 37(c)(1), it is within this

court's discretion to exclude the untimely November report from consideration (the default or

"self-executing" sanction contemplated under Rule 37(c), *see Yeti by Molly, Ltd. v. Deckers*

*Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)) or, "[i]n addition to or instead of this

sanction," to impose alternative sanctions. Fed. R. Civ. P. 37(c)(1). The alternative sanctions

available to the court include ordering plaintiffs to pay defendants' fees and costs reasonably

incurred in consequence of the report's untimeliness, dismissing plaintiffs' claims outright,

imposing negative evidentiary inferences, and other appropriate sanctions. *See id.*; *see also* Fed.

R. Civ. P. 37(b)(2)(A)(i)-(vi). Although other circuits have adopted the rule that the exclusion

sanction is an extreme remedy "not normally to be imposed absent a showing of willful deception

or flagrant disregard of a court order by the proponent of the [untimely proffered] evidence," *In*

*re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 792 (3d Cir. 1994), the Ninth Circuit has declined to

adopt any such prerequisite, *see, e.g., Quevedo v. Trans-Pacific Shipping*, 143 F.3d 1255, 1258

Page 22 - OPINION AND ORDER

(9th Cir. 1998), *Wong*, 410 F.3d at 1061-1062. Indeed, the Ninth Circuit has expressly opined that the exclusion sanction, although concededly "onerous," may be appropriately imposed under Rule 37(c) in the absence of any willfulness, fault, or bad faith on the part of the dilatory party, even where its imposition may render it difficult or impossible for that party to prove his or her case. *Yeti by Molly*, 259 F.3d at 1106.

I nevertheless find that, here, justice would not be well served by exclusion of the November report from consideration. Albeit both implicitly and minimally, Carson's June report put defendants on some measure of notice that a supplemental report of some nature, impliedly a report restating Carson's opinions in greater detail and with greater specificity, would be forthcoming. In addition, the opinions expressed in the untimely report were consistent in every particular with the theory of causation that plaintiffs have alleged since the inception of this action.[5] I therefore conclude that the prejudice to plaintiffs of excluding the November report from consideration would be a disproportionate response to the report's untimeliness.

I further conclude that the prejudice to defendants that consideration of the November report would occasion could effectively be cured, and plaintiffs' noncompliance with the requirements of Federal Civil Procedure Rule 26(a) appropriately sanctioned, by imposition of the following sanctions, each of which is hereby ordered:

- all those fees and costs reasonably incurred by defendants in consequence of plaintiffs' untimely proffer of the November report shall be paid by plaintiffs; and

- all damages claims or bases for calculating damages not previously attested in

---

[5] While the foregoing facts were insufficient by a wide margin to justify the untimeliness of the report, they may appropriately guide my discretion in determining an appropriate sanction under Rule 37(c). *See, e.g., Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996).

plaintiffs' interrogatory responses or deposition testimony or in Carson's June

report and stated for the first time in the November report (if any) shall be

excluded from consideration, except to the extent (if any) that plaintiffs could not

have discovered such claims or bases prior to expiration of the June 10, 2011,

expert disclosure deadline.

The fees and costs to be shifted to plaintiffs under this order shall include all those incurred in

connection with defendants' motion to exclude, and may additionally include some or all of

defendants' fees and costs incurred in connection with defendants' now-pending motion for

summary judgment,[6] but shall not include any fees or costs incurred in connection with discovery

or expert witnesses necessary to respond to the November report except to the extent defendants

establish that such fees or costs would not have been incurred had the November report been

timely produced.

Because it will likely be impossible before resolution of the merits of plaintiffs' claims to

determine authoritatively which of defendants' fees or costs (beyond those incurred in connection

with defendants' motion to exclude) would not have been incurred at any stage of these

proceedings but for the untimeliness of the November report, defendants are directed to defer

---

[6] In their reply memorandum in support of their now-pending motion for summary
judgment, defendants expressly argue that their motion is well-taken and should be granted even
if the court considers the November opinion. If defendants are to be taken at their word, their
motion would have been filed in comparable form even had the November report been timely
produced. Nevertheless, because it seems possible if not likely that defendants' causation motion
would have differed in some degree from the motion actually filed had defendants been able to
consider the opinions expressed in the November report prior to filing their dispositive motion, I
do not foreclose the possibility that defendants may be able to establish that some costs or fees
incurred in connection with the summary judgment motion would not have been incurred had the
November report been offered in compliance with plaintiffs' expert disclosure deadline.

Page 24 - OPINION AND ORDER

filing any petition for Rule 37(c) fees in connection with this order until after final judgment has issued in this action.  Finally, defendants are directed to advise the court within thirty days following resolution of defendants' now-pending motion for summary judgment as to any continuance they may deem necessary to permit them to respond to Carson's untimely November report.

## CONCLUSION

For the reasons set forth above, defendants' motion (#225) for imposition of sanctions is granted in part and denied in part as discussed above.

Dated this 30th day of December, 2011.

Honorable Paul Papak
United States Magistrate Judge

Page 25 - OPINION AND ORDER