**David F. Sugerman, OSB No: 86298**
DAVID F. SUGERMAN ATTORNEY, PC
707 SW Washington, Ste. 600
Portland, Oregon 97204-1535
Phone:     (503) 228-6474
Fax:       (503) 228-2556
Email:     david@davidsugerman.com

**Michael Patrick Doyle,** *Pro Hac Vice*
**Jeffrey L. Raizner,** *Pro Hac Vice*
**Patrick M. Dennis,** *Pro Hac Vice*
DOYLE RAIZNER, LLP
1221 McKinney Street
Suite 4100
Houston, Texas 77010
Phone:     (713) 571-1146
Fax:       (713) 571-1148
Email:     mdoyle@doyleraizner.com
           jraizner@doyleraizner.com
           pdennis@doyleraizner.com

**Gabriel A. Hawkins,** *Pro Hac Vice*
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, Indiana 46204
Phone:     (317) 636-6481
Fax:       (317) 636-2593
Email:     ghawkins@cohenandmalad.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

Rocky Bixby, *et al.*,

        Plaintiffs,

v.

KBR, Inc., *et al.*,

        Defendants.

Case No. 3:09-cv-632-PK

Memorandum in Support of Plaintiffs'
Motion to Compel and for Sanctions

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS                                                          i

TABLE OF AUTHORITIES                                                      ii

INTRODUCTION                                                              1

    A. Overview                                        1

    B. History                                         3

    C. The KBR 2002 Assessment                         3

    D. KBR Concealed Its Knowledge                     5

STATEMENT OF THE FACTS                                                   6

    A. Defendants' Discovery Obligations               6

    B. Plaintiffs Learn of the Contingency Support Plan     8

    C. The Import of the KBR 2002 Assessment           10

    D. Not an Oversight-Defendants' History of Non-Disclosure     11

        1. Defendants Fail to Disclose the Kimbro Email     12

        2. KBR's Representations to the Army and Senate     14

        3. KBR's Representations in Arbitration     15

        4. KBR's Representations to the Southern District of Indiana     16

        5. KBR's Representations to this Court     17

ARGUMENT                                                                 18

    A. Factors for Imposing Sanctions                   20

    B. Plaintiffs' Proposed Sanctions                   21

    C. Prejudice                                       22

Page

    1. Plaintiffs were Deprived of the use of the KBR 2002
Assessment during Depositions    22

    2. The Failure to Disclose Threatens the Trial Schedule    24

    3. The Reliability of Exploring Defendants' Discovery Compliance    24

    4. Defendants' Failure to Disclosure other Evidence    26

  D. Other Considerations for the Imposition of Sanctions    29

  E. The Need to Deter Future Misconduct    30

CONCLUSION    31

# TABLE OF AUTHORITIES

*Cases*

*1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, 2009 WL 232060
    (S.D. Ind., Jan. 30, 2009)    19

*A & T Siding, Ins. v. Capitol Specialty, Ins. Corp.*, 2012 WL 707100
    (D. Or., March 1, 2012)    19, 20, 31

*Anheuser-Busch, Inc. v. Natural Beverage Distributor*, 69 F.3d 337
    (9th Cir. 1995)    30

*Atchison, Topeka & Santa Fe Ry. Co. v. Hercules, Inc.*, 146 F.3d
    1071 (9th Cir. 1998)    21

*Chambers v. NASCO*, 501 U.S. 32 (1991)    19

*Commodity Futures Trading Comm'n v. Noble Metals, Inc.*, 67 F.3d 766
    (9th Cir. 1995)    30

Page

Page

*Clark v. U.S.*, 289 U.S. 1 (1933)                                                    19

*Dreith v. Nu Image, Inc.*, 648 F.3d 779 (9th Cir. 2011)                              21

*Evanson v. Union Oil Co. of Cal.*, 85 F.R.D. 274
    (D.C. Minn., Dec. 14, 1979)                                    21

*Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002)                    20, 21

*G-K Properties v. Redev. Agency*, 577 F.2d 645 F.2d 645
    (9th Cir. 1978)                                             19, 20

*Hyde & Drath v. Baker*, 24 F.3d 1162 (9th Cir. 1994)                                 21

*In re Exxon Valdez*, 102 F.3d 429 (9th Cir. 1996)                                    20

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Gurnee*,
    456 U.S. 694 (1982)                                             20

*Jackson v. N'Genuity Enter. Co.*, 2011 WL 4628683 (N.D. Ill.,
    Oct. 3, 2011)                                                   19

*Lee v. Walters*, 172 F.R.D. 421 (D. Or. 1997)                                    19, 30

*Nat'l Hockey League v. Metro. Hockey League Club, Inc.*, 427 U.S.
    639 (1976)                                                      30

*Phoreene Sore-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802
    (9th Cir. 1982)                                                 19

*The Sunrider Corp. v. Bountiful Biotech Corp.*, 2010 WL 4589156 (C.D.
    Cal., Nov. 3, 2010)                                             20

*U.S. ex. rel Berglund v. Boeing Co.*, 2011 WL 6182109
    (D. Or., Dec. 2, 2011)                                          19, 27

*World Courier v. Barone*, 2007 WL 1119196 (N.D. Cal., April 16, 2007)                27

*Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585
    (9th Cir. 1983)                                     18, 19, 20, 21, 30

Page

*Court Rules*

FED. R. CIV. P. 30(b)(6)                                              7, 8

FED. R. CIV. P. 37(B)(2)                                             19

FED. R. CIV. P. 37(d)                                               19

*Treatises*

35A C.J.S. FED. CIV. PROC. § 694                                    21

Charles A. Wright, 88 FED. PRAC. & PROC. CIV. § 2291 (3d ed.)       18

# INTRODUCTION

## A. Overview

KBR's knowledge of the massive sodium dichromate contamination at the Qarmat Ali water plant, and how long KBR concealed its dangers from the men exposed on the ground ("the Qarmat Ali Veterans"), sits at the heart of this case. Sodium dichromate is one of the most dangerous toxins classified by the EPA. KBR's repeated concealment and calculated downplaying of the extent of sodium dichromate's presence and harmful effect on the Qarmat Ali Veterans moved forward from a fictitious timeline formulated by KBR managers at the same time personnel onsite were being exposed to the stockpiled toxin on the ground at Qarmat Ali. In this timeline, KBR "admitted" to obtaining knowledge of sodium dichromate beginning in late July 2003. KBR's litigation-driven timeline, however, "evolved" after a former KBR employee appeared for deposition with a previously undisclosed email preserved on his personal flash drive, confirming his warnings to his KBR managers in June 2003.

This oft-repeated timeline, proffered in KBR's discovery responses, deposition testimony, and pleadings filed in this Court and others, is—again—clearly revealed as deliberate, calculated concealment with the uncovering of the KBR 2002 Assessment performed by KBR from November 2002 through January 2003 ("the KBR 2002 Assessment"). The KBR 2002 Assessment, still never revealed by KBR, confirms KBR's full knowledge of annual massive use of at least eight million pounds (8,000,000 lbs) of sodium dichromate at Qarmat Ali. KBR's knowledge of

Qarmat Ali's use of massive amounts of sodium dichromate should have—and did—alert KBR of the significant possibility of widespread contamination and need to stop work at Qarmat Ali, and dangerous exposures, long before the site was finally closed for remediation in September 2003.

The KBR 2002 Assessment and its ongoing concealment was only revealed as a result of the Department of Defense Inspector General (DODIG) investigation completed in late 2011 and recent sworn testimony of former Army Corp of Engineer (USACOE) employee John Weatherly. KBR failed to produce or disclose the KBR 2002 Assessment and its included revelations about Qarmat Ali, omitting it from all discovery responses and privilege logs. KBR's suggestion that such documentation was "classified," while apparently sufficient to make the knowledge disappear from KBR's collective memory, was also revealed as false by the DODIG. KBR's concealment of the KBR 2002 Assessment has led to a tremendous waste of judicial and party resources, both in conducting and supervising discovery with critical factual information still hidden, and from evaluating and responding to motions predicated on a knowingly incomplete record.

The Qarmat Ali Veterans therefore request that the Court compel full disclosure of the KBR 2002 Assessment, compel the identification of KBR employees and representatives implicated in its creation and concealment, as well as issue sanctions consistent with the serious misconduct at issue.

*B. History*

The KBR 2002 Assessment directly grew from information KBR acquired from various public and non-public sources. Prior to the 2003 invasion of Iraq, the United Nations' Food for Oil Programme allowed Iraq to sell oil in exchange for food, medicine, and supplies necessary to refurbish and maintain its oil industry. *See* Pls' Ex. 33, U.N. Distrib. Plan Phase X, ¶¶ 1, 27-28, 196-201.[1] The Food for Oil Programme allocated $600,000,000.00 of Iraqi oil sales to pay for "essential and urgent needs of Iraq's oil sector." *Id.* ¶ 199. Supplies included oil-industry chemicals that would be necessary to refurbish and maintain Iraq's oil-based infrastructure. *See* Pls' Ex. 34, U.N. Distrib. Plan. Phase 10 – Spare Parts and Equip., pp. 1, 3.

The U.N. Food for Oil Programme created a team of experts that would work with Iraq's Ministry of Oil to come up with a list of supplies necessary to maintain the Iraqi oil sector. Pls' Ex. 33, U.N. Distrib. Plan Phase X, ¶ 200. This process revealed that Iraq's Southern Oil Company required 4020 tons of sodium dichromate per year for the "[t]reatment chemicals for water injection and industrial water treatment." *See* Pls' Ex. 4, Vendor Supply List.

*C. The KBR 2002 Assessment*

On November 8, 2002, KBR defendants ("KBR")—contracted with United States Army Operations Support Command to use KBR's "in-depth understanding of the petroleum industry" to evaluate what would need to be done restore Iraqi oil

---

[1] The cited U.N. documents can be found at http://www.un.org/Depts/oip/dp/dp10/index.html and http://www.un.org/Depts/oip/dp/dp10/08-10.pdf.

production following an invasion of Iraq. *See* Pls' Ex. 36, Contingency Support Plan I, p. i. The base cost for this service was $10,000,000.00. *See* Pls' Ex. 25, KBR report on breakdown of expenses.

Pursuant to its contract with the USAOCS, KBR completed a pre-war "Contingency Support Plan." *See* Pls' Ex. 36, Contingency Support Plan I. The KBR 2002 Assessment not only examined water injection supporting oil production in Iraq's southern oil fields but specifically evaluated the Qarmat Ali water injection facility. *See* Pls' Ex. 2, Contingency Support Plan, F-2, C-16; *see also* Pls' Ex. 5, Contingency Support Plan, F-2, D-1 § 3(a). The KBR 2002 Assessment also identified as a major item the water injection system's corrosion projection system, which ran on sodium dichromate. *Id.* at § 3(b)(6).

Of equal importance, the KBR 2002 Assessment specifically indicates that the above-quoted U.N. Food for Oil Programme, showing that Iraq's Southern Oil Company required 4020 tons of sodium dichromate per year for the "[t]reatment chemicals for water injection," was reviewed and relied upon by KBR. *See* Pls' Ex. 1, Contingency Support Plan, N-4, 20, relevant docs. Further verifying Defendants' pre-existing knowledge of the uncontrolled and ongoing dispersion at Qarmat Ali of millions of pounds of sodium dichromate, the water injection section of the KBR 2002 Assessment specifically indicates that it relies upon U.N. documents by way of its notation:

> The water injection description and condition are based on Reference 1. Report of the Group of United Nations experts established Pursuant to Paragraph 30 of the Security Council Resolution 1284 (March 2000).

Reference 1 was prepared based on site visits to both the North and South water supply and injection facilities.

*See* Pls' Ex. 5, Contingency Support Plan, F-2, D-1, REFERENCES.

Once able to see the findings of the KBR 2002 Assessment, John Weatherly ("Weatherly"), the initial team contracting lead for the United States Army Corp of Engineers ("USACOE") explained in a recent deposition:

| QUESTION: | How clear is it if [Defendants are] reviewing, doing this assessment, gathering information, looking at UN Oil for Food Report listing sodium dichromate, how clear is it to you when you look at that, KBR knew before you did? |
|---|---|
| ANSWER: | From the documents I saw, it should be obvious. |
| QUESTION: | How clear is it they knew, at the latest, January 2003? |
| ANSWER: | From the dates on the documents, it should be obvious. |

Pls' Ex. 32, Weatherly Dep. p. 132 (bracketed material added for context).

*D. KBR Concealed Its Knowledge*

KBR's concealment of the pre-invasion KBR 2002 Assessment creates several problems. Shielding of the existence of the KBR 2002 Assessment, and improperly alleging secrecy of documentation, does not make the knowledge disappear nor justify making directly contradictory representations. Most notably, the timing of the specific knowledge flatly contradicts statements made to this Court by the KBR Defendants as well as exhibits that KBR defendants submitted in this case that aver that KBR knew nothing about sodium dichromate until July 2003. Furthermore, the KBR defendants failed to identify or disclose the KBR 2002 Assessment in response to Plaintiffs' document production and interrogatory requests. The implications arising from Defendants' failure to disclose are far

reaching and deprived the Veterans of important evidence relating to timing, knowledge, and extent of the harm.

The KBR defendants' concealment undermines the reliability of this adjudication. Accordingly, Plaintiffs seek both to compel necessary remedial discovery and sanctions.

## STATEMENT OF THE FACTS

On October 15, 2010, the parties entered into the following agreement:

> We agree that the most efficient use of resources adopts at least some of the deadlines set in the Texas case of McManaway vs. KBR, U.S. District Court Case No. 4:10-cv-01044 (S.D. Tx. Houston Div.). We further agree that discovery taken in either this case or the McManaway case can be used in either case.

*See* Pls' Ex. 31, Oct. 15, 2010 Eden Letter (emphasis added).

*A. KBR's Discovery Obligations*

Plaintiffs issued the following written discovery requests:

<u>Request No. 12</u>:    The documents identifying when you first became aware that toxic substances, including sodium dichromate, were present at the Plant.

<u>Request No. 20</u>:    The documents exchanged with government agencies or officials of . . . the United States . . . or the United Nations . . . regarding the Plant, Project RIO, and/or the exposure of individuals to toxic substances.

Pls' Ex. No. 12, Defs' Disc. Resp. Doc. Request Nos. 12, 20. Plaintiffs also issued the following interrogatory requests:

<u>Interrogatory No. 13</u>:    Please identify any . . . studies . . . of toxic substances, including zinc sulfate, selenium, and sodium dichromate, in the . . . water at the Plant.

<u>Interrogatory No. 19</u>:    Please document all communications between any of the above-captioned Defendants and the Department

of the Army . . . regarding the above-captioned litigation or the incident in question.

*Id.*, Interrog. Request Nos. 13, 19.[2]

Despite the fact that the KBR 2002 Assessment constituted a study of sodium dichromate and a communication between Defendants and the Army, the KBR Defendants failed to identify the KBR 2002 Assessment in response to the cited interrogatories. *See* Pls' Ex. No. 12, Defs' Disc. Resp. Interrog. Nos. 13 & 19. Nor did the KBR Defendants provide the Veterans with a copy of the KBR 2002 Assessment and related documents.

In addition to Defendants' non-disclosure, representations given by Defendants in their Rule 30(b)(6) deposition had the effect of concealing the very existence of the KBR 2002 Assessment. During this deposition, KBR's Vice-President for Litigation stated in response to a question posed by Defendants:

QUESTION:   I just want to ask one follow-up clarification question, Mr. Lowes. On the notice and there was some question about it, can you tell us the document retention practice for the 2002 contingent planning tasking?

ANSWER:     I can.

QUESTIONS:  Go ahead.

ANSWER:     The documents, pursuant to that, were classified, meaning that unless you have a proper security clearance, you couldn't see them nor discuss it. And I checked; whatever existed was either returned to the government or destroyed at their direction.

---

[2] By agreement of the parties, these discovery requests issued in McManaway v. KBR were treated as if issued in this case. Pls Ex. 31, p. 2.

Pls' Ex. 15, Lowes Dep. p. 85.    This testimony was joined with Defendants' corresponding representation that any potential such materials were irrelevant to Qarmat Ali:

> Defendants are not aware of any documents relevant to sodium dichromate issues at the water injection facility that have been destroyed or discarded outside the normal course of business operations or after notice of litigation relevant to sodium dichromate issues.

Pls' Ex. No. 12, Defs' Disc. Resp. Interrog. No. 7.

Thus, Defendants' 30(b)(6) sworn testimony of "whatever existed was either returned to the government or destroyed" in combination with Defendants' indication that they were not aware of any relevant documents that have been discarded or destroyed constituted a false representation that Defendants' pre-invasion documents were not "relevant to sodium dichromate issues at the water injection facility."   Furthermore, Defendants should have identified the KBR 2002 Assessment in response to Interrogatory Seven.

Moreover, the corresponding factual assertion that all such contingency planning documents were classified is flatly untrue, as the DODIG report confirmed.  In any event, the KBR 2002 Assessment never made it to any privilege log.

### B. *Plaintiffs Learn of the Contingency Support Plan*

On September 28, 2011, the United States Inspector General issued a report entitled *Exposure to Sodium Dichromate at Qarmat Ali in 2003* ("DODIG Report"). *See* Pls' Ex. 13, DODIG Report.  Part II of the DODIG Report provides:

> In preparation for military operations, DoD tasked KBR to write a Contingency Support Plan describing a broad concept of operations for the mission to restore the oil infrastructure of Iraq following combat operations. KBR undertook the effort under the statement of work for Task Order 31 of contract number DAAA09-02-D-0007, the Logistics Civil Augmentation Program. The Contingency Support Plan for Repair and Continuity of Operations of the Iraqi Infrastructure, dated January 31, 2003, stated the mission was to "support the Commander, U.S. Central Command in the assessment of damage, repair, maintenance, resumption and/or continuity of operations of the oil infrastructure of Iraq."

*Id.* at 7.

Plaintiffs had at the same time specifically requested confirmation of the completeness of Defendants' document production, specifically including materials that would include the KBR 2002 Assessment. *See* Pls' Ex. 9, Aug. 26, 2011 Dennis letter (noting Plaintiffs' concern that document request twelve may still be outstanding); *see also* Pls' Ex. 8, Sept. 2, 2011 Harrison email (notifying Plaintiffs that all documents had been produced). After substantial further enquiry, Plaintiffs were directed by the DODIG's counsel to an electronic reading room containing the KBR 2002 Assessment from the DODIG. *See* Pls' Ex. 6, Feb. 29, 2012 Fechhelm email.

After reviewing the KBR 2002 Assessment, Plaintiffs wrote Defendants and asked why it had not been produced. *See* Pls' Ex. 26, March 15, 2012 Dennis email. Defendants' responded to Plaintiffs' request by alleging that they did not produce the KBR 2002 Assessment because they had given all of their copies to the government. *Id.*

Defendants, nonetheless, failed to indicate why the KBR 2002 Assessment was not identified in response to Plaintiffs' interrogatories. Accordingly, Plaintiffs responded:

> Your note is insufficient. In particular, KBR's Contingency Support Plan was never identified by any witness, nor included in any privilege log, nor referenced in any way in discovery responses. Are you therefore representing that KBR had no knowledge or possession (including constructive) of the KBR 2002 Assessment since May 2008?

*Id.* Defendants did not respond to the question posed by Plaintiffs.

### C. The Import of the KBR 2002 Assessment

The extraordinary importance of the KBR 2002 Assessment is best demonstrated by the deposition of Weatherly—the only deposition in which Plaintiffs were in possession of the KBR 2002 Assessment. During his deposition, Weatherly confirmed that:

- Defendants did not share with him the information that they had acquired regarding potential hazards;
- the KBR 2002 Assessment indicates that 4020 tons of sodium dichromate per year was being used by the Iraqis at Qarmat Ali;
- based upon his experience, it is fair to assume that KBR had reviewed the U.N. Food for Oil Programme referenced in the KBR 2002 Assessment;
- KBR should have notified the USCOE contracting officer in writing of its knowledge;
- it is "obvious" that KBR looked at the U.N. Food for Oil Programme and knew about the thousands of tons of sodium dichromate in use at Qarmat Ali;
- based upon the KBR 2002 Assessment, it would be a false statement for KBR to claim that it did not have pre-invasion knowledge of sodium dichromate's presence at Qarmat Ali.

*See* Pls' Ex. 32, Weatherly Dep. pp. 112-13, 121-22, 126, 131, 132-33.[3]

Weatherly substantiates the basis for his conclusion that the KBR 2002 Assessment exposes Defendants' knowledge of the extensive use of sodium dichromate at Qarmat Ali by way of the following testimony:

| QUESTION: | Second paragraph from the end [of the KBR 2002 Assessment], based on the U.N. Report, three out of four lift pumps at Qarmat Ali are operating; do you see that? |
| ANSWER: | I do. |
| QUESTION: | What does that confirm about whether KBR specifically assessed, starting in November 2002, December 2002, January 2003, the Qarmat Ali facility? |
| ANSWER: | To me, this reads that KBR, based on a U.N. Report, said that three out of four lift pumps are operating. |
| QUESTION: | Which means that they had knowledge about Qarmat Ali or not? |
| ANSWER: | It means to me that they were relaying what was in the U.N. Report. |
| QUESTION: | Including the indication of what Iraqis were ordering for supplies, tons and tons of sodium dichromate? |
| ANSWER: | If I go back to the original—one of the previous documents, yes. |

*Id.* at 142-43.

### D. Not an Oversight-Defendants' History of Non-Disclosure

Defendants' environmental engineer Rod Kimbro ("Kimbro") noticed the widespread sodium dichromate contamination at Qarmat Ali on June 8, 2003 and alerted Defendants about the problem by email. *See* Pls' Ex. 37, June 21, 2003 Kimbro email. Like their failure to disclose the KBR 2002 Assessment, Defendants

---

[3] A full copy of Plaintiffs' examination of Weatherly is included, and Plaintiffs believe that a review of this examination is extremely probative to Plaintiffs' pending Motion as well as to this case. *See* Pls' Ex. 32, Weatherly Dep.

failed to disclose the Kimbro email, and Defendants used their failure to disclose both of these documents to facilitate their ability to make representations that are inconsistent with therewith.

### 1. Defendants Fail to Disclose the Kimbro Email

During Kimbro's deposition, Kimbro revealed that he had retained a copy of his June 21, 2003 email.[4] Not only had Defendants failed to disclose Kimbro's email in response to Plaintiffs' discovery requests but, despite the fact that Kimbro had specifically provided Defendants' attorneys with a copy of his email prior to his deposition, Defendants only provided Plaintiffs with a copy of Kimbro's email after its existence was disclosed.

The manner in which Kimbro's email was disclosed is particularly telling:

ANSWER:    I had prepared a number of reports.  I also had a number of e-mails that I had sent to Dr. Lee concerning Qarmat Ali.  And when I left KBR's employment I kept copies of those.  And I provided copies of those to KBR's attorneys and we discussed those documents.

QUESTION:When did you provide those documents, e-mails that you told us about?

ANSWER:    I don't know the exact day, but it was within the last month.

Mr. Doyle:    Mr. Jones, has every single one of those documents been provided?

Mr. Jones:    We produced them to you, yes.  I don't know what the Bates label range is.  He may have given me a document or two yesterday that was new to me.

Mr. Doyle:    Okay.  Have we been provided that or is there a reason why we haven't been provided it right now?

Mr. Jones:    Because you have – don't have a document request for this deposition.

---

[4] The fact that Kimbro retained a copy of his email suggests that Mr. Kimbro knew of the impropriety of Defendants' actions at Qarmat Ali and that documents might be destroyed.

| Mr. Doyle: | Okay. |
|---|---|
| Mr. Jones: | But we produced to you – |
| Mr. Doyle: | Just so we're clear – |
| Mr. Jones: | Right. |
| Mr. Doyle: | — are you really telling us that materials this gentleman evaluated working KBR Qarmat Ali are not encompassed within the outstanding discovery requests that were required to be supplemented timely? |
| Mr. Jones: | No. I'm not saying that. What I'm saying is, we have produced all the documents that he gave us to – what was it – a month or two ago that's been produced to you. |
| Mr. Doyle: | Okay. You just mentioned some additional documents. |
| Mr. Jones: | Right. If he has us anything new, I haven't produced that to you yet. |
| Mr. Doyle: | Okay. Is there a reason why we can't get a copy right now? |
| Mr. Jones: | No. |
| Mr. Doyle: | Are you going to give us a copy? |
| Mr. Jones: | Yes. We'll have to make copies. Okay? |
| Mr. Doyle: | Is there a reason why we're waiting until the middle of the deposition to get it if you've had this for some period of time? |

*See* Pls' Ex. 18, Kimbro Dep. pp. 20-22. Aside from the fact that Kimbro "may have" provided Defendants' attorney with a copy of his June 21, 2003 email prior to his deposition, it is notable that Defendants' attorney had not made copies of Kimbro's email. As evidenced by the fact that Defendants had not made copies of Kimbro's email, Defendants had no intention of disclosing it.

2.    *KBR's Representations to the Army and Senate*

Defendants have not only failed to disclose the existence of the KBR 2002 Assessment and the Kimbro email but have made several misrepresentations that are belied by the KBR 2002 Assessment.  For example, in Secretary of the Army Pete Geren's ("Secretary Geren") letter to Senators Dorgan and Bayh that was repeatedly submitted by Defendants as an exhibit in this case, Secretary Geren indicates:

> While we do know that in early June 2003 Iraqi South Oil Company staff informed KBR that sodium dichromate was used and stored at the facility, we do not have any information regarding whether KBR was aware of contamination at that time.  KBR has informed the Army that it identified the potential sodium dichromate contamination on July 25, 2003, and began site testing on August 2, 2003.

*See* Pls' Ex. 36, March 2, 2009 Sec'y Geren Letter.

Consistent with Secretary Geren's Letter, a December 22, 2008 Army briefing to the Senate informed the Senate:

> In June 2003, the Southern Oil Company staff informed KBR (according to KBR's summary) that sodium dichromate was used in the chemical injection system and housed in an adjacent storage facility.  Prior to that time, the United States Government and KBR were not aware of its use at the facility.

*See* Pls' Ex. 24, Dec. 22, 2008 Br. to the Senate Staff p. 2 (parenthetical in the original).  The Army briefing went on to provide that "KBR identified the potential sodium dichromate contamination on July 25, 2003, and KBR informed the USACE contracting officer the same day." *Id.* at 9.

In yet a third government entity to report on Defendants' discovery of sodium dichromate at Qarmat Ali, CHPPM stated that Defendants identified the sodium

dichromate contamination in late July 2003.  *See* Pls' Ex. 23, CHPPM Oct. 23, 2003

Field Report, p. 4.  Consistent with the inaccurate representations contained in

Secretary Geren's letter to Senators Dorgan and Bayh and the inaccurate

representations contained in the Army's briefing to the Senate, Defendants were

the source of CHPPM's inaccuracies.  *See* Pls' Ex. 48, Oct. 18, 2003 Adams email

(Adams noting that he was responsible for the time line).

As is demonstrated by Kimbro's June 21, 2003 email and the KBR 2002

Assessment, Secretary Geren, the Army, and CHPPM's representations that were

induced by Defendants and repeated to the Senate while Defendants stood mute

constitute outright falsehoods.

### 3.    *KBR's Representations in Arbitration*

The KBR defendants have also repeatedly pointed to the result they achieved

in the Halliburton Dispute Resolution Program proceeding involved several of

KBR's employees at Qarmat Ali, *Langford, et al. v. Halliburton Co., et al.*, 70-480-

00649-05. Among the many problems with Defendants' reliance upon *Langford,*

Defendants not only failed to disclose the June 21, 2003 Kimbro email and the KBR

2002 Assessment but took advantage of this non-disclosure by making

representations that are inconsistent with the truths that are brought to light by

these two documents.

For example, Defendants asserted in opening statements:

- I want to talk about the history of the discovery of sodium dichromate at the
  water treatment plant.  What was known about the extent of the presence
  of the chemical at the plant and actions that were taken. . . . The OAS
  engineer, they had no information about what chemicals were used at this

plant. . . . There was no way they were expecting sodium dichromate to be used in this plant.

- On July 27th a couple of OAS engineers that I mentioned earlier, a guy named Kish Atit and I think they called him Ken Singal. . . . [D]uring their assessment they learned that sodium dichromate was being used in the tanks.

- Remember the engineers came out with the memo around July 27th, around that time when the engineers first came out with the memo there was some concern that perhaps it might be in some of the stains on the soil.

*See* Pls' Ex. 17, Dec. 8, 2008 Arb. Hr'g pp. 87, 104-05, 116-17, 120; *see also* Pls' Ex. 14, Langford Disc. Resp., Interrog. No. 4. . As with Defendants' representations to Secretary Geren, the Army, and CHPPM, the KBR 2002 Assessment and the June 21, 2003 Kimbro email disclose the inaccuracies contained in Defendants' representations to the arbitrator.

### 4. *KBR's Representations to the Southern District of Indiana*

Defendants also failed to disclose the June 21, 2003 Kimbro email and the KBR 2002 Assessment during related litigation filed by Indiana guardsmen in the Southern District of Indiana. Consistent with their representations made to Secretary Geren, the Army, CHPPM, and the arbitrator, Defendants took advantage of their non-disclosure by representing in their interrogatory responses that they "were first informed about the presence of sodium dichromate at the plant on or about the end of July or the first part of August 2003." *See* Pls' Ex. 10, *McManaway* Ind. Interrog. Resp., Resp. No. 3; *see also* Pls' Ex. 11, Aug. 11, 2003 Singal email.

5.    *KBR's Representations to this Court*

Defendants utilized their failure to disclose the KBR 2002 Assessment by making representations to this Court that the KBR 2002 Assessment demonstrates are inaccurate.    For example, in Defendants' Motion to Dismiss, Defendants represented that "[d]uring KBR's efforts at Qarmat Ali, [Defendants] learned that Iraqi workers previously used sodium dichromate as anti-corrosive in the chemical injection process." *See* Defs' Mem. in Supp. at 16, Doc. No. 46.    As demonstrated by the KBR 2002 Assessment, defendants did not learn of the presence of sodium dichromate at Qarmat Ali "during their efforts at Qarmat Ali."    Rather, the KBR defendants knew of the extensive presence of sodium dichromate before ever setting foot on Qarmat Ali's sodium dichromate-contaminated soil.

Similarly, the following testimony was taken during the deposition of Defendants' Houston-based senior manager Robert Reeves ("Reeves"):

QUESTION: These (pre-invasion) planning meetings included reviewing data about existing facilities, including Qarmat Ali?

MR. LANGHAM:    Objection to the form and confidentiality of what he received during that period of time.

ANSWER:  I can't say garma—Qarmat Ali at the time because we were looking at the oil.  And we had a very limited time, so we couldn't get into great detail.

*See* Pls' Ex. 29, Reeves Dep., pp. 17-18 (parenthetical added).  Had Plaintiffs been in possession of the KBR 2002 Assessment during Reeves' deposition, they would have been able impeach his indication that prewar assessments did not concern Qarmat Ali.  The Veterans also would have known that the KBR 2002 Assessment was declassified in May 2008 and that the KBR defendants' confidentiality objection

constituted an improper attempt to keep the Veterans from learning of the contents of the KBR 2002 Assessment. *See* Pls' Ex. 2, Contingency Support Plan, F-2, C-16.

Finally, despite the fact that the KBR 2002 Assessment and June 21, 2003 Kimbro email demonstrate that Secretary Geren's statements to the Senate were inaccurate, Defendants repeatedly submitted Secretary Geren's letter to this Court as an exhibit. *See* Defs' Mem. in Supp., Ex. 2, Doc. No. 46; *see also* Doc. No. 79; Defs' Reply Br., Doc. No. 85; Defs' Mot. Supp. J. re Causation, Ex. 6, Doc. No. 205

## ARGUMENT

This Court may sanction Defendants for failing to disclose the KBR 2002 Assessment pursuant to Rule 37(d) of the Federal Rules of Civil Procedure. *See* Charles A. Wright, 88 FED. PRAC. & PROC. CIV. § 2291 (3d ed.) (Rule 37(d) allows the imposition of sanctions against a party for especially serious disregard of the obligations imposed by the discovery rules even though the party has not violated any court order). Although some federal circuits limit the imposition of sanctions under Rule 37(d) to circumstances wherein a party completely fails to provide an interrogatory response, the Ninth Circuit allows Rule 37(d) to be used as a vehicle for sanctions when a party provides a materially false interrogatory response. *See Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 588, 589 (9th Cir. 1983) (upholding Rule 37(d) sanctions when the defendant incorrectly denied having issued rebates in interrogatory responses).

In addition to Rule 37(d) sanctions, federal district courts have the inherent authority to issue a wide range of sanctions in circumstances wherein a party

provides materially false interrogatory responses. *Chambers v. NASCO*, 501 U.S. 32, 45-46 n.10 (1991). As provided by *Wyle*:

> Additionally, courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.

709 F.2d at 589 (citing *Phoreene Sore-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982)).

Sanctions that federal courts may impose for discovery violations include but are not limited to default, an award of attorney's fees and expenses, an instruction informing the jury of Defendants' misconduct and/or instructing it to treat certain facts as established, precluding a party from maintaining a claim or a defense, striking pleadings, contempt, revocation of *pro hac vice* admission, and waiver of attorney-client privilege. *See U.S. ex. rel Berglund v. Boeing Co.*, 2011 WL 6182109 * 30 (D. Or., Dec. 13, 2011); *see also Jackson v. N'Genuity Enter. Co.*, 2011 WL 4628683 * 35 (N.D. Ill., Oct. 3, 2011); *A & T Siding, Ins. v. Capitol Specialty, Ins. Corp.*, 2012 WL 707100 * 3 (D. Or., March 1, 2012); *1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, 2009 WL 232060 * 4 (S.D. Ind., Jan. 30, 2009) (citing *Clark v. U.S.*, 289 U.S. 1, 59 (1933)); Fed. R. Civ. P. 37(b)(2). The Ninth Circuit "encourages" a district court to exercise its discretion in imposing sanctions when "a party acted willfully or in bad faith in failing to comply with rules of discovery or . . . in flagrant disregard of those rules." *Lee v. Walters*, 172 F.R.D. 421, 435 (D. Or. 1997) (citing *G-K Prop. v. Redev. Agency of City of San Jose*, 577 F.2d 645, 647 (9th Cir. 1978)).

A. *Factors for Imposing Sanctions*

The factors that the Ninth Circuit uses to determine whether sanctions that include default as a remedy are appropriate include: (1) the public's interest in the expeditious resolution of litigation; (2) the Court's need to manage its docket; (3) the risk of prejudice; (4) the public policy favoring resolution of cases on their merits; and (5) the availability of less drastic sanctions. *The Sunrider Corp. v. Bountiful Biotech Corp.*, 2010 WL 4589156 * 6 (C.D. Cal. Nov. 3, 2010) (citing *In re Exxon Valdez*, 102 F.3d 429, 433 (9th Cir. 1996)).

The key factors in determining the appropriateness of sanctions are the risk of prejudice and the availability of less drastic sanctions. *Id.* Furthermore, this Court need not be overly rigid in the application of each of the Ninth Circuit's factors. *See Fair Housing of Marin v. Combs*, 285 F.3d 899, 905-06 (9th Cir. 2002) (giving terse attention to the five factors while affirming sanctions); *see also A & T Siding, Inc.*, 2012 WL 707100 * 4 (noting that the court need not make explicit findings for each factor).

In addition to the above-listed factors, the imposition of sanctions is limited by two other considerations. *Wyle*, 709 F.2d at 591. Sanctions must be "just" and specifically related to the particular "claim" which was at issue in order to provide discovery. *Id.* (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Gurnee*, 456 U.S. 694 (1982)). Sanctions are, nonetheless, appropriate when a discovery violation threatens to interfere with the "rightful decision of the case." *Id.* (citing *G-K Prop. v. Redev, Agency*, 577 F.2d 645 F.2d 645, 648 (9th Cir. 1978)).

Finally, other considerations apply when imposing the sanction of default. *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 786 (9th Cir. 2011) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Hercules, Inc.*, 146 F.3d 1071, 1073 (9th Cir. 1998)).  In addition to the Ninth Circuit's five-factor test, the moving party must demonstrate willfulness or bad faith to obtain default.[5] *Dreith*, 648 F.3d at 788 (citing *Wyle*, 709 F.2d at 589).  "Willfulness" is established by a demonstration of disobedient conduct that is within the offending party's control.  *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905-06 (9th Cir. 2002).  Furthermore, "[g]iving a false answer is itself is evidence of bad faith."  *Evanson v. Union Oil Co. of Cal.*, 85 F.R.D. 274, 277 (D.C. Minn., Dec. 14, 1979); *see also* 35A C.J.S. FED. CIV. PROC. § 694 (a party is bound to give truthful answers to interrogatories).

B. *Plaintiffs' Proposed Sanctions*

While it would be appropriate that this Court should consider default, plaintiffs ask that the Court impose at least the following sanctions.

- Require Defendants to identify all individuals—including attorneys—who had knowledge of the KBR 2002 Assessment within ten days;
- Plaintiffs to depose the identified individuals within thirty days;
- Issue an award of attorney's fees and expenses for all costs associated with Defendants' failure to produce the KBR 2002 Assessment;
- Inform the jury of Defendants' failure to disclose the KBR 2002 Assessment;
- Revoke Defendants' attorney-client privilege as it relates to discovery; and

---

[5] A finding of bad faith is not a prerequisite for imposing sanctions other than default. *See Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994) ("While a finding of bad faith is not a requirement for imposing sanctions, good or bad faith may be a consideration in determine whether impositions of sanctions would be unjust").

- Set a hearing at the conclusion of the above-captioned depositions to determine the appropriateness of any additional sanctions KBR 2002 Assessment.

Alternatively, an order of default, while drastic, may be the only way truly to mitigate the prejudice created by Defendants' failure to identify the KBR 2002 Assessment

### C. Prejudice

The chief problem in determining an appropriate sanction to remedy Defendants' failure to disclose the KBR 2002 Assessment is that Defendants' conduct is so prejudicial that even a combination of remedies, absent default, is incapable of curing the resulting prejudice.

### 1. Plaintiffs were Deprived of the use of the KBR 2002 Assessment during Depositions

Had Defendants disclosed the KBR 2002 Assessment, Plaintiffs would have been able to utilize it in the depositions of Defendants' employees and USACOE personnel. As demonstrated by the only deposition wherein Plaintiffs were able to review the KBR 2002 Assessment, the KBR 2002 Assessment would have had an overwhelming influence upon prior depositions. Furthermore, simply informing the jury that Defendants were aware that Qarmat Ali processed in degraded conditions more than 8,000,000 pounds of sodium dichromate per year prior to the invasion of Iraq does not produce the same effect as live testimony indicating that it is "obvious" that Defendants knew of the extensive use of sodium dichromate at Qarmat Ali and that Defendants should have properly notified the Army, even at

the risk of its "award": bonus for timely completion of the its work.. *See e.g.* Pls' Ex.

32, Weatherly Dep. pp. 126, 132.

By way of an example of the prejudice caused by Defendants' conduct, the

following deposition testimony was provided by Defendants' senior Houston-based

environmental manager, Ralph Stephenson:

| QUESTION: | Part of the job of the KBR team, was it to get the slightest indication of what chemicals were used? |
|---|---|
| ANSWER: | Oh, we already—we already knew. |

* * * *

| QUESTION: | Very basic question—can you confirm for us that you, corporate headquarters, KBR, Houston, Texas, knew before any assessment was done by Mr. Tseng on the ground, there was sodium dichromate out there? |
|---|---|
| ANSWER: | I am quite certain of it. |

Pls' Ex. 27, Stephenson Dep. pp. 71, 74-75, 93. Also, Stephenson indicated that he

could not elaborate on the basis of his knowledge because such testimony would

disclose classified material. *See id.* at 60. Had Defendants disclosed the KBR 2002

Assessment, Plaintiffs would not only have been able to obtain more evidence by

following up on Stephenson's probative admissions but would have also known that

Stephenson improperly invoked classification to shield the full extent of Defendants'

knowledge, as the KBR 2002 Assessment had been declassified in May 2008.

Finally, a document as comprehensive as the KBR 2002 Assessment had to

have several thousands of support pages wherein the information that was

ultimately placed therein was accumulated. As the KBR 2002 Assessment not only

references a document indicating that Qarmat Ali processed more than 4000 tons of

sodium dichromate per year but specifically indicates that the corrosion protection system was a "major item to be addressed" by the report," it is necessarily the case that the assembly of the KBR 2002 Assessment would be highly relevant in demonstrating Defendants' knowledge of the hazard present at Qarmat Ali. Because Defendants failed to disclose the KBR 2002 Assessment, Plaintiffs were prevented from exploring the compilation of the KBR 2002 Assessment or even know which KBR managers were directly involved in producing it.

### 2. The Failure to Disclose Threatens the Trial Schedule.

It is possible that the Veterans will need to re-depose as many as thirty of Defendants' employees and government personnel. This schedule threatens to disrupt dispositive motions and trial. Thus, Plaintiffs—and this Court—now face the untenable "choice" of interfering with the timely resolution of this case and this Court's docket by re-deposing more than thirty of Defendants' employees and government personnel or not being able fully to utilize the KBR 2002 Assessment to ensure an accurate resolution of this litigation.

### 3. The Reliability of Exploring Defendants' Discovery Compliance

At the time of Defendants' prior non-disclosures, the only motive Defendants had for not complying with their discovery obligations was to avoid the monetary consequences of an adverse adjudication.   Now, Defendants have the added substantial incentive of not revealing that they and their officers perjured themselves.   For this reason, Plaintiffs are concerned that Defendants may not

accurately identify all individuals who had knowledge of the KBR 2002 Assessment and that such individuals may be less candid in their depositions.

Plaintiffs' concern is grounded in experience. For example, Defendants' HSE manager Chuck Adams ("Adams")—who provided the Army with the timeline indicating that Defendants identified the sodium dichromate contamination at Qarmat Ali in late July—testified prior to Kimbro's disclosure of his June 21, 2003 email and prior to the disclosure of the KBR 2002 Assessment:

> Had I known—let me tell you this, had I known, from the beginning, of the potential hazard on that site, that there was a potential for anyone to be exposed, I would have shut the job down from day one.

*See* Pls' Ex. 41, Adams Dep. pp. 41-42; Pls' Ex. 42, Adams Arbitration Dep. p. 88. Because Adams received a copy of Kimbro's email in June 2003, his testimony indicating that he would have shut the site down had he known there was a potential hazard was inaccurate. *See* Pls' Ex. 41, Adams Dep. pp. 24-25. Similarly, Defendants' Houston-based manager Reeves—supported by Defendants' improper invocation of a confidentiality objection—denied that Defendants' pre-invasion planning concerned Qarmat Ali. *See* Pls' Ex. 29, Reeves. Dep. pp. 17-18.

Thus, in light of Defendants' history of non-disclosure when only the financial consequences attendant to the litigation were at issue, it is implausible to assert that Defendants will be fully candid in identifying all individuals who knew of the KBR 2002 Assessment. Such identification not only will demonstrate the inaccuracy of prior deposition testimony but will also reveal further inaccurate interrogatory responses and other discovery violations.

*4. Defendants' Failure to Disclosure other Evidence*

A final problem facing Plaintiffs is the fact that they have every reason to believe that Defendants have failed to disclose other probative evidence. In addition to the fact that Defendants failed to disclose Kimbro's email and the KBR 2002 Assessment, Defendants repressed evidence from the earliest stages of their involvement with Project RIO.

For example, USACOE contract coordinator Mike Remington testified that Adams—Defendants' HSE manager—instructed him "to keep some of the stuff off paper." *See* Pls' Ex. 22, Remington Dep. pp. 47-48. As indicated by Weatherly, the only reason that a contractor would tell a USACOE contracting supervisor to "keep stuff off paper" would be to hide something or to cover up something. *See* Pls' Ex. 32, Weatherly Dep. p. 136.

Also, there is no reason that Plaintiffs should not have received Kimbro's June 21, 2003 email. When asked about the Kimbro email, Defendants' on-site supervisor, Mark Daniels ("Daniels"), indicated:

> QUESTION: Which means this particular email should be part of the – what I am looking at, Plaintiffs' Exhibit 5, should be part of the KBR documentation for this project?
>
> ANSWER:   I would think so, yes.
>
> QUESTION: Any reason why it would not be contained within KBR's electronic files, even now?
>
> ANSWER:   No . . . I can't imagine it was not.

*See* Pls' Ex. 28, Daniels Dep. p. 66. Of greater concern, Daniels testified that—as one might expect—he received a copy of the Kimbro email and that there were "several" emails commenting upon Kimbro's email, with wide circulation to Defendants'

upper management. *See* Pls' Ex. 21, Daniels Dep. pp. 40, 66, 68-69, 88. Plaintiffs have yet to receive any of these emails.

To the extent that the "several" emails from Defendants' upper management were destroyed, they should not have been, as Defendants were aware of the possibility of litigation at least as early as the summer of 2003. *See* Pls' Ex. 30, Bedman Dep. p. 17 (noting that his involvement in the Qarmat Ali project in 2003 included "protecting Halliburton/KBR against potential legal claims in the future by affected individuals"); *see also U.S. ex. rel. Berglund*, 2011 WL 6182109 * 28 (citing *World Courier v. Barone*, 2007 WL 1119196 * 1 (N.D. Cal., April 16, 2007)) ("The duty to preserve material evidence arises not only during litigation but also extends to the period before litigation when a party reasonably can know that the evidence may be relevant to anticipated litigation").

More important, KBR expressly denied destroying or otherwise discarding emails or documents related to sodium dichromate. *See* Pls' Ex. 12, Interrog. No. 7 (Defendants indicating that they are not aware of any documents relevant to sodium dichromate at the water injection facility that have been destroyed or discarded). Because comment upon Kimbro's email necessarily concerns sodium dichromate, Defendants have necessarily either failed to properly identify documents relating to sodium dichromate that they destroyed in response to Interrogatory Seven or failed to produce the "several" emails commenting upon Kimbro's June 21, 2003 email.

The dearth of mid-2003 documents in Defendants' production is particularly prejudicial to Plaintiffs. Not only will such emails and documents demonstrate that Defendants were well aware of the danger that they imposed upon American soldiers but it is also probable that such documents will further enable Plaintiffs to demonstrate that their now-existing maladies were caused by sodium dichromate exposure. Indeed, the Kimbro email that Defendants failed to disclose not only exposes Defendants' knowledge of the sodium dichromate contamination but also constitutes circumstantial evidence that the soldiers stationed at Qarmat Ali were subject to a dose of exposure magnitudes higher than the OSHA PEL. *See* Pls' Ex. 37, June 21, 2003 Kimbro email (alerting Defendants of "areas of soil that had been discolored yellow east and southeast of the chlorine drums and on the west side of the chlorine tank storage area").

Despite their act of failing to disclose a document that speaks to the dose of sodium dichromate that human beings were exposed to at Qarmat Ali, Defendants routinely claim that Plaintiffs do not have on-site evidence of dose exposure. *See* Pls' Ex. 43, Weill Rebuttal Expert Report p. 1 ("Dr. Carson's report wholly lacks any quantitative assessment of any individual's exposure, dose"); *see also* Pls' Ex. 44, Beck Rebuttal Expert Report p. 3 ("Dr. Carson reached his conclusions for each plaintiff with no quantitative information on dose"); Pls' Ex. 45, Goodman Expert Rebuttal Report p. 3 ("A major shortcoming of Dr. Carson's analysis is that he does not consider Cr(VI) exposure doses"). It is bad enough that Defendants' dose argument relies upon Defendants' failure to protect the human beings present at

Qarmat Ali by, among other things, not testing the known sodium dichromate contamination at Qarmat Ali in the five months prior to encapsulation; Defendants' dose argument is far more troubling when viewed in conjunction with Defendants' failure to disclose documents that speak to pre-encapsulation contamination.

### D. Other Considerations for the Imposition of Sanctions

The other factors for imposing sanctions considered by the Ninth Circuit are largely subsumed by the above analysis of the prejudice deriving from Defendants' non-disclosure. For example, the factors of "the public's interest in the expeditious resolution of litigation" and "the Court's need to manage its docket" favor the sanction of default because it would not be possible for Plaintiffs to fully utilize the KBR 2002 Assessment by re-deposing thirty of Defendants' employees and government personnel while maintaining the October 2012 trial setting.

Similarly, although the policy favoring cases to be adjudicated on their merits favors a sanction other than default, for the reasons addressed above, should this case go to trial, the trial will not be on the merits. Rather, this adjudication will be decided on the merits of only the evidence that Defendants were forced to disclose.

Furthermore, as demonstrated above, it does not appear that a less drastic sanction would remedy the prejudice caused by Defendants' failure to disclose. Plaintiffs will not be able to make full use of the KBR 2002 Assessment in depositions while maintaining their desired October 2012 trial date. Moreover, Plaintiffs have every reason to believe that other evidence has been improperly

withheld or destroyed by Defendants—such as the "several" emails from Defendants' upper management discussing the Kimbro email.

As a remaining consideration, the sanctions proposed by Plaintiffs not only relate to the "deception in controversy" but are designed to attempt to remedy the prejudice caused thereby. *See Wyle*, 709 F.2d at 589. To the extent a lesser sanction would remedy Defendants' conduct, Plaintiffs would accept it. For the reasons stated above, however, Plaintiffs do not believe that a lesser sanction would be adequate.

*E. The Need to Deter Future Misconduct*

The Ninth Circuit also permits a district court to consider the need to deter future misconduct while imposing sanctions. *Wyle*, 709 F.2d at 589 (citing *Nat'l Hockey League v. Metro. Hockey League Club, Inc.*, 427 U.S. 639, 642-43 (1976)); *see also Lee*, 172 F.R.D. at 435 ("This Court may impose even the most severe sanction to fulfill the purpose not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent"). Defendants' above-cited discovery practices speak for themselves and not only demonstrate the need to deter misconduct but also undermine the confidence of the judiciary's ability to accurately adjudicate controversies. *See Commodity Futures Trading Comm'n v. Noble Metals, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995) (In fixing the amount of sanctions, the court may consider a party's entire course of conduct during the proceedings); *see also Anheuser-Busch, Inc. v. Natural Beverage Distributor*, 69 F.3d 337, 348 (9th

Cir. 1995) ("It is well settled that dismissal is warranted where, as here, a party has engaged deliberately in deceptive practices that undermine the integrity of the judicial proceedings"); *A & T Siding, Inc.*, 2012 WL 707100 * 3 ("this sanction is imposed when a party deceives the court or engages in conduct utterly inconsistent with the administration of justice").

## CONCLUSION

For the above-stated reasons, Plaintiffs ask this Court to grant their Motion for Sanctions and issue an order sanctioning Defendants.

Respectfully submitted,

Dated this 4th day of April 2012

David F. Sugerman, OSB No: 86298
DAVID F. SUGERMAN ATTORNEY, PC
520 S.W. Sixth Avenue, Ste. 920
Portland, Oregon 97204-1535
Phone:    (503) 228-6476
Fax:      (503) 224-2764
Email:    david@davidsugerman.com