IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ROCKY BIXBY, LAWRENCE ROBERTA,
SCOTT ASHBY, CHARLES ELLIS, MATTHEW
HADLEY, JESUS BRUNO, COLT CAMPREDON,          CV 3:09-632-PK
STEPHEN FOSTER, BYRON GREER, KELLY
HAFER, DENNIS JEWELL, STEPHEN                 OPINION AND ORDER
MUELLER, VITO PACHECO, JOHN RYDQUIST,
KEVIN STANGER, RONALD BJERKLUND,
ADANROLANDO GARCIA, BRIAN HEDIN,
CHARLES SEAMON, RANDY KEIPER, MATT
KUHNEL, DENNIS ROSGEN, AARON
ST. CLAIR, KEVIN WILSON, JASON BLAIN,
JAMES BORJA, DEVON FIELDS, LESLIE ING,
RICHARD LAWRENCE, JAY LOUISIANA,
JAMES McGOWAN, DONALD YEARGIN,
and JASON ARNOLD,

                    Plaintiffs,

v.

KBR, INC., KELLOGG, BROWN & ROOT
SERVICE, INC., KBR TECHNICAL SERVICES, INC.,
OVERSEAS ADMINISTRATION SERVICES, LTD.,
and SERVICE EMPLOYEES INTERNATIONAL, INC.,

                    Defendants.
_____

PAPAK, Magistrate Judge:


Page 1 - OPINION AND ORDER

Plaintiffs Rocky Bixby, Lawrence Roberta, Scott Ashby, Charles Ellis, and Matthew Hadley filed this action against defendants KBR, Inc., Kellogg, Brown & Root Service, Inc., KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc. (collectively, the "KBR defendants"), on June 8, 2009. On September 8, 2009, plaintiffs amended their complaint, adding Carlos Avalos, Jesus Bruno, Colt Campredon, Stephen Foster, Byron Greer, Kelly Hafer, Dennis Jewell, Stephen Mueller, Vito Pacheco, John Rydquist, and Kevin Stanger as additional plaintiffs. Plaintiffs amended their pleading a second time on February 2, 2010, adding Ronald Bjerklund, Adanrolando Garcia, Brian Hedin, Lewis Martin, and Charles Seamon as additional plaintiffs. On June 25, 2010, plaintiffs amended their complaint a third time, adding Randy Keiper, Matt Kuhnel, Dennis Rosgen, Aaron St. Clair, and Kevin Wilson as further additional plaintiffs. On October 27, 2010, plaintiffs amended their complaint a fourth time, adding Jason Blain, James Borja, Devon Fields, Leslie Ing, Richard Lawrence, Jay Louisiana, James McGowan, and Donald Yeargin as further additional plaintiffs, and adding Halliburton Company and Halliburton Energy Services, Inc. (collectively, the "Halliburton defendants"), as additional defendants. Plaintiffs amended their complaint a fifth time on January 10, 2011, adding as additional plaintiffs Jason Arnold, Thomas Barella, Daniel Grover, Christopher Wangelin, and Michael O'Rielly. Plaintiffs voluntarily dismissed Barella as a plaintiff in this action on the following day, January 11, 2011, and voluntarily dismissed Grover as a plaintiff in this action on February 25, 2011. The parties stipulated to the dismissal of Avalos, Martin, and Wangelin as plaintiffs in this action, on December 16, 2011, and to the dismissal of O'Rielly as a plaintiff on April 4, 2012. In their fifth amended complaint, plaintiffs allege defendants' liability for negligence and for fraud arising out of plaintiffs' exposure to

sodium dichromate and subsequent hexavalent chromium poisoning while stationed as Oregon National Guardsmen in Iraq and assigned to duty at the Qarmat Ali water plant in May-September 2003.

Throughout the course of this action, defendants have brought various jurisdictional challenges, most of which have been denied.  On April 12, 2010, this court denied the KBR defendants' motion to dismiss for lack of personal jurisdiction, concluding that the court may exercise specific personal jurisdiction over each of the KBR defendants on the grounds that plaintiffs had sufficiently alleged that the KBR defendants intentionally withheld information regarding the alleged sodium dichromate contamination at Qarmat Ali from the plaintiffs, whom they knew to be Oregon residents.  On August 30, 2010, this court denied the KBR defendants' motion to dismiss for lack of subject-matter jurisdiction.  In so doing, I rejected defendants' arguments that the court lacks subject-matter jurisdiction by operation of the political question doctrine, the government contractor defense, or the combat activities exception the Federal Tort Claims Act.  On June 16, 2011, this court recommended that plaintiffs' claims be dismissed to the extent alleged against the Halliburton defendants for lack of personal jurisdiction, and on July 20, 2011, Judge Hernandez adopted that recommendation as his own opinion.  On August 29, 2012, I denied defendants' renewed motion to dismiss for lack of subject-matter jurisdiction, again rejecting defendants' arguments regarding the political question doctrine and the combat activities exception to the Federal Tort Claims Act.

On April 4, 2012, the following twelve plaintiffs were designated as the "Group I" plaintiffs for trial set to commence on October 9, 2012: Jason Arnold, Rocky Bixby, Ronald Bjerklund, Colt Campredon, Charles Ellis, Byron Greer, Matthew Hadley, Brian Hedin, Vito

Pacheco, Lawrence Roberta, Charles Seamon, and Aaron St. Clair.

Now before the court is defendants' motion for summary judgment (#344) on plaintiffs' fraud and negligence claims.  For the reasons discussed below, the motion is denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence.  *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND[1]

A brief sketch of the parties basic background facts appears below.  The parties dispute virtually all other factual evidence, so that evidence is discussed where relevant to the particular claims at issue.  Kellogg, Brown & Root Service, Inc. ("KB&RS") entered into Contract No. DACA63-03-D-0005 – known as the "Restore Iraqi Oil" or "RIO" contract – with the U.S. Army

---

[1]  Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

Corps of Engineers on March 8, 2003, pursuant to which KB&RS would perform tasks as ordered by the U.S. Army Corps of Engineers in connection with efforts to restore the infrastructure underlying the Iraqi oil industry.

Combat operations in Iraq began on March 19, 2003.

On March 20, 2003, the Corps of Engineers issued "Task Order 3," which governed the services to be provided by KBR and its subsidiaries at Qarmat Ali and other facilities. Under Task Order 3, the U.S. military would declare a given worksite to be "benign" before KBR would begin operations there. In addition, the RIO contract provides that the U.S. government will indemnify KBR for any claims involving bodily injury or death arising out of KBR's provision of services under the contract.

In April 2003, the KBR defendants began operations at Qarmat Ali.

In May 2003, the Oregon National Guard was assigned to the Doha Operations Center in Kuwait. Beginning some time after May 1, 2003, the KBR defendants, or some of them, would contact the Doha Operations Center and request assistance with security issues on a regular, perhaps daily basis, in accordance with the provisions of the RIO contract and Task Order 3. On some occasions, members of the Oregon National Guard would receive security assignments to the Qarmat Ali water plant, where they were allegedly exposed to sodium dichromate, a chemical corrosion inhibitor used to treat water in oil wells, but which is also an irritant and carcinogen.

Plaintiffs are members of the Oregon National Guard allegedly exposed to sodium dichromate at Qarmat Ali in 2003 who have allegedly been harmed by their exposure.

## DISCUSSION

Defendants seek summary judgment on plaintiffs' claims for fraud and negligence.

Page 5 - OPINION AND ORDER

Defendants argue that summary judgment is appropriate on the fraud claim because plaintiffs have failed to provide satisfactory evidence of any false representations, intent to defraud, reliance, or causation.  Defendants contend that they are entitled to summary judgment on the negligence claim because KBR owed no duty to the plaintiffs.

## I.  Fraud

In order to bring an action for fraud under Oregon law, plaintiffs must establish, by clear and convincing evidence, each of the following elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Rice v. McAlister*, 268 Or. 125, 128 (1974), *citing Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or. 332, 350 (1950); *see also Pollock v. D.R. Horton, Inc.-Portland*, 190 Or. App. 1, 20 n. 22 (2003) (noting that at times Oregon courts list five elements for fraud, but that there is no substantive difference between the two sets of elements).

Here, the parties disagree only over whether defendants made any false misrepresentations, whether defendants did so with an intent to deceive, whether there was any reliance on these representations, and whether the plaintiffs' injuries were proximately caused by these representations.  Specifically, defendants contend that plaintiffs' evidence falls short of establishing each of these elements by clear and convincing evidence.  Defendants also contend that summary judgment is appropriate because plaintiffs have failed to supply the necessary particularity required by Fed. R. Civ. P. 9(b) in order to plead a fraud claim.

### A.  Compliance with Fed. R. Civ. P. 9(b)

As a preliminary matter, defendants argue that the court should dismiss plaintiffs' fraud claim because they have failed to plead fraud with the requisite particularity required by Fed. R. Civ. P. 9(b). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2003), *quoting Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.'" *Id.*, *quoting Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "A party alleging fraud must set forth more than the neutral facts necessary to identify the transaction." *Id.*, *quoting In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

Defendants assert that plaintiffs' complaint does not satisfy the heightened pleading standards of Rule 9(b) because it fails to identify who said what to whom. Notwithstanding the fact that the purpose of the heightened pleading standard is merely to give defendants sufficient notice so that they can defend the charge, *Kearns*, 567 F.3d at 1124, and the fact that defendants have litigated this case extensively even prior to filing the current dispositive motions, a review of the operative complaint reveals that plaintiffs' fraud allegations are pled with sufficient particularity. The complaint identifies specific KBR employees who allegedly knew about the sodium dichromate at Qarmat Ali, identified specific dates that they allegedly possessed this knowledge or took particular action, and alleges that despite this knowledge, at least two employees met with and told the workers that the sodium dichromate was, at most, a mild irritant. Fifth Am. Compl. ¶¶ 13, 19, 20. While the complaint does not set forth specific

statements made to each individual plaintiff, it certainly sets forth more than the "neutral facts necessary to identify the transaction," and thus, satisfies Rule 9(b)'s heightened pleading requirements.  *Kearns*, 567 F.3d at 1124.  Accordingly, I decline to dismiss plaintiffs' fraud claim on this basis.

### B.  False Representations

"Actionable fraud may be committed by a concealment of material facts as well as by affirmative and positive misrepresentations."  *Musgrave v. Lucas*, 193 Or. 401, 410 (1951).  Generally, a plaintiff cannot bring an action based on nondisclosure unless defendant had a duty to speak.  *Paul v. Kelley*, 42 Or. App. 61, 65-66 (1979).  "Nondisclosure of material facts can be a form of misrepresentation where the defendant has made representations which would be misleading without full disclosure."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1223 (9th Cir. 1999), *citing Elizaga v. Kaiser Foundation Hospitals*, 259 Or. 542, 546 (1971).  Often, "[t]he extent to which a misrepresentation is misleading and, therefore, imposes a duty of disclosure, is a question of fact."  *Id.*, *citing Gregory v. Novak*, 121 Or. App. 651, 655 (1993).

However, when there is "active concealment, as opposed to simple nondisclosure," the plaintiff does not need to prove that defendant had a duty to speak.  *Caldwell v. Pop's Homes, Inc.*, 54 Or. App. 104, 113 (1981).  "This distinction is made clearer by Prosser's classification of active concealment with affirmative statements as follows:

> Any words or acts which create a false impression covering up the truth, * * * or which remove an opportunity that might have otherwise lead to the discovery of a material fact as by floating a ship to conceal defects in her bottom, * * * sending one who is in search of information in a direction where it cannot be obtained, * * * or even a false denial of knowledge by one in possession of the facts * * * are classed as misrepresentations, no less than a verbal assurance that the fact is not true.

*Paul*, 42 Or. App. at 65-66, *quoting* Prosser, LAW OF TORTS § 106 at 695 (4th ed. 1971).

Plaintiff must also prove that the representations were false. *Nisson v. Tillman*, 213 Or. 133, 137-38 (1958). However, representations that are "literally true" may be actionable if the representation "creates a false impression under the circumstances." *Arboireau v. Adidas-Salomon AG*, 347 F.3d 1158, 1168 n. 12 (9th Cir. 2003), *citing Heverly v. Kirkendall*, 257 Or. 232, 234 (1970); *see also Sheets v. B&B Personnel Systems*, 257 Or. 135, 145 (1970) ( "Fraud may be predicated upon an equivocal, evasive or misleading answer calculated to convey a false impression even though it may be literally true as far as it goes.").

Defendants take the position that plaintiffs cannot prove that KBR made any false representations for two reasons. First, plaintiffs cannot prove that the statements made directly to the individual plaintiffs were false because the statements prove that defendants actually warned the soldiers to stay away from the contaminated soil. Second, all of plaintiffs' remaining allegations relate to statements KBR allegedly made to the Army rather than to plaintiffs themselves, and since plaintiffs may not "bootstrap" their claims to the allegedly false representations made to the Army, plaintiffs have failed to establish this element of their fraud claim.

### 1.  Statements to Individual Plaintiffs

Plaintiffs assert that defendants made false representations about the hazards posed by sodium dichromate to several individual guardsmen. Sometime in late April or early May 2003, plaintiff MSgt. Stanger and Capt. Chatterji took their first trip to Qarmat Ali and asked KBR

personnel about what they knew about the discolored soil.  Stanger Depo.[2] at 98-99.  A KBR

representative responded that "it was a mild irritant, and that [the soldiers] should try to stay

away from it, but other than that, [the soldiers would] be okay."  *Id*.[3]  According to Stanger, the

KBR representative also mentioned that it could irritate noses and throats.  *Id*. at 102.  Sometime

thereafter, yellow ribbon was placed around an area that had a large pile of discolored soil and

the message to "stay away from the stuff" was passed down the Chain of Command.  *Id*. at 103,

282-283.  During Battle Update Briefs ("BUBs"), the message to "stay away from the chemical

that is surrounded by the tape" was passed along to the Oregon National Guard leaders, who then

passed it along to the soldiers themselves.  *Id*.

  In addition to Stanger, defendants told at least three more individual plaintiffs, Jason

Arnold, Aaron St. Clair, and Dennis Rosgen, that the powder was merely an irritant.  Arnold

stated that when he asked KBR employees whether there were any hazards at Qarmat Ali, they

responded by saying that there were "certain chemicals, but that the only thing they found [were]

mild irritants."  Arnold Depo. at 127-28.  St. Clair testified that while he was at Qarmat Ali, he

went to touch some orange dust on the side of a building, but a KBR employee told him "[d]on't

touch that. That's a skin irritant.  Try not to touch that stuff."  St. Clair Depo. at 93.  After that, he

---

  [2] Both parties have submitted documents with various attachments, including multiple excerpts of the depositions that form the factual basis for the current motion.  Unless otherwise indicated, all of the citations are directly to the depositions, not the documents to which they are attached.

  [3] At other times, Stanger characterizes the KBR representative as saying that the chemical was "mildly caustic."  Stanger Depo. at 101-102.  There is also evidence that during this same time period, a KBR employee responded to an inquiry from an Indiana National Guardsmen about what the orange substance was, by saying it was "nothing . . . if anything, it's a mild irritant."  Kimberling Depo. at 60-61, 64.

made an active effort to avoid the yellowish-orange powder, though he admits that he did not

know anything about it other than that it was a skin irritant. *Id*. at 96, 141. Rosgen testified that

he observed "blown open bags" outside of a building, which he tried to avoid as much as

possible, even though he was not sure what it was. Rosgen Depo. at 117. At some point Rosgen

said he asked some KBR employees about the bags and "all this crud on the ground," and they

responded that "it was fine. Don't worry about it." *Id*. at 118.

Defendants contend that KBR never made any false statements to any plaintiff, as

evidenced by the fact that the vast majority of the plaintiffs (30 out of 34, by defendants' count)

provided testimony that they could not recall KBR ever mentioning anything about sodium

dichromate. In support, defendants provide evidence from plaintiff Charles Ellis who testified

that during his deployment, he was never provided any reports from any source about chemical or

environmental hazards at Qarmat Ali. Ellis Depo. at 92. Defendants also provide brief excerpts

from various plaintiffs' deposition testimony and interrogatory responses, where plaintiffs state

that they never communicated with any KBR employees about chemical hazards whatsoever, and

that they did not learn of the presence of sodium dichromate from anyone at KBR. Carter Aff.

Exh. 23-49, 56.

As for those four plaintiffs who claim that KBR made such misrepresentations directly to

them, defendants claim their testimony actually proves that the Army gave accurate information

to the soldiers by warning them to stay away from the contaminated soil. According to

defendants, St. Clair testified that after being told about the yellowish-orange powder being a

skin irritant, he made an effort to avoid it. St. Clair Depo. at 93, 96. Similarly, Rosgen

acknowledged that even though "the KBR guys" told him not to worry about the "crud" on the

ground, he avoided it anyway.   Rosgen Depo. at 117-120.   Defendants also provide some

evidence that even when KBR allegedly made statements about the discolored soil, plaintiffs did

not recall that KBR told them what particular chemical was causing the discoloration.  *Id.*

Finally, defendants point out that Stanger, who claimed that someone had told him that sodium

dichromate was just a "mild irritant," later testified that he received the CHPPM Risk Factor Fact

Sheet sometime in April 2004, and that this sheet actually corroborated the information that the

KBR representative had told him about the sodium dichromate, namely that it was not hazardous.

Stanger Depo. at 104-105; Carter Aff. Exh. 20.

The fact that only four plaintiffs recall that KBR made statements to them about the

hazards posed by the discolored soil does not undermine plaintiffs' fraud claim.  Nor does it

matter that the plaintiffs did not recall that the KBR employees ever specifically told them that

the discolored soil was sodium dichromate.   It is enough that plaintiffs have provided evidence

that the KBR employees' statements gave the false impression that the soil was not a serious

hazard when it was, in fact, the opposite.   The fact that the plaintiffs elected to avoid direct

contact with the soil anyway does not render the statement any less misleading.   Consequently,

plaintiffs have set forth sufficient evidence that defendants made false representations to several

individual plaintiffs about the hazards presented by the discolored soil.

### 2.  Statements to the Army

In support of the argument that plaintiffs may not sustain their fraud claim based on

statements made to the Army, defendants primarily rely on *Bootay v. KBR*, Civil No. 2:09-1241,

2010 WL 3632720, *11 (W. D. Pa. Sept. 9, 2010), *aff'd* 437 Fed. Appx. 140, 146 (3rd Cir. 2011),

a similar case involving an Army sergeant assigned to provide protection at Qarmat Ali in April 2003 and who alleged that he was exposed to and injured by sodium dichromate contamination. There, the court noted that under Pennsylvania law, one cannot rely on misrepresentations made to a third party in order to state a claim for fraud, and since the plaintiff failed to allege that KBR made any misrepresentations directly to him, the fraud claim was dismissed. *Id*. Defendants also cite an Oregon case where the court affirmed a directed verdict against a defendant's fraud defense. *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or. App. 553, 578-79 (2007). There, the defendant-lender attempted to avoid liability on the grounds that the plaintiff-homeowners had fraudulently induced the lender into the loan transaction by submitting their federal tax returns which presumably did not include a full picture of their undisclosed financial liability. *Id*. The appeals court upheld the directed verdict for the plaintiffs on the grounds that defendants failed to prove that plaintiffs' tax returns were, in fact, false. *Id*. at 579.

In response, plaintiffs argue that under Oregon law, they need not show that defendants made the representations directly to them in order to maintain their fraud claim. In support, they rely on the exception announced in *Handy v. Beck*, 282 Or. 653, 663-65 (1978), where the court concluded that a third party may bring a fraud action under certain circumstances if the third party is a member of a protected class and is injured as a result of a misrepresentation made to someone else. In *Handy*, the defendant constructed a well on the private property of plaintiffs' predecessor in interest and filed a false drilling log with the state engineer, a report which was required by state regulations. *Id*. at 655. Despite this false filing, the defendant represented that the well was "legally constructed" to the landowner. *Id*. Several years later, the plaintiffs

purchased the property and subsequently learned that the well did not meet state standards after it suffered damage. *Id*. at 656. The Oregon Supreme Court determined that under the circumstances, the defendant's misrepresentations did not need to have been made directly to the plaintiffs in order to state a claim for fraud. *Id*. at 665. In so finding, the court concluded that even though the filing of the drilling log with the state engineer was required by statute for administrative reasons rather than for purposes of public notice, "any person having a lawful purpose was entitled to review that record and to rely on its having been lawfully prepared and filed." *Id*. at 658. Moreover, a purchaser of residential property that is served by a well rather than the public water supply, "is certainly a transaction in which a prospective purchaser might review the record and rely upon the truth of its contents." *Id*. Also, there was evidence in the record to establish that the defendant had actively concealed the improper construction of the well and that the plaintiff had no practical means of otherwise discovering the truth. *Id*. at 661. Therefore, the court rejected the "narrow rule" that required proof that the misrepresentation had been communicated to and relied upon by the plaintiff, instead concluding that "where the actor has prevented the correction of the illegal condition and a member of the protected class has been injured as a consequence," then "the right to recover [is] not dependent on a misrepresentation being conveyed to [the plaintiff]." *Id*. at 665.

Defendants contend that *Handy* is inapplicable because here there was no statute governing defendants' actions, nor was there any pecuniary loss. Defendants correctly point out that the holding in *Handy* was premised on Restatement (Second) of Torts § 536, which applies where "a statute requires information to be furnished, filed, recorded or published for the

protection of a particular class of persons," and pertains to pecuniary loss, not physical harm.

However, the *Handy* court specifically noted that § 536 is merely an application of the general

rule stated in § 531, which is much broader and provides:

> One who makes a fraudulent representation is subject to liability to the persons or
> class of persons whom he intends or has reason to expect to act or to refrain from
> action in reliance upon the misrepresentation, for pecuniary loss suffered by them
> through their justifiable reliance in the type of transaction in which he intends or
> has reason to expect their conduct to be influenced.

*Handy*, 282 Or. at 664 n. 6, *citing* RESTATEMENT (SECOND) OF TORTS § 531.

Moreover, the Oregon Supreme Court in *Handy* did not single out the statutory

requirement which required the defendant file a drilling log with the state as the primary basis for

its ruling.  *Handy*, 282 Or. at 665.  Instead, the court focused on the particular circumstances of

the case, which included the defendant's misrepresentations to the plaintiff's predecessor in

interest, the false log filed with the state, the fact that the log was a public record that the public

had a right to rely upon, the fact that defendants had actively concealed the improper drilling, and

that plaintiffs had no other practical means of determining the truth.  *Id.*

In a case from this district, the court employed similar reasoning to allow plaintiffs to

bring a fraud-on-the-FDA claim without proving that they relied upon the defendants' alleged

misrepresentations to the FDA.  *Swain v. Danek Med., Inc.*, Civil No. 96-1515-JO, 1999 WL

551127, * 4 (D. Or. July 23, 1999).[4]  While the court noted that the plaintiffs alleged that "they

belong to the class of persons to be protected by the statute that defendant violated," this was just

---

[4]  This opinion is one of three nearly identical opinions issued on the same date which
involve the same legal and factual issues.  The other two cases are *Dachenhausen v. Danek
Medical, Inc.*, Civil No. 95-1650-JO, 1999 WL 552658 (D. Or. July 23, 1999), and *Price v.
Danek Medical, Inc.*, Civil No. 95-1651-JO, 1999 WL 588171 (D. Or. July 23, 1999).

one of the many similarities between the *Swain* plaintiffs and the *Handy* plaintiff that lead the

court to conclude that the fraud-on-the-FDA claim is cognizable under Oregon law by way of

Restatement (Second) of Torts § 310, "which allows recovery where plaintiff relied on

misrepresentations made by defendant to a third party." *Id*. at ** 2, 4.

      The limited number of Oregon cases which have addressed the *Handy* exception focus on

whether plaintiffs actually relied on the information communicated to the third party, not whether

there was an underlying statutory duty. *See e.g., Strawn v. Farmers Ins. Co. of Oregon*, 350 Or.

336, 373-78 (2011); *Bartlett v. Crook County, Oregon*, Civil No. 07-716-SU, 2009 WL 1176465,

* 4 (D. Or. April 28, 2009); *Burns v. MBK Partnership*, Civil No. 03-3021-CO, 2003 WL

23979014, *12 (D. Or. Nov. 5, 2003); *Jesuit High School v. General Ins. Co.*, Civil No. 95-563-

RE, 1995 WL 854773, *2-3 (D. Or. Aug. 18, 1995). Consequently, I conclude that the exception

in *Handy* does not hinge on the existence of a statute governing defendants' actions. Rather, the

inquiry is focused on whether, based on the particular circumstances presented, the defendant's

misrepresentation to a third party was such that plaintiffs could be reasonably expected to rely on

it.

      Additionally, in a case not cited by either side, the Oregon Court of Appeals stated that in

order to prove the representation element for a fraud claim, a plaintiff must prove that defendant

"(1) made a representation to plaintiff, or (2) made a representation to an agent of plaintiff or (3)

made a representation to [a third party] with the intention that it be communicated to and acted

upon by plaintiff, or under circumstances that entitled  plaintiff to believe that defendant had

authorized [the third party] to communicate the representation to plaintiff." *Johnsen v. Mel-Ken*

*Motors, Inc.*, 134 Or. App. 81, 90 (1995). There, the court concluded that material issues of fact precluded summary judgment where plaintiff alleged that defendant employer made misrepresentations to a vocational expert employed by the defendant's insurer with the intention that the misrepresentation be communicated to and acted on by the plaintiff. *Id*. at 90-91.

The Ninth Circuit applied this principle to permit an employee's spouse to bring a claim against an employer for misrepresentations made to the employee during the hiring process for a job which required the employee to relocate. *Meade*, 164 F.3d at 1223. There, the employer allegedly made misrepresentations involving the employer's financial situation and future growth prospects, thereby inducing the employee to accept the position and relocate. *Id*. at 1220-21. In allowing the fraud claim to go forward, the court noted that where an employee has a spouse, the decision to relocate is often a family decision rather than an individual one, so the employer should have known that misrepresentations made to the employee would be communicated to and relied upon by the spouse. *Id*. In a similar case from this court, the court applied the above principles to conclude that the plaintiff's wife had standing to bring a fraud claim against an employer who allegedly made misrepresentations to her husband with regard to the terms of a potential job offer. *Herron v. Wells Fargo Financial, Inc.*, Civil No. 05-659-ST, 2006 WL 2422831, * 11-12 (D. Or. May 22, 2006).

Given the above precedent, I conclude that Oregon law does not require that the alleged misrepresentations be made directly to the plaintiffs in order to state a claim for fraud so long as the plaintiff is within the class of people whom defendants should have expected to rely on those misrepresentations or defendants intended that plaintiffs should rely on the misrepresentations. In so concluding, I am not persuaded by the cases cited by defendants. *Bootay*, though very

similar on its facts and claims, relied on Pennsylvania law which differs in important respects

from Oregon law, specifically with regard to what is a permissible "representation" for purposes

of a fraud claim.  Apparently, unlike Oregon, Pennsylvania courts strictly adhere to the general

rule that requires misrepresentations be made to the plaintiff directly, not to a third party.  2010

WL 3632720, at *11.  *Vasquez-Lopez* is similarly unpersuasive since it is factually

distinguishable and does not address in any way whether a misrepresentation need to be made

directly to the plaintiff to be actionable.  210 Or. App. at 578-79.  Moreover, the court's holding

turned on the truth or falsity of the alleged misrepresentation, not the identify of the person to

whom the misrepresentation was allegedly made.  *Id.*  Here, plaintiffs allege that they were

damaged as a result of misrepresentations made to a third party, the Army, and that the plaintiffs,

as National Guard soldiers under the control of the Army, are within of the class of people whom

defendants should have expected to rely on those misrepresentations.  Therefore, plaintiffs' fraud

claim is cognizable under Oregon law.  I next turn to whether there exists sufficient evidence that

defendants made any false representations to the Army.

### a.  Factual Allegations

Defendants contend that plaintiffs cannot establish by clear and convincing evidence that

defendants made any false representations because there is no evidence that defendants ever told

the Army that there was no sodium dichromate at Qarmat Ali or that it was not potentially

hazardous.  Plaintiffs respond that there is ample evidence that defendants made many fraudulent

statements to various military personnel, and they intentionally failed to fully disclose the

existence or extent of sodium dichromate contamination at Qarmat Ali.  Keeping in mind that

fraud "may be committed by a concealment of material facts as well as by affirmative and

positive misrepresentations," I will consider plaintiffs' evidence of affirmative misrepresentations as well as their evidence of concealment and nondisclosure. *Musgrave,* 193 Or. at 410.

### i. Misrepresentations to CHPPM

Plaintiffs contend that KBR falsely misrepresented to the U.S. Army Center for Health Promotion and Preventive Medicine ("CHPPM") that it learned of sodium dichromate contamination in late July 2003, despite having knowledge of the contamination much earlier. Sugerman Decl. Exh. 7 at 4; Resta Depo. at 110. According to defendants, KBR did not learn that sodium dichromate presented a hazard until July 25, 2003, and thus, did not give any false information to CHPPM. Carter Aff. Exh. 1 at 13.

Plaintiffs present evidence that KBR knew of the dangers posed by sodium dichromate long before July 25, 2003. KBR employee Rod Kimbro wrote a memo on June 21, 2003, about the water treatment chemicals used at Qarmat Ali, noting that he had observed discolored soil near the chlorine tanks, and that "the areas are *potentially contaminated* with sodium dichromate spilled during the looting activities which occurred at the water treatment plant." Carter Aff. Exh. 7 at 3 (emphasis added). Kimbro further noted that "[d]ue to the potential toxicity of sodium dichromate, I suggest that the areas of soil stained yellow be cordoned off and that samples be collected and tested . . . If it is determined that these yellow soils are contaminated with sodium dichromate, I recommend that these soils be excavated and put in drums[.]" *Id.* A few days later, on June 25, 2003, KBR's Mark Daniels spoke to U.S. Army Corps of Engineers safety officer Remington about the presence and potential hazards of sodium dichromate during a site visit to Qarmat Ali. Remington Depo. at 244. The Inspector General at the Department of Defense concluded that KBR had identified the potential contamination by June 8, 2003.

Sugerman Decl. Exh. 1 at 4, 12. Thus, it appears clear that at least some KBR employees were aware of the hazards presented by the contamination earlier than July 25, 2003. Consequently, plaintiffs have offered sufficient evidence to establish that defendants' representations to the Army regarding when it became aware of the contamination were false.

### ii. Misrepresentations to Army Safety Personnel

Plaintiffs further claim that on August 15, 2003, KBR manager Young Lee misrepresented the extent of KBR's knowledge of the seriousness of the contamination in response to an inquiry from Army Staff Sgt. Hamilton regarding that very issue. Sugerman Decl. Exh. 14. At some point prior to August 15, 2003, Hamilton contacted Lee because he was concerned about the contamination and "wanted to know all facts such as PPE (personal protective equipment), soil and air test results, and personnel monitoring programs to protect soldiers." *Id*. In response to this inquiry, Lee told Hamilton that KBR's test results were "preliminary and could not be provided until the final results are confirmed." *Id*. Plaintiffs assert that this statement was a misrepresentation because at the time Lee told Hamilton that the test result were merely "preliminary," he knew, as of August 8, 2003, there was a "serious health problem" related to sodium dichromate at Qarmat Ali, that almost 60% of people exhibited symptoms, and that the "problem seems worse than initially considered." *Id*., Exh. 15.

It is not clear exactly what test results Lee considered "preliminary" in his August 15 email, since the email also indicates that he had already passed along the soil test results to Jerry Balcom, an environmental officer with the U.S. Army Corps of Engineers. *Id*., Exh. 14. He also noted that he would send Balcom the air test results, so it appears as though the air and soil test results were not preliminary. *Id*. Instead, it appears as though plaintiffs believe that Lee

provided misrepresentations with regard to medical tests of individuals working in the area, since this was discussed as an "action item" at the August 8, 2003 "Team RIO" meeting with various KBR officials. *Id*., Exh. 15 at 2. While a review of the minutes from this meeting reveals that "medical tests" were indeed recommended to protect individuals working in the area of exposure, it does not appear that those tests had yet been ordered, so they very well could have been "preliminary" at the time that Lee responded to Hamilton's inquiry. However, it is clear that there was significant discussion of protective measures for individuals working at the location, including setting up a decontamination station, decontaminating the interior of the trailers and containers, setting up medical testing for people working in the area, and spraying a chemical that would "stop the residue from being dusted," and to gravel or use a heavy oil to cover the surface and "prevent the wind from dusting and blowing" the chemical around. *Id*., Exh. 15 at 1-2.

A review of the August 8, 2003, minutes reveals that Lee had additional responsive information about the contamination yet he failed to provide this information even though Hamilton had specifically inquired about all aspects of the contamination, not just the air and soil testing. According to Lee's own email memorializing the conversation, this request included whether there was a need for personal protective equipment and information about other personnel safety monitoring programs. It is well-established that once one elects to make representations, there is a duty to tell the truth, even if there was otherwise no duty to speak, and that in such circumstances, concealing facts or providing half-truths can be considered fraudulent. *See Donald H. Hartvig, Inc. v. Clackamas Town Center Assoc's.*, 101 Or. App. 79, 84-85, *rev. denied*, 310 Or. 393 (1990). Similarly, "[f]raud may be predicated upon an equivocal, evasive or misleading answer calculated to convey a false impression even though it may be

literally true as far as it goes." *Sheets*, 257 Or. at 145.  Under the circumstances, Lee's statements

created a false impression about the information that KBR had regarding the extent of the

contamination as well as KBR's plan to keep personnel safe while working at the site, yet he

failed to disclose this information despite being specifically asked for it.  The fact that he did

provide the soil and air test results to Balcom, an Army officer, is not material to the court's

determination regarding his communication with Hamilton about other matters relating to the

contamination.  Consequently, for purposes of this motion, Lee's August 15, 2003, email

provides evidence of false representations made to the Army.

### iii.  Misrepresentations to British Royal Air Force

Plaintiffs assert that defendants gave misleading information to the British Royal Air

Force in the form of "biological monitoring test results . . . for contractors and American Forces,

[which were] within normal limits."  Sugerman Decl.  Exh. 17  ¶ 9.  According to plaintiffs, this

information influenced the Royal Air Force's decision to forego biological monitoring of its own

soldiers.  *Id*.  Plaintiffs contend that the information provided by KBR was intentionally

misleading because as early as September 9, 2003, defendants were aware that KBR employees

were exposed to chromium at "elevated levels."  *Id*., Exh. 19 at 2.  Moreover, on September 16,

2003, defendants received a report from Dr. M. Rao, who had examined several KBR employees,

noting that he "found a high level of chrome," with some people testing four times higher, and

others up to 14 times higher than normal.  *Id*., Exh. 18  ¶ 15.  He also noted that "14 out of 15

tested showed high chromium blood level[,] while only 1 out of 15 tested showed high urinary

level of chrome," which lead him to assume that there were no current exposures since "high

blood level of chrome indicates long term exposure while high urinary level of chrome indicates

Page 22 - OPINION AND ORDER

reduced recent exposure because the body will flush it out." *Id*.  Overall, he classified the

exposure as "less than moderate," in part because a "duration of a few weeks can be considered

okay." *Id*.

Defendants respond that KBR did not in any way misrepresent the test results it provided

to the Royal Air Force.  In support, defendants provide an email from an expert retained by the

Royal Air Force who determined that KBR's test results were actually "lower than the accepted

clinical range for both chromium and selenium."  Langham Aff. Exh. 61.  Defendants contend

that this is evidence that KBR was cautious in its biological monitoring of its employees,

reporting elevated blood chromium levels even if the levels were within the normal range.

A close review of the documents relied upon by the parties does not resolve whether KBR

indeed provided test results to the Royal Air Force that were falsely characterized by KBR as

within "normal limits."  The document referenced by defendants is dated October 8, 2003, which

would seem to imply that the test results reviewed by the Royal Air Force's expert were the ones

referenced by plaintiffs on September 16, 2003, where Dr. Rao found high chromium blood

levels.  However, this is not at all certain from this document, so it is possible that the expert

could have been evaluating test results other than the ones from September 2003.  Further

complicating the issue is the fact that the memo referenced by plaintiffs is dated February 10,

2004, well after the contamination allegedly occurred.  Sugerman Decl. Exh. 17 ¶ 9.  There, the

Royal Air Force explained its decision not to recommend further biological monitoring of its

own soldiers in part because of the amount of time that had elapsed since the exposure, and also

because "biological monitoring test results to which we have been given access for contractors

and American Forces have been within normal limits." *Id*.   Again, it is not at all clear that the

Page 23 - OPINION AND ORDER

test results referred to here were indeed the ones from September 2003 in which Dr. Rao found

high chromium blood levels, whether they were some other test results more recent in time to

when the report was written (and which the blood levels were lower than they were in September

2003), whether the overall conclusion that they were "within normal limits" was based on the

Royal Air Force's expert's earlier conclusion on the matter, or from some other source entirely.

Consequently, material issues of fact exist regarding whether defendants made false

representations to the Royal Air Force in the form of providing them with KBR's biological

monitoring test results.

### iv.  Safety Meetings

Plaintiffs contend that defendants omitted mention of the presence or hazards of sodium

dichromate at the daily safety meetings KBR had with the Army, and that this omission was

equivalent to falsely conveying that there were no hazards presented by the sodium dichromate.

Sugerman Decl. Exh. 37 at 7.  In support, they provide testimony from General Crear, who stated

that the purpose of these meetings was for KBR to share information about all on-site hazards

with military personnel.  Crear Depo. at 48-49, 58, 143.  He testified that dangers presented by

chemical contaminates were expected to be shared at these meetings.  *Id*.  Plaintiffs contend that

from this, a jury could conclude that by failing to mention sodium dichromate during daily safety

meetings, defendants implied that it was not dangerous, thereby intentionally misleading the

Army.

In this circumstance, plaintiffs are attempting to prove misrepresentation on the basis of

silence or nondisclosure.  This can be a basis for fraud so long as the person has a duty to speak

and "deliberately remains silent" or otherwise fails to disclose a "material fact which [the] person

Page 24 - OPINION AND ORDER

is bound in good faith to disclose." *Musgrave*, 193 Or. at 410 (internal citation and quotation omitted). In such circumstances, the intent to deceive is incorporated into the inquiry of whether, by one's silence or concealment, the nondisclosure amounts to a false representation necessary to support a claim for fraud. *Id*.

Here, plaintiffs cite only to one KBR Project Rio Site Report (dated June 13, 2003), to support their claim that KBR intentionally remained silent regarding the sodium dichromate hazards. Sugerman Decl. Exh. 37. A review of that document reveals that upon arrival at the site, the day crew "held [a] safety meting," but does not otherwise mention the substance of this meeting. *Id*. at 7. The remainder of the relevant portion of the site report concerns details regarding the filtration and pumping services and whether KBR needed "shooters," presumably Army personnel, for the next 24-hour period. *Id*. Though this single document with a three word reference ("held safety meeting") is not enough to establish that KBR intentionally remained silent about the sodium dichromate exposure at every single daily safety meeting held between May and September 2003, there is evidence from which a jury could conclude that KBR knew about the presence and dangers of sodium dichromate during this time period. This evidence, combined with General Crear's testimony that the Army expected KBR to share information of on-site hazards at these meetings, establish that KBR was "bound in good faith to disclose" its knowledge of the dangers presented by sodium dichromate during the daily safety meetings. *Musgrave*, 193 Or. at 410. Plaintiffs have presented at least some evidence that KBR failed to fully disclose this knowledge during at least some of these meetings. Consequently, plaintiffs have established that material issues of fact exist regarding whether KBR intentionally remained silent about the sodium dichromate during daily safety meetings in order to convey the

false representation that the site was safe.

### v. Delay in Soil Sampling

Plaintiffs also claim that defendants failed to undertake timely soil testing until after remediation efforts began. Plaintiffs contend that this is circumstantial evidence of active concealment, from which a jury could infer that defendants took deliberate steps to avoid responsibility. Defendants counter that plaintiffs have failed to provide any evidence of this delay, much less how this delay, which essentially amounts to fraud by silence, is supported by evidence of an intent to deceive sufficient to rise to the level of a nondisclosure necessary to support a fraud claim. *See Musgrave*, 193 Or. at 410.

While it is true that intent to defraud may be proven by circumstantial evidence of concealment, such evidence is sufficient only where "the circumstances are so strong as to constitute clear, satisfactory, and convincing proof of intent to defraud." *Package Containers Inc. v. Director's Inc.*, 270 Or. 845, 852-53 (1974). Plaintiffs have not set forth any evidence of this supposed concealment with regard to the delay in soil testing, instead relying only on their unsupported accusation that defendants intentionally delayed the soil and air testing in order to skew the results and therefore misrepresent the degree of the contamination and, thus, the danger posed to the plaintiffs. Accordingly, for purposes of this motion, these allegations are insufficient to constitute a false representation.

### 3. Conclusion

Viewing the facts in the light most favorable to plaintiffs as the nonmoving party, they have set forth sufficient evidence from which a jury could conclude that defendants made affirmative misrepresentations or failed to fully disclose material facts regarding the hazard

Page 26 - OPINION AND ORDER

presented by the sodium dichromate at Qarmat Ali.  Plaintiffs have provided evidence that KBR

employees provided different information at different times to various members of the military,

including the plaintiffs themselves, regarding the presence and hazards of sodium dichromate.

While it is true that plaintiffs have failed to set forth any evidence that KBR ever told anyone that

there was *not* any sodium dichromate at Qarmat Ali or that it was completely safe, plaintiffs need

not provide this kind of proof because in Oregon, representations may be "implied," such that

even if "literally true," so long as the statement "creates a false impression under the

circumstances," it maybe considered a misrepresentation for purposes of a fraud claim.

*Arboireau*, 347 F.3d at 1168 n. 12.  Consequently, plaintiffs have established that defendants

made false representations sufficient to satisfy this element of their fraud claim.

### C. Intent

Plaintiffs must also establish that defendants made the statements with an intent to

deceive.  *Rice*, 268 Or. at 128.  Plaintiffs may satisfy the intent element by showing that the

misrepresentation was made with knowledge of its falsity or with reckless disregard for the truth,

and that defendants made the misrepresentation for the purpose of misleading plaintiffs or with

knowledge or reckless disregard that plaintiffs would be misled.  *See e.g., McFarland v.

Carlsbad Sanatarium Co.*, 68 Or. 530, 535 (1913); *U.S. Nat'l Bank v. Fought*, 291 Or. 201, 223

(1981).  Defendants assert that KBR was forthcoming with information regarding the presence

and potential hazard of sodium dichromate, and therefore, cannot have acted with the requisite

intent.

According to defendants, KBR did not learn that sodium dichromate had been previously

used and stored at Qarmat Ali until June 1, 2003, and did not learn that it presented a hazard until

July 25, 2003.  Carter Aff. Exh. 1 at 13.   After learning about the presence of the chemical in early June, defendants assert that KBR timely disclosed the issue to the military and worked cooperatively with them to address it, including disclosing the hazard potential on July 25, 2003, beginning testing on August 2, 2003, restricting the area to personnel wearing personal protective equipment on August 7, 2003, and beginning remediation efforts on August 12, 2003.  *Id*. at 6, 11, 13.

The heart of defendants' argument is that at the time KBR informed the Army of the presence of sodium dichromate in early June, the Army was already aware that there was a "potential sodium dichromate soil contamination issue and potential health hazard," and so any statements made by defendants could not have been made with an intent to mislead or deceive the Army.  Kennedy Depo. at 156.  In support, defendants point out that KBR employee Rod Kimbro wrote a memo on June 21, 2003, which mentions that he observed potential sodium dichromate soil contamination (Carter Aff. Exh. 7), but Christopher Kennedy, an environmental specialist with the U.S. Army Corps of Engineers, acknowledged that he had already observed the potential sodium dichromate contamination several weeks before Kimbro's memo (Kennedy Depo. at 45-46).  A few days later, on June 25, 2003, KBR employee Mark Daniels took Mike Remington, a top safety officer with the U.S. Army Corps of Engineers, on a site visit to Qarmat Ali where they discussed the presence of sodium dichromate, that it was a potential carcinogen, and that it posed potential chemical and health hazards.  Remington Depo. at 264-65.  In a memo dated that same day, Remington noted the following:

> Corps personnel visiting this site should be made aware of the following potential hazards, and should follow the KBR Site Safety Plan[.]
>                                              ***

>Sodium dichromate: a common flocculant used by the Iraqi's. This product was once used in the U.S., but is now considered a Class I Carcinogen. Avoid breathing dust, wear gloves and safety glasses since it has a high skin absorption capacity. Product is reddish to bright orange.

Carter Aff. Exh. 8 at 2.

Consequently, according to defendants, any statements KBR made to the military could not have been made with an intent to deceive since the Army was aware of the presence and potential hazards of sodium dichromate at Qarmat Ali even before KBR. In further support of this position, defendants include evidence from various members of the U.S. Army Corps of Engineers who testified that they believed that defendants "communicated openly and honestly about the sodium dichromate hazard potential at Qarmat Ali," and that they were otherwise satisfied with KBR's work in addressing the sodium dichromate issue. Balcom Depo. at 177-78, 180; Kennedy Depo. at 59, 127-28; Remington Depo. at 265.

Plaintiffs dispute defendants' characterization of when KBR became aware of the presence of sodium dichromate at Qarmat Ali. According to plaintiffs, KBR was aware that the Southern Oil Company had used sodium dichromate at Qarmat Ali as early as January 31, 2003, but at least no later than May 2003, thereby undermining the claim that it did not know this information until June 1, 2003. KBR first visited Qarmat Ali in April 2003, but knew before entering the site that the Southern Oil Company had previously used sodium dichromate at the plant. Sugerman Decl. Exh. 1 at 4; Stephenson Depo. at 72-73, 93. Christopher Kennedy, an environmental specialist with the U.S. Army Corp of Engineers testified that he alerted defendants to the hazard in May 2003 and expected them to implement procedures necessary to keep workers safe. Kennedy Depo. at 92-93. However, there is some evidence that as of May

19, 2003, defendants did not know what chemicals had been used for chemical injection. Carter Aff. Exh. 2 at 3; Stephenson Depo. at 109. In the record currently before the court, information about the previous use of sodium dichromate was not included in a KBR project report until June 1, 2003 (Carter Aff. Exh. 3 at 3-4), though it appeared in "preliminary notes" on May 31, 2003 (Carter Aff, Exh. 4 at 3). In September 2011, the Inspector General at the Department of Defense released a report regarding the exposure at Qarmat Ali, finding that KBR was aware of the prior sodium dichromate use on May 31, 2003, and identified the potential contamination by June 8, 2003. Sugerman Decl. Exh. 1 at 4, 12. In light of the above, it there is evidence from which a jury could find that at least by May 31, 2003, defendants were aware that sodium dichromate had been previously used at Qarmat Ali.

In a similar vein, plaintiffs dispute defendants' assertion that KBR timely informed the military of the hazards presented by the contamination, contending that KBR knew of the dangers posed by sodium dichromate long before July 25, 2003, the date that KBR claims it learned that the sodium dichromate presented a hazard. As discussed in detail above with regard to the misrepresentations made to CHPPM, there is ample evidence that KBR was aware of the hazards posed by the contamination much earlier than July 25, 2003. Specifically, KBR employee Rod Kimbro's June 21, 2003, message about the water treatment chemicals used at Qarmat Ali noted his observation of discolored soil, that he thought it might be evidence of potential contamination, and included his recommendations to determine whether the soil was indeed contaminated by sodium dichromate. *See* Carter Aff. Exh. 7 at 3. Moreover, during a site visit to Qarmat Ali on June 25, 2003, KBR's Mark Daniels spoke in detail to U.S. Army Corps of Engineers safety officer Remington about the presence and hazards of sodium dichromate.

Remington Depo. at 244.

Plaintiffs further argue that defendants communicated that the chemical was only a "mild irritant," a statement which is false and misleading, and that KBR did so with an intent to downplay the danger. Coupled with the fact that during this same period, KBR's internal communications made clear that KBR knew that the chemical was "very dangerous," and that KBR employees should stay away from the area, it is plaintiffs' position that defendants intended to misrepresent the truth to the Army. Sugerman Decl. Exhs. 27-28. Also during this time, Ed Blacke, KBR's area safety supervisor at Qarmat Ali, testified that he was pressured to resign because of his efforts to alert soldiers of the hazard posed by sodium dichromate. Rea Depo. at 45; Blacke Depo. at 6.

Viewing the evidence in the light most favorable to plaintiffs as the nonmoving party, plaintiffs have set forth sufficient evidence from which a jury could conclude that an issue of fact exists regarding defendants' intent to deceive. At a minimum, the record provides evidence from which a jury could conclude that KBR intentionally attempted to downplay when it became aware of the presence of sodium dichromate and also when it learned of the potential contamination and hazards associated with the contamination. Despite KBR's claim that it did not know that sodium dichromate had been previously used at Qarmat Ali until June 1, 2003, there is convincing evidence to show that KBR was aware prior to its first site visit, which was sometime in April 2003, and at a minimum, was aware of it by May 31, 2003. Similarly, there is ample evidence to undermine KBR's claim that it was unaware of the contamination until July 25, 2003, since there is mention of the hazards presented by the discolored soil by KBR employees in internal communications as early as June 21, 2003. While there is conflicting

evidence about whether KBR's employee Ed Blacke was forced to resign or whether he left

willingly, and also about whether KBR worked appropriately with the Army to address the

contamination issue, the evidence as a whole supports the inference that KBR was not

completely forthcoming with the information provided to the Army, and that KBR did so in order

to minimize the hazard and danger presented by the sodium dichromate contamination. Such

evidence is sufficient to allow a jury to conclude that defendants acted with the requisite intent.

### D. Reasonable Reliance

It is well established under Oregon law that, "a party asserting fraud must prove by clear

and convincing evidence not only that it relied on the other party's misrepresentations, but that

the reliance was reasonable under the circumstances." *Vasquez-Lopez*, 210 Or. App. at 580.

Defendants contend that neither the Army, nor any of the plaintiffs, reasonably relied on any of

the misrepresentations.

First, with regard to the Army, defendants contend that the Army knew about the

contamination long before KBR did, yet it ultimately decided to continue working at the site, so

plaintiffs may not, in hindsight, claim that the Army relied on any information provided by KBR.

In support, defendants point out that the Army knew there was sodium dichromate at Qarmat Ali

as early as April 2003, when the Army's infrastructure assessment team noted the presence of

orange stains in the soil. Carter Aff. Exh. 11 at 14-15. At that time, the assessment team

initially recommended not to restore Qarmat Ali, yet the Army directed defendants to begin work

at the site. *Id.* Several months later, once the Army was fully aware of the sodium dichromate

contamination, safety personnel advised against continuing work there, but the military again

directed KBR to proceed. *Id.*, Exs. 12 (SEALED), 13. As of mid-May 2003, Christopher

Kennedy and Chuck Miles of the U.S. Army Corps of Engineers observed the rust-colored powder, and within a week, had identified it as sodium dichromate.  Kennedy Depo. at 18-19. Kennedy alerted his superiors about the presence of sodium dichromate and potential health hazards associated with such a contamination.  *Id*. at 23, 156.  According to defendants, since the Army already knew about the dangers posed by the sodium dichromate contamination as of early June 2003, it could not have reasonably relied upon any information subsequently provided by defendants.  Finally, defendants point out that on June 25, 2003, safety officer Remington wrote a memo warning personnel that sodium dichromate was a potential hazard and a Class I Carcinogen.  Carter Aff. Exh. 8.  Remington also told defendants to post signs warning of the hazard.  Remington Depo. at 104-105, 152-53.  As of July 2, 2003, KBR had complied with this order to Remington's satisfaction.  *Id*.

Defendants further argue that the U.S. Army and the British military conducted their own inspections of the facility, ultimately concluding that individuals working at Qarmat Ali were unlikely to suffer any adverse health effects from the exposure.  Carter Aff. Exhs. 14, 15, 57; Lovell Depo. at 127-28 (CHPPM's studies); Carter Aff. Exhs. 16, 17 (British Army's studies). Defendants allege that because the Army conducted its own assessments of the contamination and possible health effects, it could not have reasonably relied upon any supposed representations made by defendants about the presence or hazards of sodium dichromate.

With regard to whether the individual plaintiffs reasonably relied on any information communicated by KBR employees, defendants take the position that because the plaintiffs took their orders from their superiors, further disclosure would not have changed the guardsmen's orders to go to the site.  In support, defendants point out that even after KBR gave formal,

official, written notice to the Army about the contamination, the military continued to order guardsmen to Qarmat Ali, and guardsmen continued to go.  Carter Aff. Exs. 12 (SEALED), 13. Defendants also cite testimony from plaintiff Randy Keiper, who, after observing the orange dust, inquired about why the guardsmen were not required to wear protective equipment, and was told that it "wasn't needed," that he should "keep [his] mouth shut, [and] follow orders."  Keiper Depo. at 39-42.

In response, plaintiffs present evidence that the Army would have taken different action if it had known about the danger posed by the sodium dichromate.  Specifically, MSgt. Stanger and Capt. Chaterji relied on defendant's guidance.  When told that the substance was a "mild irritant," they took only minor precautions.  Stanger Depo. at 99.  Stanger testified that had he been told that the chemical posed a hazard, he would have ordered his soldiers to don their chemical protection suits when working at Qarmat Ali.  *Id*.  General Crear provided testimony that it was important for defendants to disclose information relating to hazards at the work site during the daily safety meetings.  Crear Depo. at 48-49, 143.  Lt. Col. Gentry testified that he was very disappointed that defendants had information about the contamination and did not share it with him so that he could order the soldiers to wear protective gear.  Gentry Depo. at 24-25, 44. Environmental specialist Kennedy testified that once the Army identified the presence of sodium dichromate, it did not further consider the particular hazards presented by the chemical because the Army "looked to the contractors to provide the technical assistance with determining the best method for that."  Kennedy Depo. at 19.  Safety officer Remington stated that there was very little oversight from the Army when it came to safety issues, since "you trust your contractor is going to do a good job for you."  Remington Depo. at 152.  Remington further testified that had

Page 34 - OPINION AND ORDER

he "known this information then, [he] would have taken more immediate action, such as requiring the guardsmen to "have at least a Hepa filter half mask." *Id*. at 221. Remington also opined that had he known about the hazard earlier, the Army would have initiated medical monitoring and gotten CHPPM involved with environmental exposure monitoring. *Id*.

Viewing the evidence in the light most favorable to plaintiffs as the nonmoving party, plaintiffs have set forth sufficient evidence from which a jury could conclude that the Army relied on the information provided to it by KBR about the hazards posed by sodium dichromate and about what actions to take in order to keep personnel safe. While the individual guardsmen had to follow the orders given to them, a jury could conclude that the Army relied on KBR's misrepresentations in determining the terms of the plaintiffs' orders while at Qarmat Ali, and that this is sufficient to establish reasonable reliance for purpose of the fraud claim.

### E.  Proximate Cause

As one of the elements of a claim for fraud, plaintiffs must prove that their injuries were proximately caused by their reliance on defendants' misrepresentations. *Knepper v. Brown*, 345 Or. 320, 329 (2008). With regard to causation for intentional torts such as fraud, the Oregon Supreme Court has noted that "the range of legal causation can be quite broad," but that the key inquiry is whether the damage suffered might reasonably be expected to result from a plaintiff's reliance on a defendant's misrepresentation. *Id*. at 330-31.

Defendants argue that because the Army knew about the potential contamination of sodium dichromate as well as the potential hazards posed by such contamination, yet ordered the plaintiffs to go to Qarmat Ali anyway, there was nothing that defendants said or neglected to say that could have caused any injuries that may have resulted from such exposure. Plaintiffs counter

Page 35 - OPINION AND ORDER

that a jury could reasonably conclude that defendants deliberately chose to place the plaintiffs at risk in order to speed the completion of the project, so it could "wrest every dollar from the government."  Sugerman Decl. Exh. 22.

Keeping in mind that the "key inquiry" regarding causation is whether the plaintiffs' alleged injuries could have "reasonably been expected to result" from the misrepresentation, *Knepper*, 345 Or. at 329, plaintiffs have presented evidence from which a jury could conclude that the damage suffered by them, in the form of harmful exposure to sodium dichromate, was the type of damage that could be reasonably expected to flow from the Army's reliance on the defendants' information about the presence and hazards of sodium dichromate.  Given KBR's expertise in infrastructure repair, KBR should not have been surprised to learn that sodium dichromate had been previously used at Qarmat Ali since this chemical is commonly used as an anti-corrosive at water treatment facilities.  Since the area was subject to looting and sabotage by enemy forces, it was foreseeable that there could be chemical contamination at the plant, especially upon arrival and before cleanup or restoration efforts began.  Thus, it is wholly within the realm of foreseeable consequences that without accurate information and without proper protection, people who were working at Qarmat Ali could be exposed to and harmed by hazardous substances like sodium dichromate.  Thus, for purposes of this motion, plaintiffs have established sufficient causation necessary to support their fraud claim.

**F. Conclusion**

Viewing the facts in the light most favorable to plaintiffs as the nonmoving party, they have provided clear and convincing evidence from which a jury could conclude that defendants made false representations or concealed material facts, that defendants did so with an intent to

deceive, that the Army relied on these representations, and that plaintiffs' injuries were proximately caused by these representations. Accordingly, defendants' motion for summary judgment on plaintiffs' fraud claim is denied.

## II. Negligence

Defendants contend that plaintiffs' negligence claim fails as a matter of law because defendants did not owe any duty to the plaintiffs. Defendants take the position that because KBR did not create any of the hazards at Qarmat Ali, it had no duty to warn. According to the defendants, plaintiffs' negligence claim must fail because KBR was an independent contractor that acted in conformance with the terms of the RIO contract's Task Order 3.[5] Plaintiffs allege that by virtue of Task Order 3, KBR had a duty to clean up Qarmat Ali, which included inspecting and assessing the site, and that this responsibility included a duty to warn of hazards. Fifth Am. Compl. at ¶¶ 24-26. Additionally, Task Order 3 required defendants to comply with various safety standards, including OSHA regulations regarding communication of hazards. Plaintiffs further assert that when KBR took charge of Qarmat Ali, it became an occupier or possessor of the premises, thereby triggering obligations to invitees, which, under Oregon law, includes a duty to warn of latent dangers. Finally, plaintiffs contend that even if there was no duty under Task Order 3 or by virtue of KBR's status as an occupier of Qarmat Ali, defendants would still be liable under Oregon's general foreseeability standard.

─────────────────

[5] In the briefing, both sides refer to the RIO contract rather than Task Order 3, yet cite no provisions from the RIO contract. All contract citations relied upon by the parties appear in Task Order 3. Thus, the court construes all arguments about the terms of the contract as pertaining to Task Order 3, which governed the services to be provided by KBR and its subsidiaries at Qarmat Ali and other facilities. Task Order 3 may be found as Exhibit 53 to the Carter Affidavit. All citations are directly to the contract, without reference to the exhibit numbering.

Oregon courts engage in a two-step analysis when examining tort liability in negligence actions. *See Halseth v. B.C. Towing, Inc.*, Civil No. 04-795-JE, 2006 WL 278191,* 2 (D. Or. Feb. 3, 2006). First, courts analyze whether there existed a special relationship between the parties due to a "status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty." *Buchler v. State By & Through Or. Corr. Div.*, 316 Or. 499, 504 (1993) (en banc), *quoting Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1, 19 (1987). "[W]hen a special relationship or status gives rise to the duty of care, that relationship or status *may* also define the scope of the duty by specifically describing the types of harms or class of persons that it encompasses . . . where the special relationship does not prescribe the scope of the duty, common law principles of reasonable care and foreseeability of harm are relevant." *Allstate Ins. Co. v. Tenant Screening Servs Inc.*, 140 Or. App. 41, 50 (1996) (emphasis in original) (internal citation and quotation omitted); *see also Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 342 (2004). Where no such special relationship exists, courts proceed to the second step, analyzing the defendant's duty under general foreseeability principles, with the key inquiry being whether defendant "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari*, 303 Or. at 17. "Following *Fazzolari*, [Oregon courts have] discussed a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of 'reasonable foreseeability,' rather than the more traditional 'duty of care.'" *Oregon Steel Mills*, 336 Or. at 340.

Here, plaintiffs contend that there existed a special relationship that created a duty by way of the terms of Task Order 3, or, in the alternative, because of KBR's status as an occupier of Qarmat Ali. In the event that the court determines that there was no duty created by a special

Page 38 - OPINION AND ORDER

status or relationship, then plaintiffs contend that under the general foreseeability standard, KBR created a foreseeable risk of the sort of harm that befell the plaintiffs.

### A.  Duty by Way of Special Status or Relationship

#### 1. Task Order 3

The parties agree that Task Order 3 generally set forth KBR's duties with respect to Qarmat Ali, but dispute whether it created a duty that may give rise to a negligence claim. Specifically, the parties disagree about whether Task Order 3 created such a duty by requiring KBR to conduct environmental assessments and to warn the plaintiffs of the hazards associated with sodium dichromate.

Before addressing the specific contractual responsibilities in Task Order 3, the court must first determine whether plaintiffs may bring their tort claim based on duties enumerated in a contract.  Oregon courts have long held that when the "parties' relationship arises out of a contract, plaintiff may bring a claim for negligence only if defendant is subject to a standard of care independent of the terms of the parties' contract."  *Moore Excavating Inc. v. Consolidated Supply Co.*, 186 Or. App. 324, 332-33 (2003) *citing Georgetown Realty v. The Home Ins. Co.*, 313 Or. 97, 106 (1992).  A tort claim "may exist even if it is based on an obligation that the defendant assumes as an express or implied term of the contract, so long as the obligation would exist even if it were not in the contract." *Jones v. Emerald Pacific Homes, Inc.*, 188 Or. App. 471, 476, *rev. den.*, 336 Or. 125 (2003), *citing Georgetown Realty*, 313 Or. at 106.  The key inquiry is not the terms of the contract itself, but "the nature of the parties' relationship."  *Conway v. Pacific University*, 324 Or. 231, 238-39 (1996).

A party has a heightened duty to another party when acting, "at least in part, to further the

economic interests . . . of the person owed the duty of care." *Id.* at 240, *quoting Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 161 (1992). Oregon courts have identified several categories of relationships that can impose tort obligations in addition to contractual responsibilities, such as those between professionals and their clients, principals and their agents, trustees and beneficiaries, and, in certain circumstances, between insurers and insureds. *Jones*, 188 Or. App. at 477, *citing Conway*, 324 Or. at 239-40. The common element among each of these relationships is that the relationship "impose obligations 'beyond the common law duty to exercise reasonable care to prevent foreseeable harm.'" *Id.*, *citing Onita*, 315 Or. at 159. "[P]arties to a contract are in a 'special relationship' imposing a heightened duty of care and thereby creating potential tort liability when one party delegates to the other the authority to make important decisions with the understanding that the authority is to be exercised on behalf of and for the benefit of the authorizer." *Id.* at 478. As the Oregon Supreme Court has explained:

> This is so because the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests. In doing so, the party who is owed the duty is placed in a position of reliance upon the party who owes the duty; that is, because the former has given responsibility and control over the situation at issue to the latter, the former has a right to rely upon the latter to achieve a desired outcome or resolution.

*Conway*, 324 Or. at 240.

This inquiry is "functional, not formal. 'The crucial aspect of the relationship is not its name, but the roles that the parties assume in the particular interaction where the alleged tort and breach of contract occur.'" *Jones*, 188 Or. App. at 478, *quoting Strader v. Grange Mutual Ins. Co.*, 179 Or. App. 329, 334, *rev. den.*, 344 Or. 190 (2002).

Here, plaintiffs seek to impose tort liability on the basis of the responsibilities set forth in

Task Order 3.  The critical inquiry is whether the Army and KBR were in a special relationship that resulted in a heightened duty toward the other party.  I conclude that the Army and KBR were in such a relationship.  The Army sought to restore Iraqi oil production by restoring damaged infrastructure such as the Qarmat Ali water treatment plant.  In order to achieve that goal, it entered into a contractual relationship with KBR, entrusting it to look after those interests as it performed the restoration work.  As discussed more fully below, Task Order 3 enumerated those specific responsibilities with respect to restoration efforts at Qarmat Ali, but in essence, once Qarmat Ali was cleared of any war-related hazards and declared "benign," the Army effectively turned the site to KBR and trusted its expertise to repair and restore the facility so that oil production could resume.  Consequently, the Army authorized KBR to "exercise independent judgment" on the Army's behalf when it came to restoration efforts at Qarmat Ali, thereby placing the Army in a position of reliance on KBR with regard to the Army's interest in oil production. *Conway*, 324 Or. at 240.  Consequently, the Army and KBR were in a special relationship that gave rise to a duty of care independent of the terms of the contract.

However, even accepting that the Army and KBR were in such a special relationship, it does not necessarily follow that Oregon courts would extend this principle to allow plaintiffs, who were not parties to the contract, to bring an action against KBR based on negligent performance of the contract.  All the relevant case law deals with the issue of whether an injured contracting party may bring suit against the other party in tort based on duties set forth in the contract, not whether some third-party may bring suit based on this relationship.

### a.  Restatement (Second) of Torts § 324A

In an effort to establish that KBR owed a duty to them as third parties, plaintiffs rely on

Section 324A of the Restatement (Second) of Torts, alleging that KBR negligently performed an

undertaking set forth in Task Order 3.  Pls.' Opp'n Memo. at 22.  Section 324A provides the

following:

> One who undertakes, gratuitously, or for consideration, to render services to
> another, which he should recognize as necessary for the protection of a third person
> or his things, is subject to liability to the third person for physical harm resulting
> from his failure to exercise reasonable care to protect his undertaking, if:
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third
>> person, or
>> (c) the harm was suffered because of reliance of the other or the third
>> person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A.

Defendants point out that a Pennsylvania district court rejected a similar theory in a case

based on very similar facts.  *Bootay*, 2010 WL 3632720, at *7-11.  There, the court concluded that

a soldier serving at Qarmat Ali could not maintain his negligence action by virtue of § 324A

because he had failed to establish that defendants had undertaken the duty to protect him from

hazardous chemical exposure even though it was foreseeable that he could have been injured by

sodium dichromate exposure.  *Id*.  Plaintiffs argue that Pennsylvania law is distinguishable when

it comes to imposition of a duty and thus, the *Bootay* court's conclusion on this issue is

inapplicable.  I agree.  Even though existence of a duty is a question of law in both Pennsylvania

and Oregon, Pennsylvania uses a five-part test to determine whether a duty exists, taking into

account, among other things, various public policy considerations such as the "utility of the

defendant's conduct," the "consequences of imposing the duty," and " the overall public interest."

*Id*. at *7 (discussing Pennsylvania's five-factor test for imposing a duty).  In contrast, Oregon

courts emphasize foreseeability when examining the existence of a duty, an inquiry which has

made it "problematic" for courts to determine "[w]hether or not a particular factual scenario can support a negligence claim under Oregon law[.]" *Lyche v. Washington County*, Civil No. 01-418-JE, 2003 WL 23957137, *4-6 (D. Or. April 16, 2003).

Applying Pennsylvania's duty principles to the facts at hand, the *Bootay* district court concluded that while it was foreseeable that military personnel would be exposed to and injured by sodium dichromate contamination at Qarmat Ali, the "consequences of imposing a duty on Defendants to inform individual service members (particularly those with whom they had no direct interaction) could prove far-reaching and unwise." 2010 WL 3632720, at *8. Significant to the court's conclusion was that plaintiff did "not allege that he suffered because he relied on KBR's assessment or failure to adequately assess the site," nor did he allege that KBR increased plaintiff's risk of sodium dichromate exposure. *Id*. Moreover, there was no evidence that KBR was actually aware of the plaintiff's presence at Qarmat Ali or that any KBR employees ever had any interaction with him, since by all accounts "they were, literally, strangers." *Id*. at *7, 9. By contrast, here the plaintiffs specifically allege that KBR "failed to undertake site assessments and monitoring of air quality and soil contamination," thereby causing plaintiffs' sodium dichromate exposure. Fifth Am. Compl. at ¶ 24. Moreover, there is evidence that KBR had direct interaction with at least some of the plaintiffs, and that some of these interactions concerned the hazards presented by sodium dichromate. Given Oregon's emphasis on foreseeability, I am not persuaded that the policy factors that influenced the Pennsylvania court are proper considerations under Oregon law, nor are they persuasive based on the facts alleged in this case.

Most significant to the *Bootay* court's decision, and most applicable to the issues presented here, was the fact that Pennsylvania has adopted Restatement (Second) of Torts § 324A, which

requires that a party must have specifically undertaken a task which the party "should recognize as necessary for the protection of a third person," in order to find the existence of a duty owed to that third party.[6] *Bootay,* 2010 WL 3632720, *8-9, *citing Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 263 (3rd Cir. 2010).  The Pennsylvania district court concluded that because KBR did not create the hazard, was unaware of plaintiff's presence at Qarmat Ali, and "undertook no affirmative duty to protect" plaintiff from chemical exposure or to warn him of possible exposure, plaintiff could not establish duty as a matter of law.  *Id.*  The Third Circuit agreed with this reasoning, stating that plaintiff's reliance on § 324A was "misplaced" since there was  nothing in the amended complaint that "would support an inference that KBR undertook [the responsibility to warn him]." *Bootay*, 437 Fed. Appx. at 145.  However, as pointed out above, the facts of this case are distinguishable in material respects.  Here, KBR was well aware of the plaintiffs' presence at Qarmat Ali, as established by the evidence that various KBR employees made statements to at least four plaintiffs about the sodium dichromate contamination.  Moreover, the plaintiffs have presented evidence that by virtue of Task Order 3, KBR indeed undertook responsibilities that required it to inform the Army of hazards such as those presented by sodium dichromate contamination.  The critical inquiry is whether those responsibilities were of the type

---

[6]  Though Oregon has not formally adopted § 324A, those few courts that have had occasion to consider this section have concluded that it was not applicable under the particular circumstances presented, but have not otherwise indicated that the rule itself is unsound or would not be applied under the right circumstances. *See Hollenbeck v. Weyerhaeuser Co.*, 87 Or. App. 311, 314-15 (1987) (mentioning § 324A in connection with defendant's duty to prevent harm to third persons, but concluding that the contract contained ambiguities precluding summary judgment); *Harris v. Northwest Natural Gas Co.*, 284 Or. 571, 575 n. 7 (discussing § 324A but concluding that it did not apply to the facts presented).  Accordingly, nothing in Oregon law precludes plaintiffs from relying upon § 324A to establish the existence of a duty owed to them as third parties.

that KBR "should recognize as necessary for the protection of a third party" such as the plaintiffs who were called upon by KBR to provide security for KBR's employees while they performed restoration work at Qarmat Ali.  RESTATEMENT (SECOND) OF TORTS § 324A.

Plaintiffs contend that the contract required KBR to conduct environmental assessments and to comply with various safety standards and regulations regarding the communication of hazards, and that these duties were owed not just to the Army and to KBR's employees, but also to all government employees working at Qarmat Ali.  Defendants assert that Task Order 3 clearly placed the responsibility to inspect and assess environmental hazards solely on the Army.  In support, defendants excerpt a single provision of Task Order 3 which required the U.S. military to determine that Qarmat Ali was "benign" and "cleared of all . . . environmental hazards" before sending any individuals there.  Presumably this establishes KBR had no responsibility for the assessment of environmental hazards and the related responsibility to warn of those hazards. However, it is important to read this section in its entirety.  Section 1.1.1 provides the following:

> An Iraqi Oil Infrastructure facility shall be considered benign and ready for a contractor if the following conditions are met:
> a.  Facility is not within range of any enemy direct fire weapon systems.
> b.  Facility has been cleared of all enemy forces, environmental hazards (NBC and industrial), mines, unexploded ordnance, booby-traps, and sabotage systems.
> c.  Contractor does not enter the facility any earlier than the day after the facility has been secured and cleared and declared benign.

The court agrees that this section establishes that it was the responsibility of the military to declare Qarmat Ali "benign" prior to ordering KBR to begin work at the site.  However, read in context, "benign" refers primarily to freedom from combatant activity and weapons, but does not necessarily foreclose the possibility of additional environmental hazards.  This conclusion is

further supported by several other provisions which make clear that the initial pronouncement of a site as "benign" did not foreclose the need for additional environmental assessment.  In fact, such assessments appear to be required as part of KBR's restoration efforts.

The general "Environmental Protection" section (Section 1.13), states that while it is "not the government's intention to remediate pre-existing sites," it might still be necessary to document, assess, and evaluate "site-specific liabilities," and that all "[e]nvironmental protection matters shall be coordinated with the PCO [Procuring Contracting Officer] or designated representative and Commander responsible for the AO [Area of Operations]."  Section 1.14 required KBR to establish a "safety and health program" onsite, which must be based on "applicable requirements from OSHA, AR 385-10 and EM 385-1-1," and to institute a training program to alert employees to "existing hazards and all new hazards."  Sections 1.13, 1.14, 2.4.2.2, 4.0, 4.6, 4.7, and 4.8 set forth specific health and safety requirements KBR was required to comply with in performing services under Task Order 3, including Overseas Environmental Baseline Guidance Document 4715.5-G (Mar. 2000), OHSA standards, occupational safety and health standards, and Army Corps of Engineers safety standards.

Pursuant to the terms of Task Order 3, KBR was required to execute five specific "missions" in connection with its restoration efforts:  (1) establish management infrastructure system; (2) establish initial facility operational control; (3) oil well & other facilities fire suppression; (4) respond to oil spills; and (5) emergency restoration of oil systems.  Section 1.5 ("Contractor shall execute directed missions as described in Section 2[.]").  Section 2.2 and 2.2.1, subsections of the "establish management infrastructure system" mission, required KBR to "provide technical and operational support necessary to limit safety and environmental damage

immediately following hostilities, and to facilitate responsive documentation and reporting of system condition and capabilities," and noted that fulfillment of this duty included "coordination with government representatives."  Section 2.4.2.2, a subsection of the "respond to oil spills" mission, required that KBR complete "site assessment reports," which "shall contain an environmental assessment documenting existing conditions and containing recommended remedial actions."  This section also specifically addresses the applicable standards for soil remediation, and goes on to note that "it is not the intent of this contract to remediate pre-hostilities environmental contamination unless such remediation is necessary to protect the health and safety of contractor and Government personnel during on-going restoration actions."  Even though this section is concerned with oil spill cleanup, it provides support for the conclusion that in the event that there existed contamination that threatened the safety of personnel working at the site, KBR was responsible for informing the Army of the contamination and recommending a response.  Each of these sections makes clear that KBR had responsibility for communicating with the Army about any environmental damage that it discovered at Qarmat Ali.

Under the plain language of Task Order 3, it was the Army's responsibility to initially declare a work site "benign."  However, the declaration of a site as "benign" was merely an initial clearing of the area of obvious hazards, namely those created by the war, such as enemy forces, weapons, mines, booby-traps, and the like.  As work commenced, KBR had primary responsibility for environmental inspection and assessment as well as other health and safety issues.  An integral part of KBR's responsibility was to communicate with the Army about various hazards discovered on site.  Since KBR knew that the Army would be providing protection for its employees while they performed their duties at Qarmat Ali, KBR should have recognized that KBR's responsibility

to inform the Army of hazards would be "necessary for the protection" of the Army's soldiers. RESTATEMENT (SECOND) OF TORTS § 324A. Consequently, KBR may be liable to the plaintiffs "for physical harm resulting from [KBR's] failure to exercise reasonable care" in connection with carrying out its responsibilities under Task Order 3. *Id.*

### b. Safety Regulations

Plaintiffs also contend that there exists a duty based on KBR's alleged failure to comply with various OSHA and other safety regulations incorporated into Task Order 3. The Oregon Supreme Court has suggested that "outside sources of law," such as "industry standards, statutes, or regulations could . . . provide a basis in law for liability" in a negligence action. *Boyer v. Salomon Smith Barney*, 344 Or. 583, 595 (2008). In support of this argument, plaintiffs cite only one case, *Shahtout By and Through Shahtout v. Emco Garbage Co.*, 298 Or. 598 (1985). There, the plaintiff brought a negligence action against defendant for injuries suffered when defendant's truck backed into her, arguing that the truck should have been equipped with a back-up signal. *Id.* at 600. Even though she was not an employee of the defendant, plaintiff relied upon a Workers' Compensation Department rule which required back-up signals to be used on job sites such as defendant's. *Id.* The Oregon Supreme Court rejected plaintiff's negligence *per se* claim because the rule did not "fix a standard of care for liability toward persons other than employees," but determined that the rule was relevant to determining whether the defendant met the applicable standard of care. *Id.* at 604-05. Thus, in Oregon "[a] statute can be used to establish the proper standard of care and to show that the defendant met or failed to meet this standard." *Bellikka v. Green*, 306 Or. 630, 650 (1988) (citation omitted).

As part of their general negligence claim, plaintiffs have alleged that KBR failed to meet

the standard of care set forth in several applicable safety regulations.  In support, plaintiffs rely on

the September 2011 report by the Inspector General at the Department of Defense, which

investigated the Army and KBR's actions related to the sodium dichromate contamination at

Qarmat Ali.  Sugerman Decl. Exh. 1. The report made the following conclusion with respect to

KBR's recognition of and response to sodium dichromate:

> Contractor recognition of, and response to the health hazard caused by sodium
> dichromate contamination at the Qarmat Ali facility was delayed.  The delay
> occurred because KBR did not fully comply with applicable occupational safety
> and health standards required by the contract, and TF RIO failed to enforce
> contractor compliance.

*Id*. at 12.

The report goes on to cite sections of Task Order 3 which set forth KBR's responsibilities,

including Section 1.14 which set forth KBR's general responsibilities with regard to establishing a

"health and safety program," and Section 4.0, which enumerated a preliminary list of applicable

documents that were designed to inform KBR's efforts, which included, among others, the Army

Corp of Engineers Manual 385-1-1 (Safety and Health Requirements Manual), 29 C.F.R. 1910

(Occupational Safety and Health Standards), and 29 C.F.R. 1926 (Health and Safety Regulations

for Construction).  Plaintiffs also provide testimony from one of plaintiffs' experts in a nearly

identical case proceeding in another jurisdiction, who testified that KBR failed to comply with

OSHA's HazCom regulations at Qarmat Ali, which required KBR to implement a program to

protect all employees, including soldiers, from hazardous material.  Parker Depo. at 127-28.

Defendants do not appear to dispute that KBR was required to comply with at least some

OSHA requirements, noting that KBR was "only responsible for establishing a safety and health

program which was based upon *applicable* requirements from OSHA."  Defs.' Reply at 12

Page 49 - OPINION AND ORDER

(emphasis in original).  Defendants take the position that plaintiffs have not established that KBR failed to establish a health and safety program based on OSHA or that the Army considered KBR to have breached this obligation.  I disagree.  In light of the above evidence, plaintiffs have created a genuine issue of material fact regarding whether KBR failed to meet the standard of care set forth by the various regulations contained in the contract, and that this failure caused their damages.  Consequently, the safety regulations referenced in Task Order 3 may be considered when considering the applicable standard of care, and thus, the duty KBR owed the plaintiffs.

### B.  Conclusion

In light of the above, plaintiffs have sufficiently set forth the existence of a duty owed to them as third parties.  Having concluded that defendants owed a duty to plaintiffs by way the terms of Task Order 3, I need not resolve plaintiffs' other grounds for establishing duty, namely that this duty existed by way of KBR's presumed status as an occupier of Qarmat Ali or that such a duty existed based on Oregon's general foreseeability standard.

### ORDER

For the reasons discussed above, defendants' motion for summary judgment (#344) is DENIED.

Dated this 4th day of September, 2012.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 50 - OPINION AND ORDER