IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROCKY BIXBY, LAWRENCE ROBERTA,
SCOTT ASHBY, CHARLES ELLIS, MATTHEW
HADLEY, JESUS BRUNO,COLT CAMPREDON,
STEPHEN FOSTER, BYRON GREER, KELLY
HAFER, DENNIS JEWELL, STEPHEN
MUELLER, VITO PACHECO, JOHN RYDQUIST,
KEVIN STANGER, RONALD BJERKLUND,
ADANROLANDO GARCIA, BRIAN HEDIN,
CHARLES SEAMON, RANDY KEIPER, MATT
KUHNEL, DENNIS ROSGEN, AARON
ST. CLAIR, KEVIN WILSON, JASON BLAIN,
JAMES BORJA, DEVON FIELDS,  LESLIE ING,
RICHARD LAWRENCE, JAY LOUISIANA,
 JAMES McGOWAN, DONALD YEARGIN,
JASON ARNOLD, and MICHAEL O'RIELLY,

      Plaintiffs,

                                    3:09-CV-632-PK

v.

                                    OPINION AND
                                    ORDER

KBR, INC., KELLOGG, BROWN & ROOT SERVICE,
INC., KBR TECHNICAL SERVICES, INC.,
OVERSEAS ADMINISTRATION SERVICES, LTD.,
and SERVICE EMPLOYEES INTERNATIONAL, INC.,

      Defendants.

PAPAK, Magistrate Judge:

      Plaintiffs Rocky Bixby, Lawrence Roberta, Scott Ashby, Charles Ellis, and Matthew

Hadley filed this action against defendants KBR, Inc., Kellogg, Brown & Root Service, Inc.,

Page 1 - OPINION AND ORDER

KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc. (collectively, the "KBR defendants"), on June 8, 2009. On September 8, 2009, plaintiffs amended their complaint, adding Carlos Avalos, Jesus Bruno, Colt Campredon, Stephen Foster, Byron Greer, Kelly Hafer, Dennis Jewell, Stephen Mueller, Vito Pacheco, John Rydquist, and Kevin Stanger as additional plaintiffs. Plaintiffs amended their pleading a second time on February 2, 2010, adding Ronald Bjerklund, Adanrolando Garcia, Brian Hedin, Lewis Martin, and Charles Seamon as additional plaintiffs. On June 25, 2010, plaintiffs amended their complaint a third time, adding Randy Keiper, Matt Kuhnel, Dennis Rosgen, Aaron St. Clair, and Kevin Wilson as further additional plaintiffs. On October 27, 2010, plaintiffs amended their complaint a fourth time, adding Jason Blain, James Borja, Devin Fields, Leslie Ing, Richard Lawrence, Jay Louisiana, James McGowan, and Donald Yeargin as further additional plaintiffs, and adding Halliburton Company and Halliburton Energy Services, Inc. (collectively, the "Halliburton defendants"), as additional defendants. Plaintiffs amended their complaint a fifth time on January 10, 2011, adding as additional plaintiffs Jason Arnold, Thomas Barella, Daniel Grover, Christopher Wangelin, and Michael O'Rielly. Plaintiffs voluntarily dismissed Barella as a plaintiff in this action on the following day, January 11, 2011, and voluntarily dismissed Grover as a plaintiff in this action on February 25, 2011. On June 16, 2011, these chambers recommended that the court dismiss the plaintiffs' claims to the extent alleged against the Halliburton defendants for lack of personal jurisdiction, and on July 20, 2011, Judge Hernandez adopted that recommendation as his own opinion. The parties stipulated to the dismissal of Avalos, Martin, and Wangelin as plaintiffs in this action, on December 16, 2011, and to the dismissal of O'Rielly as a plaintiff on April 4, 2012. In their fifth amended complaint, plaintiffs

allege defendants' liability for negligence and for fraud arising out of plaintiffs' exposure to sodium dichromate and subsequent hexavalent chromium poisoning while stationed as Oregon National Guardsmen in Iraq and assigned to duty at the Qarmat Ali water plant in May-September 2003.

Now before the court is defendants' motion (#333) for summary judgment as to plaintiffs' claims for damages arising out of emotional distress, genetic transformation injury, and the need for medical monitoring. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, defendants' motion is granted in part and denied in part as discussed below.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

Page 3 - OPINION AND ORDER

**FACTUAL BACKGROUND**[1]

**I.      History of the Parties' Dispute**

Kellogg, Brown & Root Service, Inc. ("KB&RS") entered into Contract No. DACA63-03-D-0005 – known as the "Restore Iraqi Oil" or "RIO" contract – with the U.S. Army Corps of Engineers on March 8, 2003, pursuant to which KB&RS would perform tasks as ordered by the U.S. Army Corps of Engineers in connection with efforts to restore the infrastructure underlying the Iraqi oil industry.

Combat operations in Iraq began on March 19, 2003.

On March 20, 2003, the Corps of Engineers issued "Task Order 3," which governed the services to be provided by KBR and its subsidiaries at Qarmat Ali and other facilities. Under Task Order 3, the U.S. military would declare a given worksite to be "benign" before KBR would begin operations there. According to the deposition testimony of retired Brigadier General of the U.S. Army Corps of Engineers Robert Crear and of retired U.S. Army Corps of Engineers employee Gordon Sumner, "benign" referred to freedom from combatant activity and from nuclear or chemical weapons, and did not foreclose the possibility of environmental hazards, including hazardous (but not weaponized) chemicals. Support for this interpretation can be found in the provisions of Task Order 3, which suggest that pronouncement of a site as "benign" did not, for example, foreclose the need for environmental assessment.

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

It appears from the language of Task Order 3[2] that KBR was responsible for providing the Corps of Engineers with an environmental assessment of any facility in which they undertook operations. The obligation to provide such assessments included the obligation to report and evaluate any environmental hazards. According to the deposition testimony of General Crear and of Sumner, KBR was not merely permitted but required under Task Order 3 and the RIO contract to take all necessary precautions to safeguard personnel who might potentially be exposed to environmental hazards at worksites, including the wearing of protective gear and/or the closing down of operations at any unsafe site.

The RIO contract sets forth specific health and safety requirements KBR was required to comply with in performing services under the contract, including Overseas Environmental Baseline Guidance Document 4715.5-G (Mar. 2000), OHSA standards, industry standards, CERCLA requirements, environmental assessment requirements, Army safety regulations, and Army Corps of Engineers safety standards. These requirements were never waived.

The RIO contract further provides that the U.S. government will indemnify KBR for any claims involving bodily injury or death arising out of KBR's provision of services under the contract.

In April 2003, the KBR defendants began operations at Qarmat Ali. In May 2003, the Oregon National Guard was assigned to the Doha Operations Center in Kuwait. Beginning some time after May 1, 2003, the KBR defendants, or some of them, would contact the Doha Operations Center and request assistance with security issues on a regular, perhaps daily basis, in

---

[2] Moreover, the army briefed the Senate on December 22, 2008, that KBR was required to perform an initial site assessment of Qarmat Ali "in order to establish an environmental baseline."

Page 5 - OPINION AND ORDER

accordance with the provisions of the RIO contract and Task Order 3.  On some occasions, members of the Oregon National Guard would receive security assignments to the Qarmat Ali water plant, where they were allegedly exposed to sodium dichromate.

In an internal email, in June 2003 a KBR employee discussed sodium dichromate contamination at Qarmat Ali and recommended that remedial measures be taken, including excavating and placing in drums all contaminated soil.

Defendants did not advise the Oregon National Guard of the presence of sodium dichromate at Qarmat Ali until August 12, 2003, when KBR issued an official report to the army detailing the chemical's presence.  The report indicated that sodium dichromate at Qarmat Ali constituted a serious health hazard.

The Qarmat Ali site was shut down September 9, 2003.

Plaintiffs are members of the Oregon National Guard allegedly exposed to sodium dichromate at Qarmat Ali in 2003 who have allegedly been harmed by their exposure.

## ANALYSIS

By and through their motion (#333) for summary judgment, defendants move for summary adjudication of plaintiffs' prayer for emotional distress damages, for the costs of medical monitoring, and for so-called genetic transformation injury.  I analyze the merits of defendants' motion as to each of the subject categories of prayed-for damages below.

I.   **Plaintiffs' Prayer for Personal Injury Damages as Compensation for Genetic Transformation Injury and Prayer for the Costs of Medical Monitoring**

Defendants filed their motion (#333) for summary judgment prior to issuance of my Opinion and Order (#493) dated August 29, 2012 (my "*Daubert* order").  Several of the issues

Page 6 - OPINION AND ORDER

raised by defendants' motion were subsequently resolved by my *Daubert* order, including in

particular issues relating to plaintiffs' prayer for personal injury damages in compensation for so-

called genetic transformation injury and for the consequential costs of medical monitoring.

Addressing the proffered opinion testimony of Arch Carson, plaintiffs' medical expert, I ruled in

relevant part as follows in my *Daubert* order:

> Pursuant to this Opinion and Order, and for the foregoing reasons, Carson's
> opinion testimony regarding the persistence of genetic transformation to the
> present and the consequential need for medical monitoring is inadmissible and
> shall be excluded. I note that, although defendants' motion is captioned as a
> motion to exclude Carson's testimony regarding genetic transformation injury,
> remote exposure injury, and medical monitoring, defendants' argument in support
> of their motion addresses only Carson's opinion testimony genetic transformation
> injury and the need for medical monitoring, and neither addresses nor defines the
> "remote exposure injury" referenced in the caption. To the extent, if any, that the
> phrase "remote exposure injury" as used in Carson's opinion testimony may
> properly be construed to refer to asymptomatic subcellular genetic transformation,
> Carson's testimony regarding such injury is likewise inadmissible to the extent
> that Carson opines that such asymptomatic remote exposure injury persists to the
> present, and otherwise admissible, whereas to the extent that such testimony is
> properly construed as referring to symptomatic injury in consequence of plaintiffs'
> exposure to sodium dichromate at Qarmat Ali, such testimony is admissible.
> Thus, pursuant to this Opinion and Order, to the extent that Carson offers opinion
> regarding any symptomatic injury suffered by the plaintiffs in consequence of
> their exposure to sodium dichromate at Qarmat Ali, regarding genetic
> transformation injury caused by plaintiffs' exposure, regarding the risks associated
> with genetic transformation injury, and/or regarding his inability to quantify the
> probability that genetic transformation injury may have persisted to the present in
> the case of any individual plaintiff, such opinion is admissible under Rule 702.
> Under this order, Carson's opinion testimony is inadmissible only to the extent it
> addresses the persistence of asymptomatic subcellular transformation to the
> present, personal injury damages flowing directly from such asymptomatic
> condition, and the consequential need for medical monitoring.

Opinion and Order (#493) dated August 29, 2012, pp. 15-16. In consequence of my *Daubert*

order, therefore, Carson's opinion testimony regarding plaintiffs' alleged personal injury damages

flowing directly from asymptomatic subcellular genetic transformation and the consequential

need for medical monitoring, including testimony regarding the cause of such damages, is inadmissible and excluded.  Plaintiffs offer no alternative expert opinion on these narrow issues.

Under Oregon law, "[w]hen the element of causation involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless the plaintiff has presented expert testimony that there is a reasonable medical probability that the alleged negligence caused the plaintiff's injuries." *Baughman v. Pina*, 200 Or. App. 15, 18 (2005), *citing Uris v. State Compensation Dep't*, 247 Or. 420, 424 (1967) ("Where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science and must necessarily be determined by testimony of skilled, professional persons") (internal quotation marks omitted).  "Th[is] rule prevents jurors from speculating about causation in cases where that determination requires expertise beyond the knowledge and experience of an ordinary lay person." *Id.*, *citing Howerton v. Pfaff*, 246 Or. 341, 347-348 (1967).

Because a necessary predicate for award of personal injury damages in compensation for genetic transformation injury and/or of the costs of medical monitoring purportedly necessary in light of such injury is expert medical testimony regarding the causation of such injury, and plaintiffs offer no admissible expert testimony regarding such causation, I need not address defendants' arguments that asymptomatic subcellular transformation that causes no present impairment but increases the risk of future harm is not cognizable as damages under Oregon law, that Carson lacks qualification to testify to such injury as an expert, that Carson utilized an unreliable methodology in concluding that plaintiffs more likely than not currently suffer from such injury, that Carson's proffered opinion regarding the need for medical monitoring is

Page 8 - OPINION AND ORDER

unreliable, or that Carson's proffered opinion regarding the need for medical monitoring should

properly be excluded from consideration pursuant to my Opinion and Order (#244) dated

December 30, 2011. In the absence of admissible expert opinion as to causation in connection

with these two categories of damages, such damages are unavailable as a matter of law. *See*

*Baughman*, 200 Or. App. at 18. Defendants' motion is therefore granted as to plaintiffs' prayer

for damages to the extent plaintiffs pray for personal injury damages in compensation for

persistent, asymptomatic, subcellular genetic transformation and/or for the consequential costs of

medical monitoring.

## II.    Plaintiffs' Prayer for Emotional Distress Damages

        In support of their motion (#333) for summary judgment, defendants argue that plaintiffs

are not entitled to award of emotional distress damages because "plaintiffs cannot prove that they

are suffering from any present illness caused by sodium dichromate." Memorandum in Support

of KBR's Motion for Summary Judgment re Plaintiffs' Claims for Mental Anguish, Medical

Monitoring, and Genetic Transformation Injury, p. 2. By so arguing, defendants mischaracterize

both Oregon law and the factual record of this action.

        In 1997, the Oregon Appeals Court summarized the jurisprudence governing this legal

issue:

> For at least 60 years, Oregon courts have assumed, albeit implicitly, that
> emotional distress damages can only be recovered in cases involving physical
> injury--and then have proceeded to carve out exceptions to that general
> proposition. [FN 4] * * *
>
>> [FN 4:] Plaintiff points out correctly that no Oregon decision has
>> explicitly stated that "rule" in circumstances in which the plaintiff was the
>> *direct* victim of the tortious conduct. *Compare Saechao v. Matsakoun*, 78
>> Ore. App. 340, 345-48, 717 P.2d 165, *rev dismissed* 302 Ore. 155 (1986)

Page 9 - OPINION AND ORDER

> (plaintiffs who suffered psychic injury from witnessing negligent physical injury to a close relative, but who suffered no physical injury, could not recover emotional distress damages). Nevertheless, as amplified below, that "rule"--or, more correctly, unspoken first premise--underlies the evolution of Oregon law in this area.

*Curtis v. MRI Imaging Servs. II*, 148 Or. App. 607, 612 (1997) (emphasis original). The *Curtis* court enumerated the "exceptions to the general assumption, under Oregon law, that psychic distress is not compensable unless accompanied by physical injury" as follows:

> First, where the defendant intended to inflict severe emotional distress. Second, where the defendant intended to do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself. Third, where the defendant's conduct infringed on some legally protected interest apart from causing the claimed distress, even when that conduct was only negligent.

*See Curtis*, 148 Or. App. at 614, *quoting Hammond v. Cent. Lane Communications Ctr.*, 312 Or. 17, 22-23 (1991).

Where emotional distress damages flow from physical injury, the quantum of "injury" required is small. An offensive touching that causes no physical damage, and which is offensive only in that it is the cause of emotional distress, is sufficient to satisfy the requirements of the "physical impact rule." *See, e.g., Wilson v. Tobiassen*, 97 Or. App. 527, 532 (1989). Moreover, the predicate physical impact need not result in any lasting or persistent injury in order to support a claim for emotional distress damages. *See id.; see also, e.g., Fehely v. Senders*, 170 Or. 457, 461 (1943). Defendants' characterization of Oregon law is thus inaccurate both insofar as defendants imply that the physical injury flowing from the predicate physical impact must persist until a plaintiff files suit in order to support a claim for emotional distress damages and insofar as defendants fail to acknowledge that emotional distress damages may be available under

Page 10 - OPINION AND ORDER

appropriate circumstances even in the absence of any physical impact.

Defendants moreover mischaracterize the factual record insofar as they assert that plaintiffs cannot establish any predicate physical injury. To the contrary, all or nearly all of the 34 plaintiffs who remain parties to this action have offered evidence of having suffered either transient or permanent symptoms consistent with hexavalent chromium poisoning. All plaintiffs who experienced such symptoms are entitled to claim damages in compensation for all emotional distress suffered in "natural consequence" of such symptoms and of the circumstances under which the condition underlying such symptoms came about. *Fehely*, 170 Or. at 474.

In addition, defendants have not established the absence of any unresolved question of fact as to whether their complained-of conduct violated any independent "legally protected interest" of the plaintiffs. Where a defendant's negligence violates such an interest, the adversely impacted plaintiff may bring a claim for emotional distress damages even in the absence of any predicate physical impact. *See Curtis*, 148 Or. App. at 614; *Hammond*, 312 Or. at 22-23; *Macca v. Gen. Telephone Co. of N.W.*, 262 Or. 414, 420, 420 n. 1 (1972). As I determined in my Opinion and Order (#512) dated September 4, 2012, KBR's contractual relationship with the Corps of Engineers as memorialized in the RIO contract created a duty flowing from KBR to the plaintiffs. *See* Opinion and Order (#512) dated September 4, 2012, pp. 47-48, 49-50. Such duty constitutes a legally protected interest, and is sufficient to support each plaintiff's claims for emotional distress damages.

Finally, although as noted above I ruled that Carson's proffered testimony regarding plaintiffs' alleged personal injury damages flowing directly from asymptomatic subcellular genetic transformation was inadmissible, I further ruled that his proffered testimony was

Page 11 - OPINION AND ORDER

admissible to the extent Carson offered opinion "regarding genetic transformation injury caused by plaintiffs' exposure, regarding the risks associated with genetic transformation injury, and/or regarding his inability to quantify the probability that genetic transformation injury may have persisted to the present in the case of any individual plaintiff." Opinion and Order (#493) dated August 29, 2012, p. 15. Although plaintiffs may not seek personal injury damages premised on the theory that such genetic transformation injury persists to the present, I find no principle of Oregon law to suggest that physical transformation of a plaintiff's cellular structure caused by physical exposure to a carcinogenic industrial toxin is insufficient to satisfy Oregon's minimal physical impact rule for purposes of determining the plaintiff's entitlement to emotional distress damages. *See, e.g., Wilson*, 97 Or. App. at 532; *Fehely*, 170 Or. at 461; *Doe v. American Red Cross*, 322 Or. 502, 512 (1996) (finding that asymptomatic presence of virus in plaintiff's blood was sufficiently cognizable as present physical injury to cause statutory limitations period to begin to run despite the absence of any immediate harm or impairment to the plaintiff). I conclude in consequence that, on the basis of Carson's admissible opinion testimony that each plaintiff suffered genetic transformation injury at or around the time of the plaintiff's exposure to sodium dichromate at Qarmat Ali, and without regard to the absence of any admissible opinion testimony as to whether such genetic transformation injury persists to the present, each plaintiff is entitled to pray for award of emotional distress damages.

## CONCLUSION

For the reasons set forth above, defendants' motion (#333) for summary judgment as to

/ / /

/ / /

Page 12 - OPINION AND ORDER

plaintiffs' claims for damages arising out of emotional distress, genetic transformation injury, and the need for medical monitoring is granted in part and denied in part as discussed above.

Dated this 17th day of September, 2012.

Honorable Paul Papak
United States Magistrate Judge