**Geoffrey L. Harrison**, admitted Pro Hac Vice
Susman Godfrey LLP
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 653-7807
Fax: (713) 654-3367
Email: gharrison@susmangodfrey.com
           Attorney-in-Charge for KBR Defendants

**Jeffrey S. Eden, OSB #851903**
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone 503.222.9981
Fax 503.796.2900
Email: jeden@schwabe.com
           Local Counsel for KBR Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ROCKY BIXBY, et al,** | No. 3:09-cv-632-PK |
| Plaintiffs, | |
| vs. | DECLARATION OF JEFFREY S. EDEN IN SUPPORT OF KBR'S RESPONSE TO PLAINTIFFS' RENEWED ATTEMPT TO ESTABLISH A FOUNDATION FOR THEIR CSP-RELATED EXHIBITS AND ARGUMENTS |
| **KBR INC., et al.,** | |
| Defendants. | |

I, Jeffrey S. Eden, do hereby declare and say the following:

1.       I am over the age of twenty-one (21) years, am competent to testify to the matters

stated herein, have personal knowledge of the facts and statements in this declaration, and each

of the facts and statements is true and correct.

Page 1 -     DECLARATION OF JEFFREY S. EDEN

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Telephone 503.222.9981  Fax 503.796.2900

PDX/123495/181198/JSE/10115628.1

2.       I am an attorney in the law firm of Schwabe, Williamson & Wyatt.  I am licensed to practice law in the state of Oregon and admitted before this Court.  I am the local counsel of record for the KBR Defendants in the above-referenced litigation.

3.       Attached as Exhibit 1 (X-1) to this Declaration is a true and correct copy of excerpts from the Pretrial Hearing of September 18, 2012.

4.       Attached as Exhibit 2 (X-2) to this Declaration is a true and correct copy of excerpts from the deposition of Kuo Y. Tseng dated February 3, 2011.

5.       Attached as Exhibit 3 (X-3) to this Declaration is a true and correct copy of excerpts from the deposition of Robert Reeves dated August 17, 2012.

I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND THEY ARE MADE FOR USE AS EVIDENCE IN COURT AND ARE SUBJECT TO PENALTY FOR PERJURY.

Dated this 5th day of October, 2012.


*/s/ Jeffrey S. Eden*
_____
Jeffrey S. Eden

Of Counsel:

Jeffrey S. Eden
jeden@schwabe.com
SCHWABE, WILLIAMSON & WYATT
1211 SW 5th Avenue, Suite 1900
Portland, Oregon 97204
Telephone:  (503) 796-2837
Facsimile:  (503) 796-2900


Page 2 -     DECLARATION OF JEFFREY S. EDEN

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone 503.222.9981  Fax 503.796.2900

Vineet Bhatia
Texas State Bar No. 00795976
S.D. Admissions No. 20187
vbhatia@susmangodfrey.com
J. Hoke Peacock III (Admitted *Pro Hac Vice*)
Texas State Bar No. 15673980
S.D. Admissions No. 13529
tpeacock@susmangodfrey.com
Johnny W. Carter (Admitted *Pro Hac Vice*)
State Bar No. 00796312
S.D. Admissions No. 21988
jcarter@susmangodfrey.com
Chanler A. Langham (Admitted *Pro Hac Vice*)
Texas State Bar No. 24053314
S.D. Admissions No. 659756
clangham@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

Jordan Connors (Admitted *Pro Hac Vice*)
Washington State Bar No. 416499
jconnors@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue
Seattle, Washington 98101
Telephone:  (206) 516-3880
Facsimile:  (206) 516-3883

Raymond B. Biagini (Admitted *pro hac vice*)
rbiagini@mckennalong.com
Kurt J. Hamrock
khamrock@mckennalong.com
MCKENNA LONG & ALDRIDGE LLP
1900 K Street NW, Suite 100
Washington, D.C. 20006-11808
Telephone:  (202) 496-7500
Facsimile:  (202) 496-7756

Warren W. Harris (Admitted *pro hac vice*)
warren.harris@bgllp.com
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 221-1490
Facsimile:  (713) 221-2199

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone 503.222.9981  Fax 503.796.2900

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF OREGON

 3   ROCKY BIXBY, et al.,          )
                                   )
 4           Plaintiffs,           )   Case No. 3:09-cv-632-PK
                                   )
 5       vs.                       )
                                   )
 6   KBR, Inc., et al.,            )   September 18, 2012
                                   )
 7           Defendant.            )   Portland, Oregon
     _____)

 8

 9

10

11

12

13

14                   Pretrial Hearing

15              TRANSCRIPT OF PROCEEDINGS

16        BEFORE THE HONORABLE PAUL PAPAK

17   UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

18

19

20

21

22

23

24

25
```

EXHIBIT 1
Page 1 of 2

44

1    THE COURT:  Well, I think you presume the

2    conclusion perhaps the plaintiffs presumed at the outset

3    that there's relevance.  If there is a link, if the

4    plaintiffs establish a link that somebody knew and had in

5    their possession, saw, read, should have known because they

6    were opening these documents, there seems to be an

7    inference -- not a powerfully strong one -- that someone

8    would know that a large volume of chemicals was used, one of

9    which was sodium dichromate, and that could have influenced

10   KBR's decision.

11         Absent that link, absent some foundational showing

12   of that link, the document doesn't come in, and its

13   relevance isn't established for consideration by the jury in

14   the abstract.  If there is some document out there -- and so

15   what I'm saying to the plaintiffs is I'm not going to grant

16   this motion, but the contingency support plan and the

17   inferences that you drew from it to information about sodium

18   dichromate will only be for the jury if an adequate

19   foundation as to its linkage to KBR's knowledge is drawn.

20   Absent that, it won't come in, or if it comes in

21   inadvertently, there will be an instruction that makes it

22   clear to the jury that this was not an appropriate thing for

23   them to consider.  So I'm going to deny it with that

24   explanation.

25         *Erin Brockovich.*  I'm not exactly sure about the

EXHIBIT 1
Page 2 of 2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


MARK McMANAWAY, ET AL            )
                                 )
                PLAINTIFFS,      )
                                 ) Civil Action No.
VS.                              )
                                 ) 4:10-cv-01044
KBR, INC., ET AL,                )
                                 )
                DEFENDANTS.      )

*************************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

ROCKY BIXBY, ET AL            )
                              )
                PLAINTIFFS,   )
                              )
VS.                           ) CASE NO. 3:09-CV-632-PK
                              )
KBR, INC., ET AL              )
                              )
                DEFENDANTS.   )


*************************************************************

ORAL VIDEOTAPED DEPOSITION OF

KUO Y. TSENG

FEBRUARY 3, 2011

*************************************************************

EXHIBIT 3
Page 1 of 4

*KUO  Y.  TSENG  -  February 3, 2011*

5

1          THE VIDEOGRAPHER:  This is Tape 1 in the
2   videotaped deposition of Mr. Kuo Tseng.  Today's date
3   is February 3rd, 2011.  We're on the record.  The time
4   is 9:26 a.m.
5          Will counsel please introduce themselves for
6   the jury?
7          MR. DOYLE:  Mike Doyle and Gabe Hawkins
8   here for Rocky Bixby and other veterans.
9          MR. PEACOCK:  Trey Peacock of Susman
10   Godfrey on behalf of the witness and KBR, along with
11   Ronald Scott from KBR.
12               KUO Y. TSENG,
13   having been first duly sworn, testified as follows:
14               EXAMINATION
15   BY MR. DOYLE:
16      Q.   Tell us your name, please.
17      A.   My name is K-U-O, said in Chinese, "Ko."  My
18   last name is Tseng, T-S-E-N-G.
19      Q.   Let me --
20      A.   Kuo Tseng.
21      Q.   And you work for -- for KBR?
22      A.   Yes, I am.
23      Q.   Did you work for KBR in 2003?
24      A.   Yes.
25      Q.   Doing what?

EXHIBIT 3
Page 2 of 4

*KUO Y. TSENG - February 3, 2011*

6

1      A.    I was -- I was working for KBR in 2003 as a

2  project engineer assigned to Iraq from March of the

3  year to help KBR to complete the RIO Project, R-I-O

4  Project.

5      Q.    And by "RIO," Restore Iraqi Oil Project?

6      A.    Yes.

7      Q.    This was work on the oil infrastructure of

8  Iraq?

9      A.    The assignment I took was to assist the

10  company to restore the oil business in Iraq.

11      Q.    Which meant doing work on the infrastructure,

12  the buildings, the equipment?

13      A.    To do my -- to use my experience to help the

14  company to restore the oil sector in the country.

15      Q.    And by the "oil sector," what are you talking

16  about?

17      A.    The oil production from the oil well, the

18  refining capability in the refinery, the gas liquefied

19  process in the LPG plant, and transportation of the

20  crude through the pipeline, on and on.

21      Q.    Including what water treatment facility in

22  Southern Iraq?

23      A.    Including the power supply, including the

24  water treatment, including the wastewater treatment,

25  and so forth.

EXHIBIT 3
Page 3 of 4

*KUO  Y.  TSENG  -  February 3, 2011*

7

1      Q.    What water treatment plant in Southern Iraq

2    near Basra also?

3      A.    We had no idea of the facility before we left

4    the United States.

5      Q.    When you say "we," you were given zero

6    information by anyone about a facility called Qarmat

7    Ali before you left the United States?

8      A.    That's true.

9      Q.    Who was giving you information?  What level of

10   management?

11     A.    I was hired by the company back in February of

12   1980.  And as a designing engineer, in '92 they pulled

13   me out of the discipline and assigned me as the project

14   management, engineering project management, and then my

15   job title was project engineer at the time.  So I took

16   the assignment as a project engineer.

17     Q.    2003, who was giving you information, what

18   managers, about what you were to do?

19     A.    We did not know that until we settled in

20   Kuwait where the team of the -- KBR was assembled at

21   the time, because Iraq at that time was -- was -- was

22   still in the war zone.  So the team, we stay in one of

23   the hotels in Kuwait, and then the headquarter at the

24   time was there.

25     Q.    You spent time getting ready to testify today

EXHIBIT 3
Page 4 of 4

111

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARK McMANAWAY, ET AL.,         )
                                )
              PLAINTIFFS,        )
                                )
VS.                             )  CASE NO. 4:10-cv-01044
                                )
KBR, INC., ET AL.,              )
                                )
              DEFENDANTS.        )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERT A. REEVES

AUGUST 17, 2012

VOLUME 2

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF ROBERT A. REEVES,

Volume 2, produced as a witness at the instance of the

PLAINTIFFS, and duly sworn, was taken in the

above-styled and numbered cause on the 17th of August,

2012, from 1:38 p.m. to 3:20 p.m., before Jeffrey M.

Steele, CSR in and for the State of Texas, reported by

machine shorthand, at the offices of Susman Godfrey, 901

Main Street, Suite 5100, City of Dallas, County of

Dallas, State of Texas, pursuant to the Federal Rules of

Civil Procedure.

EXHIBIT 3
Page 1 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

122

1    Rio was issued March 2003 the team reassembled?

2        A.   Yes.   Not -- not exactly that team, but I'm

3    sure a lot of the people who were on it were brought

4    back and then supplemented by other people as necessary.

5        Q.   The particular assessment, contingent plan,

6    including assessing the Iraq infrastructure?

7        A.   Uh-huh.

8        Q.   Yes?

9        A.   Yes.

10       Q.   Including Qarmat Ali?

11       A.   Yes.

12       Q.   In fact, there was a specific section of this

13   plan dealing with the water injection plants?

14       A.   Yes.

15       Q.   You were aware of that when you gave your

16   testimony last time, weren't you?

17       A.   Yes.

18       Q.   Did you indicate that this plan didn't -- the

19   last time you testified, didn't have any indication it

20   had to do with the oil project?

21       A.   I'm sorry, could you say that question again.

22       Q.   Did you indicate when you testified last time

23   under oath that this particular assessment --

24       A.   Which particular assessment now?

25       Q.   The one you were involved in prewar, the one

EXHIBIT 3
Page 2 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

123

1    that you were the program manager.

2        A.   Okay.

3        Q.   Did not include any effort to assess

4    Qarmat Ali?

5        A.   No, that's not what I said.  What I said was I

6    was not very familiar with any of the great details on

7    Qarmat Ali at that time.

8        Q.   Did you look at your deposition before today?

9        A.   No.

10       Q.   Did you review it?

11       A.   No.

12       Q.   You absolutely, positively remember what you

13   testified under oath, 2011, in this case?

14       A.   Yeah, because I thought at that time what could

15   have been misconstrued on the answer.

16       Q.   When you -- what do you mean it could have been

17   misconstrued?

18       A.   To mean I -- we didn't have anything to do with

19   Qarmat Ali, but that's not the case.  All I was saying

20   was I was not intimately familiar with it, but we did

21   have it in the plan.

22       Q.   In fact, there was a very specific tab in this

23   plan dealing with Qarmat Ali?

24       A.   Yes.

25       Q.   A very detailed plan for labor and equipments

EXHIBIT 3
Page 3 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

130

1     Q.  Correct?

2     A.  Yes.  Yes.

3     Q.  All right.  Was there any restriction on

4  looking for publicly available documents during this

5  assessment?

6     A.  Yes.

7     Q.  What was that?

8     A.  We were restricted to use the information given

9  to us by the -- by the government to develop the plan,

10  and we were not allowed to go outside for other

11  information.

12     Q.  When you say, we weren't allowed to go to other

13  information, weren't allowed to go, for example, to

14  textbooks that engineers had available?

15     A.  The textbooks would be okay.

16     Q.  Well, what else is okay?  If textbooks are

17  available, what other --

18     A.  That's -- that's it.

19     Q.  This particular plan, contingency plan, was it

20  continued to be referred to once the actual work on the

21  ground began?

22     A.  I'm not sure I follow your question.

23     Q.  You charged the government $10 million for this

24  assessment, right?

25     A.  I'm not sure if $10 million is right.  I think

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

143

1      A.   Yes.

2      Q.   That was professionals in safety at KBR,

3   including at least one you remember, Dennis Bagnoche,

4   actually going through all the documents, all the

5   information available, making sure they identified

6   potential safety hazards, that was what they were

7   getting paid to do, wasn't it?

8           MR. HARRISON:   Objection to the form of the

9   question.

10     A.   They would have done a safety review, so I -- I

11  can't say the details, I'm not quite sure what you're --

12  what they did.

13     Q.   (BY MR. DOYLE)  Well, when you say you're not

14  quite sure, part of what they were supposed to do,

15  because this was an assessment of the work that was

16  going to be done on the ground once the war started, was

17  identify hazards that might be anticipated?

18     A.   Burning oil wells, oil well spills, things like

19  that.

20     Q.   Chemicals?

21     A.   Sure.

22     Q.   Any doubt that absolutely, positively from the

23  prewar assessment knew that there were likely going to

24  be chemicals involved in the Iraqi oil infrastructure?

25     A.   Is there any doubt there would be?  No, there

EXHIBIT 3
Page 5 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

144

1   would be no doubt.

2       Q.  In fact, was it also well known to KBR that

3   this was environmentally degraded infrastructure, not

4   very good industrial hygiene?

5       A.  We knew that the Iraqi facilities were not

6   getting the best of care during -- during operation.

7       Q.  Well, you knew that standard industrial hygiene

8   practices were not something you anticipated the Iraqis

9   had been doing for decades --

10      A.  Uh-huh.

11      Q.  -- true?

12      A.  Yes.

13      Q.  So it wasn't something unanticipated.  In fact,

14  you knew from the assessment, you knew from doing this

15  prewar work that not following industrial hygiene, not

16  following accepted Western safety handling was something

17  that you anticipated from the prewar assessment?

18      A.  Yes.

19      Q.  You knew that it was likely that chemicals that

20  were present were not going to necessarily be contained,

21  safe, like you might anticipate in a Texas plant?

22      A.  Yes.

23      Q.  You knew that it was likely that whatever

24  chemicals were being used might be sitting in a

25  potentially contaminated area, that wasn't something

EXHIBIT 3
Page 6 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

145

1     that would be a surprise, that was something you

2     confirmed from the assessment?

3          A.   Right.

4          Q.   Likewise, it was clear that once on the ground

5     there would be -- it would be necessary to look at these

6     degraded decades of poor industrial hygiene by

7     professionals, true?

8          A.   Yes.

9          Q.   In fact, that was what KBR knew it had to do as

10    part of the work, use its professional expertise to look

11    at these, evaluate just how bad these environmentally

12    degraded, poor chemical handling, poor infrastructure

13    Iraqi facilities were?

14         A.   Yes.

15         Q.   So it certainly wouldn't be a surprise, in

16    fact, already knew before you ever got out there from

17    the prewar assessment, that Qarmat Ali, like all these

18    other facilities, was likely to have chemicals that were

19    maintained poorly, poor industrial hygiene, site

20    contamination, poorly maintained?

21              MR. HARRISON:   Objection to the form of the

22    question.

23         A.   Could you repeat it again please?

24         Q.   (BY MR. DOYLE)   Yes, sir.   In fact, it wasn't a

25    surprise, it was already known from the assessment from

EXHIBIT 3
Page 7 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

148

1    Qarmat Ali, like the other portions of the Iraqi oil

2    infrastructure, expected what kind of environmental

3    conditions?

4        A.  I don't know you could say environmental, so

5    much as we -- we expected the equipment to be in

6    relatively poor conditions, and if you want to take an

7    extension of that, you know, that would mean it would be

8    a maybe not environmentally as good as it could be.

9        Q.  Well, potential hazards --

10       A.  Uh-huh.

11       Q.  -- right?

12       A.  Yeah.

13       Q.  I mean that was something that KBR knew from

14   before the war from their assessment --

15       A.  Okay.

16       Q.  -- true?

17       A.  Uh-huh, yes.

18       Q.  Is that correct?

19               And so it certainly would not be a surprise

20   if chemicals onsite were un-contained, not where they

21   were supposed to be, not fully sealed off because that's

22   what an environmentally degraded site is, isn't it?

23       A.  Okay.

24       Q.  Is that correct?

25       A.  Yes.

EXHIBIT 3
Page 8 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

156

1    significant document and time was of the -- of the

2    essence to get it done.

3        Q.   The particular engineering teams, do you

4    remember any human beings on those?

5        A.   On the engineering teams?

6        Q.   Yes, sir.

7        A.   Hoosh, I know Rick Badgett was, like, the head

8    of -- head of it.  Good lord, I'm afraid I can't bring

9    forth too many memories on what the names of the people

10   were.

11       Q.   So you've indicated Ralph Stephenson, Ray

12   Badgett, any other human beings?

13       A.   I'm trying to remember but I can't.

14       Q.   You'd have to look at the organizational chart?

15       A.   Yes.

16       Q.   The particular -- you have in front of you

17   what's been marked as Plaintiff Exhibit 27, have you

18   seen that document before?

19       A.   Yes.

20       Q.   Tell us what it is.

21       A.   It's a Ministry of Oil listing of equipment for

22   all the various portions of -- of the facilities.

23       Q.   Basically would it be fair to describe it as

24   the Iraqi shopping list during the food for oil program?

25       A.   As the shopping list?

EXHIBIT 3
Page 9 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

159

1  under the United Nations, it would probably a listing of

2  the oil produced during that program.

3      Q.  Got it.  So actually you don't even know what

4  this document, you know, we're looking at, oil exports,

5  you don't even know what that document is?

6      A.  No, I don't.

7      Q.  Okay.  So you can't say it's not this other

8  document or it's this document because you've never seen

9  it?

10     A.  But I'm telling you what it says, it says, oil

11  exports, which would mean to me, it says how much oil is

12  being exported from Iraq in that program.

13     Q.  Do you know what portions of the UN documents

14  were actually review by KBR, did you ever look at them

15  all?

16     A.  No.

17     Q.  So as far as what UN --

18     A.  We -- we did not look at it because it was not

19  part of the information given to us by the -- by the

20  client.

21          MR. DOYLE:  Let me finish my question.  Not

22  responsive.

23     Q.  (BY MR. DOYLE)  Did you actually look at all

24  the UN documents that were reviewed by the KBR

25  engineers?

EXHIBIT 3
Page 10 of 19

*ROBERT A. REEVES - VOLUME 2 - August 17, 2012*

160

1      A.  Did I actually look at it?

2      Q.  Yes, sir.

3      A.  No.

4      Q.  So if we want to say, Mr. Reeves, this was a

5  document that was part of what KBR looked at and this

6  wasn't, the answer would be you know or don't know?

7      A.  I know that we would not use any information

8  not given it to us by the client because that was part

9  of our statement of work, and -- and so we wouldn't go

10  out looking for -- for more information like that

11  because the information given to us by them was stated

12  that it was the latest and most accurate information, so

13  we wouldn't be going out looking for other stuff because

14  we wouldn't know whether it was accurate or inaccurate.

15           MR. DOYLE:  Nonresponsive.

16      Q.  (BY MR. DOYLE)  I want to focus on what you can

17  tell us under oath.  The UN materials available on the

18  Iraqi oil infrastructure, whatever was reviewed or not

19  reviewed by engineers during this prewar assessment,

20  you, program manager, can't tell us what documents are

21  in that whole category because you never --

22      A.  Yes, I can.  I can tell you they used the

23  United Nations Expert Report because I remember that.

24  And this one says above that we got a listing of the oil

25  exports from the United -- from the United -- under the

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

161

1    United Nations Oil-for-Food Programme, and that says,

2    oil exports, and that's -- what that says to me is that

3    says how much oil was being produced in that timeframe,

4    so we knew how much oil was coming out and what we had

5    to try and get back to.

6              MR. DOYLE:  Nonresponsive.

7        Q.  (BY MR. DOYLE)  Very specific.  If I ask you,

8    Mr. Reeves, what oil exports under the United States

9    Oil-for -- program actually looked like, the documents,

10   how many pages, what was in it, you never saw it

11   personally?

12       A.  Not the oil exports, no.

13       Q.  Okay.  You never saw the United Nations Expert

14   Report, did you?

15       A.  Yes, that was -- that was things that we had

16   seen as it came in.

17       Q.  Did you see it?

18       A.  Yes.

19       Q.  Okay.  What did it include?

20       A.  It included a listing of, as best they could,

21   the situation of the state of the oil facilities or oil

22   infrastructure.

23       Q.  Did it include materials that were needed in

24   the infrastructure?

25       A.  No.

EXHIBIT 3
Page 12 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

163

1   we -- we knew three pumps were running there and one

2   pump wasn't; that's probably where that came from.

3       Q.   Okay.  Was it -- this particular UN Expert

4   Report, was it something available on-line?

5       A.   I don't know.

6       Q.   But what was -- what was in the documents and

7   what was not in this thing called the UN, United Nations

8   Expert Report, are you able to detail for us every page?

9       A.   No.

10      Q.   Are you able to tell us, for example, whether

11  something was part of it or not?

12      A.   Not -- not now I couldn't, no, not --

13      Q.   All right.  So for example, can you under oath

14  say, because you don't know exactly what was part of

15  that today, whether or not this document we see as

16  Plaintiffs' Exhibit 27 was part of it or not?

17      A.   Not.

18      Q.   And the reason you say, not, is you remember it

19  page-by-page?

20      A.   Because this is Ministry of Oil and it's --

21  it's a listing from the oil companies of what they need,

22  has nothing to do with the United Nations.

23      Q.   Do you know this listing of what the Iraqi oil

24  companies needed, whether it was given to the UN or not?

25      A.   No, I don't know that.

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

166

1    wouldn't -- wouldn't have seen it.

2        Q.  You wouldn't know?

3        A.  No.

4        Q.  So it's absolutely crystal clear; you're not

5    saying, I, Robert Reeves, under oath know for a fact

6    KBR, none of their employees, none of the folks in this

7    professional assessment, looked or didn't look, reviewed

8    or didn't review this listing of what the Iraqis had

9    been ordering for chemicals for years?

10       A.  I would say it's highly improbable they didn't

11   because it just -- I don't think it was part of the UN

12   documents that we had.

13            MR. DOYLE:  Nonresponsive.

14       Q.  (BY MR. DOYLE)  Is the bottom-line truthful

15   answer, you, Robert Reeves, can't verify, don't know

16   whether this UN listing of documents, materials ordered

17   by the Iraqis for years was actually reviewed by a KBR

18   engineer or not?

19            MR. HARRISON:  Objection to the form of the

20   question; it has been asked and answered, he has told

21   you.

22            If you have some new information or

23   something to link this in some way please provide it,

24   but that question's been asked and answered.

25            MR. DOYLE:  No, it hasn't, and please don't

EXHIBIT 3
Page 14 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

169

1    Q.   Was there somebody that indicated in any way

2    from KBR, whatever you do don't look at UN reports?

3    A.   And that question --

4    Q.   Yes, sir.  I'll --

5    A.   -- is confusing.

6    Q.   -- rephrase it.  The particular evaluation that

7    was done, did it cease January 31st, 2003 when the

8    report was given to the U.S. Army?

9    A.   Yes, the project was shut down until

10   Project Rio started up.

11   Q.   But there was still a team at KBR?

12   A.   A limited team.

13   Q.   And the limited team's job was to do what?

14   A.   Basically keep the task force opened, waiting

15   for -- for the order to proceed.

16   Q.   Is it in any way a big shock to you that the

17   Iraqis used 4,000 tons of chemicals over a year basis at

18   Qarmat Ali?

19   A.   I'm not a order expert so I would say yes it is

20   a big shock to me.  I don't know one way or the other.

21   Q.   But clearly anybody at KBR is going to know

22   they used chemicals?

23   A.   Sure.

24   Q.   And during this month long assessment by KBR

25   managers, employees of Qarmat Ali that you don't know,

EXHIBIT 3
Page 15 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

177

1   promised, I told you if you just be quiet for 30

2   seconds, you didn't be quiet for 30 seconds, you didn't,

3   you could not do it, it was impossible.  I don't have

4   any more questions, but it's amazing that when you say

5   you're going to be quiet for 30 seconds you can't do it.

6            MR. SCOTT:  The only thing he said -- well,

7   never -- that's --

8            THE VIDEOGRAPHER:  Are we off the record?

9        Q.  (BY MR. DOYLE)  Actually we don't have an

10  updated address for you, what's your current address?

11       A.  Same address you had before.

12            MR. DOYLE:  Thank you, sir.

13            THE VIDEOGRAPHER:  We are off the record,

14  the time is 2:59 p.m.

15                 (Off the record.)

16            THE VIDEOGRAPHER:  This is the beginning of

17  tape two.  We are back on the record, the time is

18  3:17 p.m.

19                 EXAMINATION

20  BY MR. HARRISON

21       Q.  May I ask you just a few questions about the

22  Contingency Support Plan that KBR prepared for the U.S.

23  government back in late 2002, early 2003?

24       A.  Yes.

25       Q.  Do the words sodium dichromate appear anywhere

EXHIBIT 3
Page 16 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

178

1    in the 2000-plus page Contingency Support Plan?

2              MR. DOYLE:  Leading, form.

3         A.  To the best of my knowledge, no.

4         Q.  (BY MR. HARRISON)  Do the words sodium

5    dichromate relating to Qarmat Ali or any other Iraqi oil

6    infrastructure facility appear anywhere in the

7    Contingency Support Plan?

8         A.  To the best of my knowledge, no.

9              MR. DOYLE:  Mr. Reeves, just a moment

10   pause; I don't want to talk over you.

11             Form; leading.  Go ahead.

12        Q.  (BY MR. HARRISON)  From where did KBR receive

13   the information it used to come up with the Contingency

14   Support Plan?

15        A.  From our client, the U.S. government.

16        Q.  Okay.  Was KBR allowed to do research beyond

17   the information provided by the U.S. government?

18        A.  No.

19             MR. DOYLE:  Leading, form.

20        Q.  (BY MR. HARRISON)  Why not?

21        A.  Because it was a classified --

22             MR. DOYLE:  Form.

23        A.  -- project and doing research outside of the

24   information given to us would be breaching that

25   classification, and it also, the information given to us

EXHIBIT 3
Page 17 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

179

1    to the best of our knowledge was the latest information

2    that the government had on the situation and the

3    infrastructure.

4        Q.   (BY MR. HARRISON)   Who told you that?   Is that

5    from the government?

6        A.   Yes.

7              MR. DOYLE:   Leading, form.

8        Q.   (BY MR. HARRISON)   Who told you that?

9        A.   I believe it's in the statement of work.

10       Q.   Provided by the?

11       A.   U.S. government.

12             MR. DOYLE:   Leading.

13       Q.   (BY MR. HARRISON)   Did the Plaintiff lawyer in

14   his questioning of you show you any document or evidence

15   indicating that KBR knew anything about sodium

16   dichromate at Qarmat Ali during the contingency planning

17   work?

18       A.   No --

19             MR. DOYLE:   Leading, form.

20       A.   -- he didn't.

21       Q.   (BY MR. HARRISON)   Did he have the opportunity

22   to do that?

23             MR. DOYLE:   Leading, form.

24       A.   Yes.

25       Q.   (BY MR. HARRISON)   Have you read the

EXHIBIT 3
Page 18 of 19

ROBERT A. REEVES - VOLUME 2 - August 17, 2012

180

1    Plaintiffs' legal papers on the subject of the

2    Contingency Support Plan and sodium dichromate?

3        A.  Yes.

4        Q.  Did the Plaintiffs in their legal papers have

5    any indication of sodium dichromate being known to KBR?

6           MR. DOYLE:  Leading, form.

7        A.  No.

8        Q.  (BY MR. HARRISON)  Do you know whether the

9    organizational chart listing team members involved in

10   the Contingency Support Plan still exists at KBR?

11       A.  No, I don't know if it's exist or it had been

12   destroyed or -- just destroyed I guess.

13          MR. HARRISON:  No further questions.  Thank

14   you.

15          THE VIDEOGRAPHER:  We are off the record,

16   the time is 3:20 p.m.

17          THE REPORTER:  For the record, counsel have

18   stipulated that custody of the Original Transcript of

19   the Oral Deposition of Robert A. Reeves, and exhibits

20   marked, if any, will be maintained by Mr. Michael

21   P. Doyle, Counsel for Plaintiff.

22          This concludes the deposition at 3:20 p.m.

23       (The Deposition was concluded at 3:20 p.m.)

24

25