IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROCKY BIXBY, LAWRENCE ROBERTA,
SCOTT ASHBY, CHARLES ELLIS, MATTHEW
HADLEY, JESUS BRUNO, COLT CAMPREDON,
STEPHEN FOSTER, BYRON GREER, KELLY
HAFER, DENNIS JEWELL, STEPHEN
MUELLER, VITO PACHECO, JOHN RYDQUIST,
KEVIN STANGER, RONALD BJERKLUND,
ADANROLANDO GARCIA, BRIAN HEDIN,
CHARLES SEAMON, BERTHA HELMAN-SHUIT,
MATT KUHNEL, DENNIS ROSGEN, AARON
ST. CLAIR, KEVIN WILSON, JASON BLAIN,
JAMES BORJA, DEVON FIELDS,  LESLIE ING,
RICHARD LAWRENCE, JAY LOUISIANA,
JAMES McGOWAN, DONALD YEARGIN, and
JASON ARNOLD,

         Plaintiffs,

                                          3:09-CV-632-PK

v.                                       OPINION AND
                                       ORDER

KBR, INC., KELLOGG, BROWN & ROOT SERVICE,
INC., KBR TECHNICAL SERVICES, INC.,
OVERSEAS ADMINISTRATION SERVICES, LTD.,
and SERVICE EMPLOYEES INTERNATIONAL, INC.,

         Defendants.

PAPAK, Magistrate Judge:

      Plaintiffs Rocky Bixby, Lawrence Roberta, Scott Ashby, Charles Ellis, and Matthew

Hadley filed this action against defendants KBR, Inc., Kellogg, Brown & Root Service, Inc.,

Page 1 - OPINION AND ORDER

KBR Technical Services, Inc., Overseas Administration Services, Ltd., and Service Employees International, Inc. (collectively, the "KBR defendants"), on June 8, 2009. On September 8, 2009, plaintiffs amended their complaint, adding Carlos Avalos, Jesus Bruno, Colt Campredon, Stephen Foster, Byron Greer, Kelly Hafer, Dennis Jewell, Stephen Mueller, Vito Pacheco, John Rydquist, and Kevin Stanger as additional plaintiffs. Plaintiffs amended their pleading a second time on February 2, 2010, adding Ronald Bjerklund, Adanrolando Garcia, Brian Hedin, Lewis Martin, and Charles Seamon as additional plaintiffs. On June 25, 2010, plaintiffs amended their complaint a third time, adding Randy Keiper, Matt Kuhnel, Dennis Rosgen, Aaron St. Clair, and Kevin Wilson as further additional plaintiffs. On October 27, 2010, plaintiffs amended their complaint a fourth time, adding Jason Blain, James Borja, Devin Fields, Leslie Ing, Richard Lawrence, Jay Louisiana, James McGowan, and Donald Yeargin as further additional plaintiffs, and adding Halliburton Company and Halliburton Energy Services, Inc. (collectively, the "Halliburton defendants"), as additional defendants. Plaintiffs amended their complaint a fifth time on January 10, 2011, adding as additional plaintiffs Jason Arnold, Thomas Barella, Daniel Grover, Christopher Wangelin, and Michael O'Rielly. Plaintiffs voluntarily dismissed Barella as a plaintiff in this action on the following day, January 11, 2011, and voluntarily dismissed Grover as a plaintiff in this action on February 25, 2011. On June 16, 2011, these chambers recommended that the court dismiss the plaintiffs' claims to the extent alleged against the Halliburton defendants for lack of personal jurisdiction, and on July 20, 2011, Judge Hernandez adopted that recommendation as his own opinion. The parties stipulated to the dismissal of Avalos, Martin, and Wangelin as plaintiffs in this action, on December 16, 2011, and to the dismissal of O'Rielly as a plaintiff on April 4, 2012.

Page 2 - OPINION AND ORDER

By and through their fifth amended complaint, plaintiffs alleged defendants' liability for negligence and for fraud arising out of plaintiffs' exposure to sodium dichromate and subsequent hexavalent chromium poisoning while stationed as Oregon National Guardsmen in Iraq and assigned to duty at the Qarmat Ali water plant in May-September 2003. From October 9, 2012, through November 2, 2012, trial was held in this action on the claims alleged in plaintiffs' fifth amended complaint on behalf of plaintiffs Arnold, Bixby, Bjerklund, Campredon, Ellis, Greer, Hadley, Hedin, Pacheco, Roberta, Seamon, and St. Clair (collectively, the "trial plaintiffs") against defendants KBR, Inc., and Kellogg, Brown & Root Service, Inc. ("KB&RS" and, collectively with KBR, Inc., the "trial defendants"). The jury found the trial defendants not liable in connection with the trial plaintiffs' fraud claims, but awarded both non-economic and punitive damages against them in connection with the trial plaintiffs' negligence claims. The claims brought against the defendants on behalf of all other plaintiffs remain at issue in this action.

Effective December 21, 2012, plaintiffs amended their complaint a sixth time, substituting Bertha Helman-Shuit, personal representative of the estate of Randy Keiper, as a plaintiff in lieu of deceased plaintiff Keiper. The amendment otherwise effected no significant modification to plaintiffs' claims or to their allegations in support thereof.[1]

Now before the court are defendants' Federal Civil Procedure Rule 50(b) motion (#630) for judgment as a matter of law, plaintiffs' Federal Civil Procedure Rule 54(b) motion (#651) for entry of final judgment on the jury verdict resolving the trial plaintiffs' claims, and defendants'

---

[1] Plaintiffs' sixth amended complaint continues to list dismissed plaintiffs Avalos, Martin, Barella, Grover, Wangelin, and O'Rielly as plaintiffs, and continues to state allegations in support of the claims formerly brought by those dismissed plaintiffs. I disregard all such references and allegations as presumptively erroneous and unintentional.

Federal Civil Procedure Rule 59 motion (#653) for new trial or remittitur in connection with the jury verdict on the trial plaintiffs' claims. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, defendants' Rule 50(b) motion (#630) is denied, plaintiffs' Rule 54(b) motion (#651) is granted, and defendants' Rule 59 motion (#653) is denied as to defendants' request for a new trial and granted in part and denied in part as discussed below as to defendants' request for remittitur of the jury's award of damages.

## LEGAL STANDARDS

### I.    Federal Civil Procedure Rule 50(b) Motion for Judgment as a Matter of Law

Federal Civil Procedure Rule 50 governs entry of judgment as a matter of law in connection with a jury trial. Rule 50(a) permits a party to move for judgment as a matter of law as to any issue or combination of issues raised by the party's claims at any time before the claims are submitted to the jury. *See* Fed. R. Civ. P. 50(a). Rule 50(b) provides as follows:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

Page 4 - OPINION AND ORDER

"It is error to deny a [Rule 50(b) motion for judgment as a matter of law] when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Erickson v. Pierce County*, 960 F.2d 801, 804 (9th Cir. 1992), *citing Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985). By contrast, entry of Rule 50(b) judgment notwithstanding a contrary jury verdict is "inappropriate if there is substantial evidence to support a verdict for the non-moving party." *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir. 1985). That is, a Rule 50(b) motion should be granted if a reasonable jury could not have returned the verdict actually returned on the claims at issue, and should otherwise be denied.

## II.    Federal Civil Procedure Rule 59 Motion for New Trial or Remittitur

The district court's discretionary decisions whether to order a new trial or to order a reduction in an award of damages following return of a jury verdict, whether on a party's motion or *sua sponte*, is governed by Federal Civil Procedure Rule 59. Rule 59 provides, in relevant part, as follows:

    (a)    In General.

        (1)    Grounds for New Trial. The court may, on motion, grant a new
               trial on all or some of the issues—and to any party—as follows:

            (A)    after a jury trial, for any reason for which a new trial has
                   heretofore been granted in an action at law in federal court;
                   . . .

        * * *

    * * *

    (b)    Time to File a Motion for a New Trial. A motion for a new trial must be
           filed no later than 28 days after the entry of judgment.

Page 5 - OPINION AND ORDER

(c)    Time to Serve Affidavits.  When a motion for a new trial is based on affidavits, they must be filed with the motion.  The opposing party has 14 days after being served to file opposing affidavits.  The court may permit reply affidavits.

(d)    New Trial on the Court's Initiative or for Reasons Not in the Motion.  No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion.  After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion.  In either event, the court must specify the reasons in its order.

Federal Civil Procedure Rule 59(a)-(d).

In deciding a Rule 59 motion for new trial following a jury verdict, the district court has the right and duty "to weigh the evidence," and where the jury's verdict was "contrary to the clear weight of the evidence," even if nevertheless "supported by substantial evidence," to "set aside the verdict . . . to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Murphy v. Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990), *quoting Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957).  "It is equally clear that erroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Id.*, *citing Rinker v. County of Napa*, 831 F.2d 829, 832 (9th Cir. 1987), *Cleveland v. Southern Pac. Co.*, 436 F.2d 77, 80-81 (9th Cir. 1970).

Whether or not to grant a new trial under Rule 59 is a question "confided almost entirely to the exercise of discretion on the part of the trial court."  *Id.* at 186, *citing Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).  However:

The trial judge is ultimately responsible for the conduct of the litigation, and is also responsible for ensuring that a party is not a victim of a miscarriage of justice.  *See Cheney v. Moler*, 285 F.2d 116, 118-19 (10th Cir. 1960) (duty of trial judge to ensure that just verdict is returned); *Moist Cold*, 249 F.2d at 256 (trial judge may grant new trial to avoid miscarriage of justice); *Aetna Casualty &*

Page 6 - OPINION AND ORDER

> *Surety Co. v. Yeatts*, 122 F.2d 350, 352-55 (4th Cir. 1941) (detailing the
> traditional discretion afforded a trial judge). The court's control over a trial is
> illustrated by the court's *sua sponte* power to grant a new trial on grounds not
> alleged by a party. *See* Fed. R. Civ. P. 59(d).

*Id.* at 187.

On a party's motion for remittitur, "[t]he jury's verdict should be accepted if it could

reasonably have been reached and a trial court's decision against remittitur is reversed only on a

showing of clear abuse of discretion." *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1376 (9th Cir.

1990) (internal quotation marks omitted), *quoting Raynor Bros. v. American Cyanamid Co.*, 695

F.2d 382, 385 (9th Cir. 1982).

## III.    Federal Civil Procedure Rule 54(b) Motion for Entry of Final Judgment

Federal Civil Procedure Rule 54 provides in relevant part as follows:

> When an action presents more than one claim for relief—whether as a claim,
> counterclaim, crossclaim, or third-party claim—or when multiple parties are
> involved, the court may direct entry of a final judgment as to one or more, but
> fewer than all, claims or parties only if the court expressly determines that there is
> no just reason for delay. Otherwise, any order or other decision, however
> designated, that adjudicates fewer than all the claims or the rights and liabilities of
> fewer than all the parties does not end the action as to any of the claims or parties
> and may be revised at any time before the entry of a judgment adjudicating all the
> claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). To certify an otherwise interlocutory order as a partial final judgment and

therefore as immediately appealable under Rule 54(b), the court must make an "express

determination that there is no just reason for delay" in rendering judgment on the matter decided

by the order and must further make an "express direction for the entry of judgment" as to that

order. *SEC v. Capital Consultants LLC*, 453 F.3d 1166, 1174 (9th Cir. 2006) (citations omitted).

The decisions whether to make the Rule 54 express determination and express direction

are "exclusively within the discretion of the district court." *Dannenberg v. Software Toolworks*, 16 F.3d 1073, 1078 (9th Cir. 1994), *quoting Illinois Tool Works, Inc. v. Brunsing*, 378 F.2d 234, 236 (9th Cir. 1967); *see also*, *e.g.*, *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991) ("[t]he present trend is toward greater deference to a district court's decision to certify under Rule 54(b)"). In general, "Rule 54(b) certification is proper if it will aid 'expeditious decision' of the case" in which it is requested. *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797 (9th Cir. 1991), *quoting Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 468 (9th Cir. 1987).

## ANALYSIS

### I.    Federal Civil Procedure Rule 50(b) Motion for Judgment as a Matter of Law

By and through their Federal Civil Procedure Rule 50(b) motion for judgment as a matter of law, defendants timely renew their pretrial Rule 50(a) motion (#583) for directed verdict.

> A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion. *See* Advisory Comm. Notes to the 1991 Amendments, Fed. R. Civ. P. 50 ("A post trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion].").

*Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003). In support of their Rule 50(b) motion, defendants identify numerous discrete issues in connection with which they argue that the evidence of record, including all reasonable inferences therefrom, is insufficient to support the jury's verdict on the trial plaintiffs' claims. I address each in turn.

### A.    Defendants' Rule 50(b) Motion:  Personal Jurisdiction Issues

I turn first to defendants' arguments regarding personal jurisdiction, because resolution of the personal jurisdiction issue in defendants' favor would void the jury's verdict on the trial

plaintiffs' claims and obviate any need to consider other issues raised by either of defendants' motions now before the court. Defendants advance two broad arguments in support of the proposition that this court may not properly exercise personal jurisdiction over either of the two trial defendants in connection with any of the trial plaintiffs' negligence claims: first, that the jury verdict of no liability on the trial plaintiffs' fraud claims in some sense extinguished this court's personal jurisdiction over the trial defendants; and second, that the trial plaintiffs failed to present sufficient evidence at trial to support a finding that this court could properly exercise personal jurisdiction over the trial defendants for purposes of the claims at issue. I agree with the defendants that the jury's verdict left unresolved certain questions relating to the court's jurisdiction over the trial defendants, and that those questions require resolution. However, I disagree with the details of defendants' identification and framing of the questions that remain to be resolved. I therefore review the governing case law and legal principles before discussing the merits of defendants' Rule 50(b) motion as it relates to personal jurisdiction.

Defendants are permitted to move prior to trial, as the defendants did in this action, for dismissal of a complaint against them for lack of personal jurisdiction. "Because there is no statutory method for resolving this issue, the mode of its determination is left to the trial court." *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977), *citing Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939). "The limits which the district judge imposes on the pre-trial proceedings will affect the burden which the plaintiff is required to meet." *Id.*

Where – as here – the defendants' motion to dismiss for lack of personal jurisdiction is decided on the basis of affidavits and/or of allegations contained in pleadings, rather than on the basis of a full evidentiary hearing, the plaintiff or plaintiffs need only make a *prima facie*

showing that personal jurisdiction may properly be exercised over the defendants in order to survive dismissal.  *See id.*  In the event that plaintiffs avoid a preliminary motion to dismiss by making only a *prima facie* showing of jurisdictional facts, personal jurisdiction over each defendant necessarily remains to be established by a preponderance of the evidence at a subsequent, plenary evidentiary hearing.  *See id.*; *see also id.* at n. 2.

Such plenary evidentiary hearing may be conducted as a pretrial proceeding, in which case the judge sits as the trier of fact and is empowered to weigh the evidence and to make determinations of credibility.  *See*, *e.g.*, *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004); *see also Data Disc*, 557 F.2d at 1285.  In the absence of such a pretrial proceeding, plaintiffs are required to establish personal jurisdiction over each defendant by a preponderance of the evidence at trial.  *See*, *e.g.*, *Data Disc*, 557 F.2d at 1285, n. 2.  Here, no such pretrial proceeding was conducted, and the trial plaintiffs' claims went to trial on the basis of my April 12, 2010, finding that plaintiffs had made a *prima facie* showing of personal jurisdiction over each defendant in connection with plaintiffs' fraud claims.[2]

In their trial memorandum filed August 20, 2012, in connection with the upcoming trial of the trial plaintiffs' claims, defendants did not indicate any intention to litigate the question of personal jurisdiction over any defendant.  On August 29, 2012, the parties jointly filed a set of proposed jury instructions to be offered at the trial of the trial plaintiffs' claims, including instructions the parties agreed upon, instructions jointly proposed by the parties but proposed in

---

[2]   Pending ultimate resolution of the personal jurisdiction issue in connection with plaintiffs' fraud claims, the court properly exercised pendant personal jurisdiction over each defendant in connection with plaintiffs' negligence claims, because the fraud claims and negligence claims arose out of a common nucleus of operative facts.  *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180-1181 (9th Cir. 2004).

Page 10 - OPINION AND ORDER

differing versions, instructions proposed only by the plaintiffs, and instructions proposed only by

the defendants.  Neither set of parties proposed a jury instruction relating to personal jurisdiction

at that time.  Also on August 29, 2012, plaintiffs filed a proposed special jury verdict form, and

on August 30, 2012, defendants filed an alternative proposed special jury verdict form.  Neither

set of parties proposed a verdict form that included any question regarding personal jurisdiction

over any defendant.  On September 17, 2012, plaintiffs proposed an amended jury verdict form,

which included no question regarding personal jurisdiction.

 Subsequently, on September 27, 2012, defendants proposed a "supplemental" set of jury

instructions, including for the first time an instruction addressing personal jurisdiction, albeit in a

manner inconsistent with Ninth Circuit jurisprudence clarifying the scope of the so-called *Calder*

effects test (discussed below).  That same day, defendants filed an amended proposed special jury

verdict form, which did not include any question regarding personal jurisdiction over any

defendant.  The parties' proposed jury instructions and proposed jury verdict forms were

discussed on the record at a hearing on October 4, 2012, and on several occasions thereafter both

prior to and during the course of trial.  At no time prior to the conclusion of the trial of the trial

plaintiffs' claims did defendants expressly advise the court of their intent to litigate the personal

jurisdiction issue or to seek a jury finding as to personal jurisdiction over the trial defendants,

other than by proposing a single jury instruction on September 27, 2012.  However, because

defendants first raised the personal jurisdiction issue in a timely motion (#21) to dismiss on

September 11, 2009,[3] under controlling Ninth Circuit case law such failure to press their

---

  [3]  In addition, defendants challenged this court's personal jurisdiction over the trial
defendants in their Rule 50(a) motion, if not on precisely the same grounds as those relied upon
in the Rule 50(b) motion now before the court.

Page 11 - OPINION AND ORDER

challenge clearly in the course of pretrial proceedings does not constitute waiver of any defect in personal jurisdiction.  *See, e.g., Peterson v. Highland Music*, 140 F.3d 1313, 1319 (9th Cir. 1998).  Ultimately, the jury was not asked to make any determination in connection with the personal jurisdiction issue.

In consequence of the foregoing, defendants remain entitled to a finding as to whether a preponderance of the material evidence offered at trial is sufficient to establish the court's personal jurisdiction over each trial defendant.  In the absence of any jury finding deciding that issue, it necessarily falls to the court to act as the trier of fact (as it would have done in the context of a pretrial hearing) and to issue the required finding.

"When no federal statute governs personal jurisdiction, the district court applies the law of the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008), *citing Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  Oregon's long-arm statute creates a standard co-extensive with federal jurisdictional standards, *see* Or. R. Civ. P. 4L, so a federal court sitting in the District of Oregon may exercise personal jurisdiction wherever it is possible to do so within the limits of federal constitutional due process, *see, e.g., Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990).

Federal due process jurisprudence requires that, to be subject to the personal jurisdiction of a federal court, a nonresident defendant must have at least "'minimum contacts'" with the court's forum state such that "the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Two forms of personal jurisdiction are available for application to a nonresident defendant:  general

personal jurisdiction and specific personal jurisdiction.  Here, I found on April 12, 2010, that

plaintiffs were unable to establish that the court could properly exercise general personal

jurisdiction over any defendant.  In consequence, only specific personal jurisdiction over the trial

defendants is at issue in this action.

The courts of the Ninth Circuit apply a three-pronged test for determining whether the

exercise of specific personal jurisdiction over a nonresident defendant may be appropriate:

> (1) The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or perform some
> act by which he purposefully avails himself of the privilege of conducting
> activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's
> forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice,
> *i.e.* it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802, *quoting Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987).

The plaintiff bears the burden of satisfying the first two prongs of the test, whereupon the burden

shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not

be reasonable."  *Id.*, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

In the context of cases that sound primarily in tort, courts have considered it sufficient to

satisfy the first prong of the test where the *only* contact a nonresident defendant had with the

forum state was "the 'purposeful direction' of a *foreign* act having *effect* in the forum state."

*Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986)

(emphasis original), *citing Calder v. Jones*, 465 U.S. 783, 789 (1984).  This "'effects' test requires

that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the

Page 13 - OPINION AND ORDER

forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  "The requirement is but a test for determining the more fundamental issue of whether a 'defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.'" *Id.*, quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Under the effects test, "jurisdiction may be exercised with a *lesser showing of minimum contact* than would otherwise be required if considerations of reasonableness dictate." *Haisten*, 784 F.2d at 1397 (emphasis original), *citing Burger King*, 471 U.S. at 476-477.

The second prong of the test requires that the plaintiff's claim arise out of the nonresident defendant's forum-related activities.  *See Boschetto*, 539 F.3d at 1016.

At the third prong of the test, the burden shifts to the defendant to present a "compelling case" to rebut the presumption that the exercise of specific personal jurisdiction would be reasonable.  *See id.*

> In determining reasonableness, th[e] [courts of the Ninth] circuit examine[] seven factors:  the extent of purposeful interjection; the burden on the defendant to defend the suit in the chosen forum; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in the dispute; the most efficient forum for judicial resolution of the dispute; the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and the existence of an alternative forum.

*Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386 (9th Cir. 1990), *citing Federal Deposit Ins. Corp. v. British-American Ins. Co., Ltd.*, 828 F.2d 1439, 1442 (9th Cir. 1987).  "The court[s] must balance the seven factors to determine whether the exercise of jurisdiction would be reasonable."  *Id.*, *citing British-American*, 828 F.2d at 1442.

On April 12, 2010, I found that plaintiffs had made a *prima facie* showing of personal

jurisdiction over their fraud claims in satisfaction of the *Calder* effects test based on allegations that "each defendant, with knowledge that plaintiffs were Oregon National Guardsmen from Oregon," intentionally misrepresented the extent of the risk posed by environmental hazards at Qarmat Ali and/or intentionally failed to disclose the extent of such risk, to plaintiffs' alleged detriment. The court's task now, following the parties' trial presentations, is to determine whether a preponderance of material evidence supports plaintiffs' allegations that (i) the trial defendants, by and through their employees or agents, either affirmatively misrepresented to each trial plaintiff the extent of the risk posed by sodium dichromate contamination at Qarmat Ali or omitted to disclose the extent of that risk (or both), (ii) with knowledge that the trial plaintiffs were Oregon National Guardsmen, (iii) at a time when the trial defendants were aware of both the sodium dichromate contamination at Qarmat Ali and of the health risk such contamination created, (iv) causing the trial plaintiffs to suffer harm.

A preponderance of the trial evidence establishes that the trial defendants, by and through their employees or agents, affirmatively misrepresented the extent of the risk posed by sodium dichromate at Qarmat Ali to trial plaintiffs and others in their chain of command, and failed to disclose the extent of that risk to any trial plaintiff. Trial plaintiffs Arnold, Bixby, Bjerklund, Ellis, Greer, Hadley, Pacheco, Roberta, Seamon, and St. Clair each provided clear and unequivocal testimony that KBR did not provide any contemporaneous warning regarding environmental hazards at Qarmat Ali. *See* Docket No. 658 at 1185-1186 (Arnold), Docket No. 658 at 1259-1260 (Bixby), Docket No. 688 at 2025, 2031 (Bjerklund), Docket No. 665 at 1372 (Ellis), Docket No. 661 at 2523 (Greer), Docket No. 671 at 2661, 2663, 2707 (Hadley), Docket No. 690 at 2786-2787 (Pacheco), Docket No. 689 at 2286 (Roberta), Docket No. 661 at 2431

(Seamon), Docket No. 661 at 2468 (St. Clair).  Trial plaintiff Campredon testified, somewhat less clearly, that he did not "hear at the time anything about Qarmat Ali," *see* Docket No. 669 at 1909, and that the first time he heard anything about possible exposure to a dangerous chemical at Qarmat Ali was in January 2009, years after his deployment had ended, *see* Docket No. 669 at 1912-1913, Docket No. 688 at 1918.  Similarly, trial plaintiff Hedin testified that he did not hear anything "at the time about the water treatment plant," *see* Docket No. 688 at 1956, and that he did not learn about potential exposure to hazardous chemicals at Qarmat Ali until after his deployment there had ended, *see* Docket No. 688 at 1960.

At least two of the trial plaintiffs provided testimony that they were expressly and personally advised by KBR that the sodium dichromate contamination at Qarmat Ali did not constitute a significant health hazard.  Arnold testified that when he asked KBR personnel specifically about whether there were chemical hazards at Qarmat Ali, he was told that only a "mild irritant" was present.  *See* Docket No. 658 at 1187-1188.  St. Clair testified that when he noticed "yellowish-orange powder"on the walls of a pump station at Qarmat Ali, and reached to touch the powder, KBR engineer Young Lee told him that it was a "skin irritant."  *See* Docket No. 661 at 2468-2469, 2482.

Military personnel other than the trial plaintiffs testified that they were specifically advised by KBR that the sodium dichromate contamination at Qarmat Ali did not pose a significant health hazard, including Tony Watters, *see* Docket No. 658 at 1167, 1170, 1171, and plaintiff Kevin Stanger, a sergeant major with command authority over most of the trial plaintiffs, *see* Docket No. 691 at 2928, 2929-2932, 2933-2934, 2936, 2952-2953, 2955-2958, 2962.  Stanger testified that in early May 2003, he and his captain made a visit to Qarmat Ali for

the specific purpose of following up with a responsible KBR employee on reports of possible chemical irritation symptoms experienced by soldiers returning from that location, and to ensure that Oregon National Guardsmen were not being exposed to a chemical hazard. *See* Docket No. 2927-2928, 2952-2953. Stanger testified that he and his captain located the "guy in charge" of KBR's field operations at Qarmat Ali, asked him about the possibility of chemical exposure on site, and were informed by him that the visible orange powder was a "mild irritant" and that the Oregon National Guardsmen would be "fine" so long as they didn't "bathe in" the substance. *See* Docket No. 691 at 2928, 2930. Stanger testified that he and his captain determined that "no staff action" would be required in response to possible exposure to a chemical that was merely a "mild irritant," and passed that information from KBR both up and down the chain of command. *See* Docket No. 691 at 2929-2930, 2933, 2955-2958. Stanger specified that the information from KBR that he passed up and down the chain of command would ordinarily be expected to reach each and every Oregon National Guardsman deployed to Qarmat Ali. *See* Docket No. 691 at 2955-2958.[4]

Further evidence that the trial defendants affirmatively concealed the extent of the risk presented by sodium dichromate contamination at Qarmat Ali may be found in the testimony of Mike Remington, safety specialist for the U.S. Army Corps of Engineers. Remington testified, *inter alia*, that KBR health, safety, and environmental manager Chuck Adams asked him not to put safety issues identified by Remington in connection with sodium dichromate in writing, *see*

---

[4] Under the rule of law discussed in *Handy v. Beck*, 282 Or. 653, 663-664 (1978), it appears clear that the KBR manager's representation to Stanger in response to Stanger's fact-finding inquiry on behalf of the Oregon National Guardsmen deployed to Qarmat Ali should be treated as though it were directed to each such Oregon National Guardsman for purposes of plaintiffs' fraud claims.

Page 17 - OPINION AND ORDER

Docket No. 669 at 1842-1846, that KBR project manager Mark Daniels was aware of the sodium dichromate problem at the facility before Remington brought it to his attention in June 2003, *see* Docket No. 669 at 1847-1848, and that Daniels failed to advise Remington that the extent of contamination at Qarmat Ali was significantly greater than Remington understood it to be, despite Daniels' awareness that Remington believed the contamination was confined to a very limited area, *see* Docket No. 669 at 1854-1855.

By contrast, defendants offered no evidence that they provided information accurately decribing the extent of the health risk posed by exposure to sodium dichromate to any trial plaintiff or to any other party prior to the end of the Oregon National Guard's deployment to Qarmat Ali. The preponderance of the evidence thus supports plaintiffs' allegation that the trial defendants both misrepresented the extent of the risk of chemical hazards at Qarmat Ali and failed to disclose the actual extent of that risk to any trial plaintiff.

A preponderance of the evidence similarly supports plaintiffs' allegations that KBR's employees and agents were contemporaneously aware that the trial plaintiffs were Oregon National Guardsmen from Oregon. By way of example, plaintiff Stanger testified that the KBR manager who advised him that sodium dichromate was merely a "mild irritant" and that his soldiers would be "fine" so long as they didn't "bathe in" the substance was aware that he and his captain were Oregon National Guardsmen. *See* Docket No. 691 at 2928-2929. Stanger further testified that the Oregon National Guardsmen's uniforms clearly and saliently identified them as such, and that any KBR employee talking to a uniformed guardsman would be expected to understand the guardsman's provenance. *See* Docket No. 691 at 2928-2929. Defendants offer no clear contrary evidence.

Page 18 - OPINION AND ORDER

A preponderance of the evidence likewise establishes that the trial defendants knew of sodium dichromate contamination at Qarmat Ali, and of the fact that the chemical represented a significant risk to the safety of personnel exposed to it, both at and prior to the time the Oregon National Guardsmen were deployed to the site.  By way of example, Ralph Stephenson, KBR's environmental manager for Project RIO from September 2002 until after the plaintiffs had left Iraq, testified that "in a conference call" taking place "before KBR sent personnel out to Qarmat Ali," "the sodium dichromate presence" at Qarmat Ali had been "identified" and discussed by KBR's corporate managers.  *See* Docket No. 685 at 533-535.  Stephenson further testified that he and "every environmental person and industrial hygienist" were immediately aware that the presence of sodium dichromate indicated a likely hazard, because sodium dichromate is well known for its hazardous potential.  *See* Docket No, 685 at 536.  Stephenson testified that when he learned of the presence of sodium dichromate at Qarmat Ali, before any KBR personnel were sent to the site, he sent an MSDS information sheet regarding the dangers presented by sodium dichromate exposure to KBR health, safety, and environmental manager Chuck Adams, who turned out already to have possession of the same sheet.  *See* Docket No. 685 at 535.  Stephenson also testified regarding a field assessment of environmental safety conducted at Qarmat Ali by KBR engineer Kuo Tseng in April 2003.  *See* Docket No. 685 at 533-534.  However, Stephenson expressly confirmed that he was "quite certain" that at "corporate headquarters" KBR "knew, before any assessment was done by Mr. Tseng on the ground, there was sodium dichromate" at Qarmat Ali.  *See* Docket No. 685 at 538.  Additional evidence supporting the proposition that the trial defendants knew of potentially hazardous sodium dichromate contamination at Qarmat Ali, at and/or prior to the time the Oregon National Guardsmen were deployed to the site, may be

found, *inter alia*, in the testimony of John Weatherly, the civilian employee of the Army Corps of Engineers responsible for oversight of Project RIO "on the ground in Kuwait."  *See* Docket No. 672 at 2969-2984.

Defendants offered very little evidence to the contrary, and such evidence as they offered was generally equivocal, as for example testimony of KBR health, safety, and environmental manager Chuck Adams that it was "accurate" to say that KBR first identified sodium dichromate at Qarmat Ali in July 2003 but simultaneously acknowledging an internal KBR memorandum of June 2003 in which the sodium dichromate contamination hazard was discussed.  *See* Docket No. 664 at 1126-1132.  Taking all of KBR's contrary evidence into account, I conclude that the preponderance of the evidence supports plaintiffs' allegation that at all material times the trial defendants were aware of the sodium dichromate hazard at Qarmat Ali.

Finally, a preponderance of the evidence establishes that the foredescribed conduct caused plaintiffs to suffer harm.  First, a preponderance of the evidence establishes that, but for the fact that the trial plaintiffs had not been advised that sodium dichromate presented a serious health risk, their exposure to sodium dichromate at Qarmat Ali would have been eliminated or greatly reduced.  Trial plaintiffs Campredon and Pacheco testified that when on deployment Oregon National Guardsmen were required to carry with them respirators and other protective gear that could have helped to minimize their exposure to inhaled or ingested sodium dichromate had they been aware that the chemical was more than a mere "mild irritant."  *See* Docket No. 669 at 1907 (Campredon), Docket No. 690 at 2787 (Pacheco).  Trial plaintiff Bjerklund specifically testified that:

What bothers me the most is I -- I had means that I could have protected myself

Page 20 - OPINION AND ORDER

> from -- from any kind of chance exposure if I had known about it.  I had a chemical suit, I had a respirator and protective mask.  And all that needed to happen is I needed someone to tell me what to look out for.  Someone to tell me what the possible dangers were, so that if I saw a danger, I could react to it.  I didn't know there was any danger.

Docket No. 688 at 2031.  Quite similarly, trial plaintiff Hadley testified as follows:

> I was upset that there was no reason in my mind for this, because we didn't -- no soldier left their post without carrying their NBC mask, their biological gas mask, or their NBC suit.  At no time across the wire did we do that.  So I had everything I needed to protect myself and my soldiers with me.

Docket No. 671 at 2663.  In addition, U.S. Army Corps of Engineers safety specialist Mike Remington testified to his understanding that the sodium dichromate contamination at Qarmat Ali constituted a clear danger to the health and safety of personnel working at the site, and to his expectation that KBR would not "continue to expose people" to sodium dichromate without first advising them of the need to wear appropriate protective equipment.  *See* Docket No. 669 at 1843, 1849, 1851.  Defendants offered no countervailing evidence.

Second, a preponderance of the evidence establishes that exposure to sodium dichromate caused each trial plaintiff to suffer harm.  This latter conclusion is clearly established by the jury verdict so finding.  *See* Docket No. 609.  Moreover, I independently reach the same conclusion based on my analysis of the causation evidence presented, including primarily the testimony for the plaintiffs offered by Arch Carson, but also that offered for the plaintiffs by Jim Tarr and Herman Gibb, and that offered for the defendants by Paolo Zannetti and Barbara Beck.

The trial evidence that, by and through their employees and agents, the trial defendants intended to conceal the extent of sodium dichromate contamination and did both affirmatively misrepresent the extent of the risk and fail to disclose the true extent of the risk is sufficient to

Page 21 - OPINION AND ORDER

establish by a preponderance that the trial defendants committed an intentional act.  The evidence

that the trial defendants employees and agents who interacted with the trial plaintiffs were aware

at all material times that the trial plaintiffs were Oregon National Guardsmen is sufficient to

establish by a preponderance that the trial defendants' intentional misrepresentations and failures

to disclose were expressly aimed at Oregon residents, and that any consequential harm they

might suffer would be experienced in Oregon.  The trial evidence that the trial plaintiffs were

harmed by exposure to sodium dichromate at Qarmat Ali and that, but for the trial defendants

failure to inform them of the risks, such exposure would have been reduced or eliminated is

sufficient to establish by a preponderance that the trial defendants' misrepresentations and

failures to disclose caused the trial plaintiffs to suffer harm.  Taken together, these three

propositions satisfy the *Calder* effects test, and thus satisfy the first prong of the three-prong

personal jurisdiction test.

   Plaintiffs' fraud claims undisputedly arise out of the intentional acts discussed above,

satisfying the second-prong of the three-prong test.

   Finally, no evidence presented at trial gives rise to grounds for disturbing my previous

conclusion that, in the event plaintiffs' allegations were borne out, it would comport with fair

play and substantial justice to hale defendants into court in Oregon.  As I reasoned in my Opinion

and Order (#44) dated April 12, 2010:

> Any person who intentionally permits a group of persons from a particular state to
> become seriously poisoned may quite reasonably anticipate being subjected to
> legal action in the victims' state of residence.
>
> The foregoing conclusion is supported by analysis of the factors the courts of the
> Ninth Circuit employ in determining whether the exercise of specific personal
> jurisdiction is reasonable.  By intentionally putting Oregon National Guardsmen –

persons whose health and safety directly impact Oregon's treasury as a matter of state law, see O.R.S. 396.366 – at risk of harm, defendants purposefully injected themselves into this forum.  The purposeful interjection factor therefore weighs heavily in favor of exercising jurisdiction.

By contrast, the factor treating the inconvenience of the proposed forum to the defendants weighs at least mildly against exercise of jurisdiction.  An Oregon forum would require all defendants to travel and to transmit evidence to Oregon, a forum in which no defendant has any physical presence.  However, because there is no forum that could entirely mitigate defendants' inconvenience, since the defendants are not all located in any single forum, this factor cannot be accorded dispositive weight in the reasonableness analysis.

The interference with sovereignty factor is immaterial here.

As to the forum state's interest, Oregon has a clear interest in protecting the health and safety not merely of its citizens, but also of its employees, the Guardsmen, whose health concerns are specifically addressed in Oregon legislation, see O.R.S. 396.366.  This factor therefore weighs heavily in favor of exercising jurisdiction.

As to the efficiency of the proposed forum, it is clear that not all evidence is located in Oregon.  However, because all but one of the plaintiffs and much, if not all, of the plaintiffs' evidence, including their medical records, are located in Oregon, and because no single forum contains all of the defendants or all of the defendants' evidence, an Oregon forum is likely somewhat more efficient than any other, assuming arguendo that any other is available.  This factor therefore weighs slightly in favor of exercising jurisdiction here.

Because Oregon is the place of residence of all but one of the plaintiffs, Oregon is clearly the forum most convenient to plaintiffs.  No other forum has been shown to be more capable than this one of providing the plaintiffs with effective relief.  The sixth factor therefore weighs in favor of exercising jurisdiction in Oregon.

Finally, as to the availability of an alternative forum, plaintiffs are correct that it is unclear whether any alternative forum is available in which all defendants would be subject to suit.  This factor therefore weighs in favor of exercising jurisdiction here.

For the foregoing reasons, the court may properly exercise specific personal jurisdiction over each defendant. . . .

In light of the evidence produced by the parties at trial, I now reaffirm that same

Page 23 - OPINION AND ORDER

conclusion *mutatis mutandis*. The trial defendants may reasonably be haled into court in Oregon based on their conduct as established by a preponderance of trial evidence.

The foregoing analysis establishes personal jurisdiction over the trial defendants in Oregon in connection with the trial plaintiffs' fraud claims. The fact that the jury did not find either trial defendant liable in connection with the fraud claims is without impact on this conclusion. First, it is quite clear both that a plaintiff need not prove the merits of a claim in order to establish the court's personal jurisdiction over the parties against whom that claim is brought and that a plaintiff's failure to prevail on a claim does not in any sense extinguish the court's personal jurisdiction in connection with that claim. Second, the jury verdict is not in conflict with the foregoing analysis of the trial evidence. The jury could have rejected the trial plaintiffs' theory of fraud based on an element whose factual underpinnings were wholly non-overlapping with the foregoing analysis, as for example the trial plaintiffs' reasonable reliance on the trial defendants' representations and omissions, or based on the higher standard of proof applicable to fraud claims, namely the clear and convincing evidence standard.

Personal jurisdiction over the trial defendants in Oregon having been established for purposes of the trial plaintiffs' fraud claims, it remains to determine whether personal jurisdiction over those defendants likewise lies in connection with the trial plaintiffs' negligence claims. "Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery*, 368 F.3d at 1180, *citing Data Disc*, 557 F.2d at 1289 n.8. However, the *Action Embroidery* court expressly adopted the doctrine of pendent personal jurisdiction within the Ninth Circuit, whereby district courts may appropriately exercise personal jurisdiction over a defendant or defendants as to claims in connection with which personal jurisdiction does not

Page 24 - OPINION AND ORDER

otherwise exist, so long as those claims arise out of "a common nucleus of operative facts with a

claim in the same suit over which the court does have personal jurisdiction":

> Many of our sister circuits have adopted the doctrine of "pendent personal jurisdiction." Under this doctrine, **a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction**. *See, e.g.*, *United States v. Botefuhr*, 309 F.3d 1263, 1272-75 (10th Cir. 2002); *Robinson Eng'g Co., Ltd. Pension Plan & Trust v. George*, 223 F.3d 445, 449-50 (7th Cir. 2000); *ESAB Group[, Inc. v. Centricut, Inc.*], 126 F.3d [617,] 628-29 [(4th Cir. 1997)]; *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993); *Oetiker v. Werke*, 181 U.S. App. D.C. 124, 556 F.2d 1, 5 (D.C. Cir. 1977); *Robinson v. Penn Cent. Co.*, 484 F.2d 553, 555-56 (3d Cir. 1973). Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction. In *Data Disc*, we noted the jurisdictional issues presented in such a case, but "reserved judgment on this issue until it was properly before us." 557 F.2d at 1289 n.8.
>
> Today, we join our sister circuits and adopt the doctrine of pendent personal jurisdiction. We note, in adopting this doctrine, as the Tenth Circuit has recently noted, that "every circuit court of appeals to address the question [has] upheld the application of pendent personal jurisdiction." *Botefuhr*, 309 F.3d at 1273. Like the Tenth Circuit "we see no reason why, in certain situations, the assertion of pendent personal jurisdiction would be inappropriate." *Id.* **When a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts.** We believe that judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties is best served by adopting this doctrine.
>
> Like our sister circuits, we hold that **the actual exercise of personal pendent jurisdiction in a particular case is within the discretion of the district court**. "The district court may have discretion to dismiss the pendent claims where 'considerations of judicial economy, convenience and fairness to litigants' so dictate." *Oetiker*, 556 F.2d at 5 (citation omitted).

*Id.*, at 1180-1181 (emphasis supplied). Here, it is clear that the trial plaintiffs' negligence claims

arose out of a common nucleus of operative facts with the trial plaintiffs' fraud claims. At all

Page 25 - OPINION AND ORDER

times pretrial, moreover, considerations of judicial economy, convenience, and fairness to the litigants dictated that plaintiffs be permitted to litigate their negligence claims within the same forum as their fraud claims.  Notwithstanding that the jury verdict absolved the trial defendants of liability in connection with the trial plaintiffs' fraud claims, those same considerations mitigate strongly against dismissal of the pendent negligence claims, particularly in light of the fact that the same jury verdict served to resolve the negligence claims in their entirety, and that no further litigation is required in this court in connection with those claims.

For the foregoing reasons, I find that this court properly exercised personal jurisdiction over the trial plaintiffs' claims, and therefore deny defendants' Rule 50(b) motion to the extent premised on defects in this court's personal jurisdiction over the trial defendants.

### B.    Defendants' Rule 50(b) Motion:  Timeliness of Certain Trial Plaintiffs' Claims

In response to Verdict Question No. 1, the jury unanimously found that each trial plaintiff's claims were timely filed.  Defendants now challenge the sufficiency of the evidence adduced at trial to support the jury's findings that the claims of trial plaintiffs Bixby, Ellis, St. Clair, and Roberta were timely filed.

By Opinion and Order (#528) dated September 13, 2012, I found that unresolved questions of material fact precluded entry of summary judgment in defendants' favor as to whether these plaintiffs' claims were time-barred.  Defendants do not dispute that the same evidence upon which I relied in reaching that conclusion was presented to the jury at trial.  For the same reasons articulated in my previous order denying defendants' summary judgment motion regarding applicable statutes of limitations, a jury could reasonably find on the basis of

the evidence presented that these plaintiffs' claims were timely filed.  In consequence, Defendants' Rule 50(b) motion is denied to the extent premised on the purported untimeliness of these plaintiffs' claims.

### C.  Defendants' Rule 50(b) Motion:  Liability of KBR, Inc.

In response to Verdict Question No. 2.1 the jury unanimously found that trial defendant KBR, Inc., was negligent and that its negligence caused plaintiffs' damages.  The jury separately found, in response to Verdict Question No. 2.2, that trial defendant KB&RS was also negligent with consequential damage to plaintiffs.  Defendants now challenge the first of those two jury findings, arguing that the jury lacked sufficient evidence to find that KBR, Inc. (the corporate parent of KB&RS, the latter entity being the sole successor in interest to the signatory of the RIO contract), could have been negligent as alleged in the plaintiffs' complaint.  Indeed, defendants assert that corporate parent KBR, Inc., was not formed until 2006, years after the complained-of conduct took place, and on that basis argue that the trial plaintiffs' claims cannot lie against KBR, Inc.  Defendants further argue in support of their challenge that the trial plaintiffs failed at trial to present evidence cited in plaintiffs' trial memorandum to support a finding that KBR, Inc., was an entity against whom plaintiffs' negligence claims could appropriately be brought, and that the only evidence of that entity's involvement in the conduct complained of in plaintiffs' complaint was general reference by witnesses to "KBR," which, defendants argue, could reasonably apply to KBR, Inc., or to any other KBR-related entity, and thus cannot support the verdict specifically against KBR, Inc.

I am unpersuaded by defendants' arguments because defendants expressly and voluntarily waived the underlying issue.  On the morning of the fifteenth day of trial I specifically found that

testimony of Chris Heinrich, if admitted, could provide sufficient grounds to support a finding

that KBR, Inc., could be liable on plaintiffs' claims, but further noted that the subject testimony

was inadmissible due to unrelated reference to prejudicial matters (specifically, to the

indemnification provisions of the RIO contract):

>THE COURT:  But where I really run into problems is in the deposition of
>Chris Heinrich.
>
>Mr. Heinrich's deposition, which I excluded -- at least as of today is still excluded
>-- was excluded because I was trying to avoid prejudice to KBR by getting into the
>indemnity issue.  And I thought indemnity really went, as it was being presented
>in that context, to Rule 411, and should be excluded except in special
>circumstances where it was going to be used to impeach a witness.
>
>But as I read Mr. Heinrich's testimony, which I'm trying to find in my group of
>papers here, now in the context of this new question of -- of the admissibility -- or
>the proper parties, Mr. Heinrich is asked specifically:
>
>>And the term is KBR, Inc.  Was KBR, Inc., involved in the negotiation of
>>this indemnity contract?
>
>And he explains, yes, [it] was.
>
>He never says anything close to suggest that, well, KBR wasn't.  They didn't exist
>at the time.  It was another company -- presumably Kellogg, Brown & Root --
>who were in existence at the time, and they negotiated this contract.
>
>Which leads me to believe -- that, and there's other testimony of like kind in here
>to suggest that KBR, Inc., is used as the broader explanation of the current
>company who is responsible for the debts of whatever company -- presumably
>Kellogg, Brown & Root or Kellogg Brown & Root, Inc. -- that was managing the
>project in 2003.  And that there's sufficient -- enough evidence, based on his
>testimony, that there is a question that could be presented to the jury about
>whether KBR, Inc., is the proper defendant in this matter.

Docket No. 674 at 3662-3664.  I advised the parties that if the defendants intended to put on

argument or evidence that KBR, Inc., was not a proper party against whom plaintiffs' claims

could be brought, I would admit the Heinrich testimony notwithstanding its potentially

Page 28 - OPINION AND ORDER

prejudicial nature, with a limiting instruction.  *See* Docket No. 674 at 3664-3669.  Counsel for defendants requested time to consider the issue.

The following morning, on the sixteenth day of trial, counsel for defendants expressed strong objection to being put to the choice, but ultimately agreed on the record not to litigate the question of whether KBR, Inc., could properly be found liable on plaintiffs' claims, on the understanding that defendants' agreement meant that the Heinrich testimony would not be admitted:

> THE COURT:  I think there are two parties.  . . .  The jury can decide if either or both of those defendants are liable.  **The separate question that I was concerned with was the argument that KBR, Inc. should not be a party to this case because there hasn't been sufficient proof of their involvement based on the evidence presented by the plaintiff.**
>
> **I am understanding you to say you don't intend to argue that position or put evidence in the record**, in which case I won't change my previous rulings.  Mr. Heinrich's testimony will not be admitted for that limited purpose.  I don't think there is a need to admit the terms of the contract, particularly the potential value to KBR from the contract, and the only questions that remain will be the admission of a portion of Exhibit 97 and the rebuttal testimony of Dr. Gibb, which is separate.
>
> **Is that your understanding as well?**
>
> **MR. HARRISON: Again, preserving the error, yes.**
>
> THE COURT: I just want to say for the record that, while I understand you think me to be in error going left or going right, my view was to give you as many options as possible and let you decide. I indicated from the beginning of this case, I was going to try to limit indemnity evidence, and I have done so, and also to limit the terms of the contract, and I have done so.  When you raised the issue of KBR, Inc. not being the proper party, giving you the option to litigate that issue as well.
>
> But I couldn't allow you to win on all three of those, because, in my view, once you were arguing about KBR, Inc., the Heinrich testimony took on independent significance on that question, and I would have allowed it, perhaps with a limiting

> instruction, if requested, on the indemnity question, and there was also the
> independent issue about the contract, if the jury found KBR Services as the only
> viable defendant on the question of possible punitive damages.  However we see
> it, I understand your position.  So we're all clear, going forward then, the plaintiffs
> will not be allowed to play Mr. Heinrich's testimony.

Docket No. 675 at 3884-3886 (emphasis supplied).[5]

On the basis of the foregoing colloquies, I find that defendants expressly waived the right

to litigate the question whether KBR, Inc., was not an appropriate party against whom plaintiffs'

claims could be brought.  In consequence, defendants will not now be permitted to raise an

assignment of error based on the insufficiency of the evidence offered at trial on that question.

Defendant's Rule 50(b) motion is therefore denied to the extent premised on the insufficiency of

the evidence to find the corporate parent entity KBR. Inc., liable on the trial plaintiffs' negligence

claims.

### D.    Defendants' Rule 50(b) Motion:  Duty of Care

Defendants challenge the sufficiency of the evidence to support the jury's finding that

either trial defendant owed any trial plaintiff a cognizable duty of care, such a duty being

requisite to the jury's finding that each trial defendant was liable to each trial plaintiff for

negligence.  In support of their challenge, defendants argue (i) that the trial defendants owed

duties under the RIO contract solely to the U.S. Army Corps of Engineers and not to any third

party, (ii) that no trial defendant owed any extra-contractual duty to any  person in connection

with environmental hazards at Qarmat Ali because defendants did not create those hazards, (iii)

---

[5]  In context, it is clear that defense counsel's phrase "preserving the error" refers to the
Hobson's choice to which counsel felt his client was being put, and not to counsel's agreement
not to litigate the issue.  There is no indication that counsel intended only to give the appearance
of agreeing not to litigate the KBR, Inc., issue in order to prevent plaintiffs from offering
competent material evidence, while secretly reserving the right to reject the apparent agreement.

that if any trial plaintiff was owed a duty of care in connection with environmental hazards at Qarmat Ali, such duty could only have been owed by the United States military, whose contractual duty under the RIO contract it was to declare the area "benign" before defendants moved in, (iv) that reference in Task Order 3 to regulatory standards of care did not give rise to any duty of care owed by any trial defendant to any trial plaintiff, (v) that it would be in some sense improvident to vest a contractor with a duty to warn active service members regarding known health or safety risks, and, in the alternative (vi) that the United States military was at all material times aware of the environmental hazards at Qarmat Ali, relieving the trial defendants of any duty to warn the trial trial plaintiffs regarding those hazards.  Each of these issues has already been fully litigated, and there is no argument that the trial plaintiffs failed to present critical material evidence at trial.

As I ruled in my Opinion and Order (#512) dated September 9, 2012, as a matter of law the trial defendants owed plaintiffs a duty of reasonable care under the RIO contract and under Task Order 3, and the regulatory standards of care incorporated into Task Order 3 could be considered in connection with that duty.  By and through that same order, I additionally ruled as a matter of law that notwithstanding the obligation of the U.S. Army Corps of Engineers under Task Order 3 to pronounce the worksite "benign"[6] before KB&RS began operations there, KB&RS and its agents owed a continuing duty under the RIO contract and Task Order 3 to report to the United States military any environmental hazards as "necessary for the protection" of military personnel.  Moreover, substantial evidence was produced at trial from which the jury

---

[6]  The parties dispute the meaning of the contractual term "benign."  However, testimony provided by representatives of the U.S. Army Corps of Engineers strongly suggests that, for purposes of Task Order 3, "benign" meant free of enemy combatants and of military hazards.

could reasonably have found that such duty was not obviated by the military's knowledge of potential environmental hazards at Qarmat Ali prior to the end of the trial plaintiffs' deployment there, and that because the trial defendants were aware of environmental hazards unknown to the trial plaintiffs, those defendants owed those plaintiffs a duty of care under Oregon's generally applicable foreseeability standard, *see Fazzolari v. Portland School Dist.*, 303 Or. 1, 17-18 (1987). Because a jury could reasonably have found on the basis of the evidence presented at trial that the trial defendants owed each trial plaintiff a duty of care, defendants' Rule 50(b) motion is denied to the extent premised on the purported insufficiency of the evidence to support that finding.

### E.    Defendants' Rule 50(b) Motion:  Breach of the Duty of Care

Assuming *arguendo* that the trial defendants owed the trial plaintiffs a duty of care, defendants challenge the sufficiency of the evidence to support the jury's finding that the trial defendants could have breached that duty. In support of their challenge, defendants note trial evidence that the United States military was satisfied with the performance of KB&RS and its agents under the RIO contract and that ultimately the trial defendants advised the military of potential hazards at Qarmat Ali, and argue that the manner in which the trial defendants responded to the hazards at Qarmat Ali was necessarily reasonable under the circumstances obtaining at the time the trial plaintiffs were deployed to that location.

I agree with the defendants that substantial evidence was produced at trial from which a jury could reasonably have found that the trial defendants did not breach any duty of care owed to the trial plaintiffs. However, the jury was additionally presented with substantial evidence in support of the opposite conclusion, including evidence that, under the RIO contract, the trial

Page 32 - OPINION AND ORDER

defendants were obliged to shut down operations at Qarmat Ali until it was safe to work there (and failed to do so), that the trial defendants were aware of the risks presented by sodium dichromate at Qarmat Ali prior to taking any action to warn plaintiffs or any other party, that the defendants failed to take reasonable safety precautions to prevent the trial plaintiffs from being harmed by exposure to sodium dichromate at Qarmat Ali, and that the trial defendants both failed to warn the first tranche plaintiffs prior to the end of their deployment of the risks presented by sodium dichromate contamination at Qarmat Ali and affirmatively provided misinformation regarding the extent of that risk.  Because a reasonable jury could have concluded on the basis of this evidence that the trial defendants breached a duty of care owed to the trial plaintiffs, defendants' Rule 50(b) motion is denied to the extent premised on the insufficiency of the trial evidence to support a finding of breach.

### F.    Defendants' Rule 50(b) Motion:  Causation

Defendants challenge the sufficiency of the evidence presented at trial to support the jury's finding that the harms suffered by the trial plaintiffs were caused by the trial defendants' negligence.  Defendants offer four broad assignments of error to the jury's finding:  (i) that opinion testimony offered by plaintiffs' medical expert Arch Carson was insufficient to support a jury finding that the trial plaintiffs' injuries could have been caused by sodium dichromate exposure, (ii) that the trial evidence was insufficient to support a jury finding that the trial plaintiffs' exposure to sodium dichromate was caused by conduct of either trial defendant, (iii) that medical evidence presented at trial was insufficient to support a jury finding that certain specified injuries suffered by certain trial plaintiffs were caused by sodium dichromate exposure, and (iv) that the trial evidence was insufficient to support award of emotional distress damages to

Page 33 - OPINION AND ORDER

any trial plaintiff.  I address each assignment of error in turn.

### 1.    Causation:  Carson's Testimony

Plaintiffs relied in significant part on opinion testimony offered by their medical expert Arch Carson to establish that the trial plaintiffs' injuries were caused by exposure to sodium dichromate.  Defendants now challenge the sufficiency of Carson's opinion testimony to support that finding.  In support of their challenge, defendants argue that Carson's opinion is speculative and therefore cannot support a finding of causation, that Carson's failure to quantify the trial plaintiffs' exposure dosage with precision deprives his opinion of probative value, that Carson's analysis of differential diagnoses was inadequate to support a finding of causation, that Carson's data were unreliable, and that Carson's theory of genetic transformation injury is baseless and speculative.

Defendants' challenge to the sufficiency of Carson's opinion testimony has already been extensively litigated.  By and through my Opinion and Order (#493) dated August 29, 2012, and Opinion and Order (#504) dated August 31, 2012, I addressed all of the arguments defendants now raise in support of their Rule 50(b) challenge, and ruled that the purported defects in Carson's testimony did not foreclose a finding of medical causation.  I reaffirm that conclusion now.

Substantial evidence was presented at trial from which a jury could reasonably conclude that no exposure to sodium dichromate could be considered safe, that in light of the zero-threshold for safe exposure to sodium dichromate, Carson's testimony was not arbitrary or necessarily unreliable (and precise quantification of exposure dosage was unnecessary), that Carson's theory of genetic transformation theory is not necessarily speculative and is supported

Page 34 - OPINION AND ORDER

by reliable science, that Carson addressed and reasonably accounted for inconsistencies in the

data available to him, and that Carson adequately considered potential differential diagnoses.  On

the basis of such findings, a jury could reasonably have concluded that Carson's opinion

testimony supported a finding of medical causation.  In consequence, defendants' Rule 50(b)

motion is denied to the extent premised on the insufficiency of the trial evidence to support a

finding of medical causation.

### 2.    Causation:  Trial Defendants' Conduct

Defendants challenge the sufficiency of the evidence to support a finding that plaintiffs'

exposure to sodium dichromate at Qarmat Ali was caused by any trial defendant's conduct.  In

support of their challenge, defendants argue that it was necessarily the United States Army's

responsibility, and not any defendant's, to warn National Guardsmen about sodium dichromate

contamination at Qarmat Ali and, moreover that the trial defendants could not properly have

issued any such warning without breaching chain-of-command principles.

Discussion above has established that substantial trial evidence supports the finding that

the trial defendants owed the trial plaintiffs a duty of care in connection with environmental

hazards at Qarmat Ali.  In addition, substantial evidence offered at trial supports the findings that

the trial defendants affirmatively misrepresented the extent of the risk of sodium dichromate

exposure and inadequately advised the United States military regarding the extent of the

chemical hazards at Qarmat Ali.  On the basis of these findings, a jury could reasonably have

concluded that the trial defendants' conduct caused plaintiffs to be exposed to sodium

dichromate.  Defendants' Rule 50(b) motion is therefore denied to the extent premised on the

sufficiency of the evidence to support a finding that the trial defendants' conduct caused the trial

Page 35 - OPINION AND ORDER

plaintiffs' injuries.

### 3.     Causation:  Medical Evidence

Defendants challenge the sufficiency of the trial evidence to support findings that trial plaintiffs Greer, Ellis, and Roberta's gastroesophageal reflux disease and trial plaintiff Bixby's lower respiratory issues were caused by exposure to sodium dichromate.  However, because the jury made no specific finding regarding these conditions, and because substantial trial evidence established that each of those plaintiffs suffered from other medical conditions as to which medical causation testimony was offered and which could have supported the jury's award of noneconomic damages to those plaintiffs, defendants' arguments in support of their challenge give rise to no grounds for disturbing the jury's verdict.  Defendants' Rule 50(b) motion is therefore denied to the extent premised on the sufficiency of the medical evidence to support a finding that the specified conditions were caused by sodium dichromate exposure.

### 4.     Causation:  Emotional Distress Damages

Defendants challenge the sufficiency of the evidence offered at trial to support award of money damages for emotional distress suffered by the trial plaintiffs.  In support of their challenge, defendants argue that plaintiffs' medical expert Arch Carson failed to offer any medical opinion as to the causation of the trial plaintiffs' claimed emotional distress, that as a matter of Oregon law a plaintiff may not recover emotional distress damages for fear of future cancer absent a diagnosis to a reasonable degree of medical certainty that the plaintiff is more likely than not to develop cancer in the future, and that the trial plaintiffs' evidence of emotional distress was insufficient to support award of money damages.  In addition, defendants argue that some of the trial plaintiffs suffered from pre-existing conditions such as depression or alcohol

Page 36 - OPINION AND ORDER

abuse that preclude award of emotional distress damages.

Defendants' argument that award of emotional distress damages for fear of future cancer is precluded absent a reliable diagnosis that future cancer was more likely than not is premised on a faulty understanding of Oregon law.  As I found in my Opinion and Order (#538) dated September 17, 2012, "no principle of Oregon law . . .  suggest[s] that physical transformation of a plaintiffs cellular structure caused by physical exposure to a carcinogenic industrial toxin is insufficient to satisfy Oregon's minimal physical impact rule for purposes of determining the plaintiff's entitlement to emotional distress damages."  For all of the reasons discussed in that Opinion and Order, I find that the substantial trial evidence of each trial plaintiff's transient or permanent symptoms consistent with hexavalent chromium poisoning and of each trial plaintiff's emotional distress associated with those symptoms and with the fear of future chromium-related illness is sufficient to support the jury's award of noneconomic damages to each trial plaintiff.  In consequence, defendants' Rule 50(b) motion is denied to the extent premised on the sufficiency of the evidence to support the jury's award of emotional distress damages.

G.    **Defendants' Rule 50(b) Motion:  Roberta's Purported Contributory Negligence**

In response to Verdict Question No. 2.3, the jury found that trial plaintiff Roberta's own negligence was not a cause of the damage he suffered.  Defendants now challenge that finding. In support of their challenge, defendants note that Roberta ate a chicken patty that had been dropped in the same orange powder that, mere moments before, had burned Roberta's eyes, mouth, and throat after he accidentally inhaled some of it.  Defendants argue that no reasonable person under similar circumstances would have eaten the contaminated chicken patty, even after

Page 37 - OPINION AND ORDER

rinsing off the visible orange powder with canteen water, as Roberta did before eating it. However, substantial evidence was presented at trial from which the jury could reasonably have concluded that Roberta had been advised by employees or agents of the trial defendants that the orange powder was only a "mild irritant" and not harmful.  On the basis of such a finding, the jury could reasonably have concluded that Roberta's conduct was not negligent.  In consequence, defendants' Rule 50(b) motion is denied to the extent it challenges the jury's finding that Roberta was not contributorily negligent.

### H.    Defendants' Rule 50(b) Motion:  Damages Award

In response to Verdict Question No. 4, the jury unanimously awarded each trial plaintiff noneconomic damages in the amount of $850,000.  The jury unanimously found that each trial plaintiff was entitled to award of punitive damages in response to Verdict Question No. 5.1, and awarded each trial plaintiff punitive damages in the amount of $6,250,000 in response to Verdict Question No. 5.2.  Defendants now challenge the trial plaintiffs' entitlement to recover damages in excess of the $500,000 statutory cap on noneconomic damages set forth in Or. Rev. Stat. 31.710, and additionally challenge those plaintiffs' entitlement to award of punitive damages in any amount.

Because these issues were not fairly raised by defendants' previously filed Rule 50(a) motion, this court lacks authority to consider defendants' challenge to the jury award of damages in connection with the Rule 50(b) motion now before the court.  *See Freund*, 347 F.3d at 761. Defendants' Rule 50(b) motion is consequently denied to the extent it addresses the jury's award

of damages.[7]

## II.   Federal Civil Procedure Rule 59 Motion for New Trial or Remittitur

By and through their Federal Civil Procedure Rule 59 motion, defendants request that the jury's verdict on the trial plaintiffs' claims be set aside and a new trial ordered or, in the alternative, that the jury's damage award be reduced.

### A.   Defendants' Rule 59 Motion for New Trial

In support of their Rule 59 motion for a new trial, defendants assert numerous arguments in support of the proposition that the jury verdict in the trial plaintiffs' favor on those plaintiffs' claims of negligence was a miscarriage of justice and contrary to the clear weight of evidence.  I address each set of arguments in turn.

#### 1.   Defendants' Rule 59 Motion for New Trial:  Arguments Duplicative of Arguments Discussed Above in Connection with Defendants' Rule 50(b) Motion

Certain arguments offered in support of defendants' Rule 59 motion are largely duplicative of arguments offered in support of defendants' Rule 50(b) motion, discussed above. Specifically, defendants argue that new trial is warranted on the trial plaintiffs' negligence claims on the grounds that (i) the jury lacked sufficient evidence to find certain trial plaintiffs' claims timely, (ii) the jury lacked sufficient evidence to find that the corporate parent entity KBR, Inc., was a party against which the trial plaintiffs' negligence claims could appropriately be brought, (iii) the jury lacked sufficient evidence to find that the trial defendants owed plaintiffs a duty of care, (iv) the jury lacked sufficient evidence to find that the trial defendants breached any duty of

---

[7]  These issues are discussed in full detail below, in connection with defendants' Federal Civil Procedure Rule 59 motion now before the court.

care owed to plaintiffs, (v) expert opinion testimony offered on plaintiffs' behalf by Arch Carson was inadequate to support the finding that the trial plaintiffs' complained-of injuries were caused by sodium dichromate exposure, (vi) the jury lacked sufficient evidence to find that defendants' conduct caused plaintiffs' exposure to sodium dichromate, (vii) the jury lacked sufficient evidence to award damages in connection with certain specified medical injuries, (viii), the jury lacked sufficient evidence and/or any legal basis to award damages for emotional distress, and (ix) the jury improperly failed to find that Roberta was comparatively negligent.

As to the argument that the trial plaintiffs should not have been permitted to seek damages from the corporate parent entity KBR, Inc., as noted above defendants expressly and voluntarily waived their right to litigate that issue. In consequence, the jury verdict finding KBR, Inc., liable on the trial plaintiffs' negligence claims was not a miscarriage of justice giving rise to grounds for ordering a new trial.

Other than the waived legal issue regarding the propriety of permitting the trial plaintiffs' claims to proceed against KBR, Inc., I have discussed each of the foredescribed arguments in detail above, in connection with defendants' Federal Civil Procedure Rule 50(b) motion, and have determined in each case that the jury's verdict was supported by substantial evidence. My analysis of the evidence offered at trial further establishes in connection with each foredescribed argument that the jury's verdict was not contrary to the clear weight of the trial evidence, and did not constitute a miscarriage of justice. Defendants' Rule 59 motion for a new trial is therefore denied to the extent premised on the foredescribed arguments.

### 2.    Defendants' Rule 59 Motion for New Trial:  Jury Instructions

Defendants challenge the propriety of some of the jury instructions offered at trial. Jury

Page 40 - OPINION AND ORDER

instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir. 1999), *citing Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). A district court has substantial latitude in tailoring jury instructions. *See id.*, *citing Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998). A jury verdict will not be set aside because of an erroneous instruction if the error is more probably than not harmless. *See Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992), *citing Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1337 (9th Cir. 1985). I address each of defendants' assignments of error in jury instructions in turn.

### a.    Jury Instructions:  Requested Medical-Causation Instruction

In a second supplemental request for jury instructions (#600), defendants requested the following instruction:  "A cause of damage must be established to a reasonable medical probability."  I declined to offer the requested instruction in favor of the Oregon form jury instruction regarding causation.[8]  Specifically, the jury was instructed that it needed to find causation by a preponderance of the evidence.

I find no error in either the jury instruction actually offered or the court's failure to offer the requested instruction.  The requested instruction would have been potentially confusing to a jury, particularly in the absence of any clear distinction between a standard requiring "reasonable medical probability" and one requiring that a finding be "more probable than not" in light of the

---

[8]  I did, however, advise the defendants that expert testimony regarding the cause of the trial plaintiffs' medical injuries would be admissible only to the extent that the testifying expert expressly offered his or her opinion to a reasonable degree of medical certainty.  Each testifying medical expert complied with that requirement over the course of trial.

evidence presented, which is the nub of the preponderance standard the jury applied to the trial

plaintiffs' negligence claims.  Moreover, in light of the absence of a clear distinction between

those standards, defendants cannot have been harmed by the instruction actually offered.

Defendants' Rule 59 motion for a new trial is therefore denied to the extent premised on the

court's failure to offer defendants' requested medical-causation instruction.

### b.    Jury Instructions:  Requested Instruction to Limit Carson's Testimony; Future-Injury Instruction

In a second supplemental request for jury instructions (#600), defendants requested the

following instruction:

> Dr. Arch Carson testified about something he calls "genetic transformation injury"
> and its possible consequences.  You are instructed that I have determined as a
> matter of law that there are limits to the reliability of Dr. Carson's opinions.  In
> particular, Dr. Carson has not offered a reliable opinion about whether any
> plaintiff's alleged "genetic transformation injury" continued to exist after he left
> Qarmat Ali.  Therefore, to the extent that you believe that a plaintiff experienced
> "genetic transformation injury" while he was at Qarmat Ali, you are instructed
> that you may not award damages for any plaintiff's alleged emotional distress for
> fear of developing illnesses in the future after they left Qarmat Ali, and you are
> instructed that there is no reliable evidence that he will or likely will sustain any
> future physical or medical injuries.

The court declined to offer the requested instruction, offering in its stead the following:

> Noneconomic Damages – Future Injury
>
> In determining the amount of each plaintiff's noneconomic damages, if any, you
> may not award damages for the possibility that any plaintiff has an increased risk
> of developing cancer or the possibility that any plaintiff may develop cancer in the
> future.
>
> If a plaintiff has experienced emotional distress regarding the possibility that he
> may develop cancer in the future, and you find that the plaintiff's emotional
> distress regarding that possibility was caused by wrongful conduct of any
> defendant, you may appropriately award the plaintiff damages for such emotional
> distress.

Page 42 - OPINION AND ORDER

Defendants argue that they were entitled to the requested instruction because in its absence the jury could potentially award damages for the possibility of developing future injury, if it credited Carson's testimony.  However, the limiting instruction actually offered obviated the risk defendants identify.  Defendants' Rule 59 motion for a new trial is therefore denied to the extent premised on the court's failure to offer defendants' requested limiting instruction.

In addition, defendants argue that the future-injury instruction offered in lieu of the requested limiting instruction was prejudicial in that it placed undue emphasis on the compensability of plaintiffs' claimed emotional distress damages.  However, the jury received, in addition to the foregoing, the instruction that "The fact that [the court is] instructing [the jury] with respect to damages is not to be considered by [the jury] as an attempt by the court to suggest or indicate that [the jury] should or should not award damages."  Additionally, the court instructed the jury that damages must be proved by a preponderance of evidence, and not merely inferred from a jury instruction.  In light of those additional instructions, I find the challenged instruction unobjectionable.  Defendants' Rule 59 motion for a new trial is therefore denied to the extent premised on purported error in the court's future-injury instruction.

### c.    Jury Instructions:  Requested Knowledge-of-the-U.S.-Army Instruction

Defendants requested the following instruction:  "If the U.S. Army already had knowledge of potential sodium dichromate hazards, then no act or omission of the defendant could have been a cause of injury to any plaintiff."  *See* Docket No. 496.  I declined to offer the requested instruction because it was not based on any model instruction, appeared to impermissibly direct a legal conclusion, and misstated the law.  I reaffirm that decision now.

Defendants' Rule 59 motion for a new trial is denied to the extent premised on the court's failure to offer the requested knowledge-of-the-U.S.-Army instruction.

**d.      Jury Instructions:  Conduct-of-Nonparties Instruction**

The court offered the jury the following instruction:

Conduct of Nonparties

If you find the negligence of any defendant combined with the conduct of any nonparty to cause injury to a plaintiff, then the defendant would be liable for the entire injury, regardless of the relative degree to which the nonparty contributed to it.  However, if you find that the conduct of the nonparty was the sole cause of an injury to a plaintiff, the defendant would not be liable for that injury.

The term nonparty means a person or entity that is not named as a plaintiff or defendant in this lawsuit, including the United States Army and the United States Army Corps of Engineers.

Defendants argue that the offered instruction was prejudicially misleading when considered in light of other instructions requiring a comparative fault analysis among the parties, that is, as to plaintiff Roberta.  However, the instruction defines the term "nonparty" to make clear that it does not include a plaintiff such as Roberta.  Accordingly, I find no error in the offered instruction.  Defendants' Rule 59 motion for a new trial is denied to the extent premised on purported error in the court's conduct-of-nonparties instruction.

**e.      Jury Instructions:  Requested Damages-Limitation Instruction**

In a second supplemental request for jury instructions (#600), defendants requested the following instruction:

Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss.  That is, do not compensate twice for the same loss, if any.

The court declined to offer the requested instruction, on the ground that it was confusingly

worded and its substance adequately covered by the offered instruction as to the basis for award

of noneconomic damages.  In the absence of any suggestion that the jury may in fact have

double-counted damages in any sense, and in light of the fact that the jury's instructions do not

suggest that double-counting damages could be appropriate, I find no error in the court's failure

to offer the requested instruction.  Defendants' Rule 59 motion for a new trial is therefore denied

to the extent premised on the court's failure to offer defendants' requested damages-limitation

instruction.

### f.      Jury Instructions:  Punitive-Damages Instructions

The court offered the following instructions:

Punitive Damages – General

If any plaintiff prevails on his negligence claim or on his fraud claim, then you
must consider whether or not to award punitive damages in that plaintiff's favor.
A jury may award punitive damages to punish misconduct and deter similar
misconduct from occurring in the future.

You may find that a plaintiff is entitled to an award of punitive damages if the
plaintiff shows by clear and convincing evidence that a defendant has shown a
reckless and outrageous indifference to a highly unreasonable risk of harm and has
acted with a conscious indifference to the health, safety, and welfare of others.

Clear and convincing evidence is evidence that makes you believe that the truth of
the claim is highly probable.

There is no fixed standard for determining the amount of punitive damages and
you are not required to award punitive damages.  If you decide to award punitive
damages, you should consider all of the following in determining the amount:

(a) How reprehensible was the defendant's conduct, considering the nature of that
conduct and the defendant's motive?

(b) Is there a reasonable relationship between the amount of punitive damages and
the plaintiff's harm?

Page 45 - OPINION AND ORDER

(c) In view of the defendant's financial condition, what amount is necessary to punish the defendant and discourage future wrongful conduct?  You may not punish a defendant merely because it has substantial financial resources.

Punitive Damages – Harm to Others

In determining the amount of an award of punitive damages as to a particular plaintiff, you may only consider the harm, if any, caused to that plaintiff by one or more defendants' negligence and/or fraud, if any, and may not consider harm, if any, that any defendant's conduct may have caused to others.

Defendants argue that the court's instructions "improperly allowed the jury to impose punitive damages against KBR for conduct toward nonparties. . . ."  However, the offered instructions correctly state the principles governing award of punitive damages.  Moreover, the second-cited instruction clearly obviates the risk defendants identify.

In addition, defendants argue that the court's punitive damages instructions were erroneous in that they permitted the jury impermissibly to award punitive damages on the basis of conduct taking place outside of Oregon.  However, I am aware of no provision of Oregon law or of any constitutional jurisprudence according to which out-of-state conduct that causes harm to be suffered within Oregon may not, if sufficiently reprehensible, support award of punitive damages.  I find no error in the requested instructions.

For the foregoing reasons, defendants' Rule 59 motion for a new trial is denied to the extent premised on purported error in the court's punitive-damages instructions.

> **g.     Jury Instructions:  Requested Comparative-Negligence Instruction Regarding Smoking**

Defendants requested that the jury be instructed to compare the negligence of each plaintiff with a tobacco-smoking habit with defendants' alleged negligence.  I declined to offer the instruction, on the ground that there was no evidence that plaintiffs' claimed damages had

been caused by smoking.  In the absence of any medical evidence suggesting that plaintiffs'

complained-of injuries could have been caused by a synergetic relationship between smoking and

sodium dichromate exposure, I find no error in my refusal to offer the requested instruction.

Defendants' Rule 59 motion for a new trial is therefore denied to the extent premised on the

court's failure to offer defendants' requested comparative-negligence instruction.

### h.    Jury Instructions:  Requested Personal-Jurisdiction Instruction

In a supplemental jury instruction request (#546), defendants requested the following

instruction:

> To determine that a defendant's conduct was purposely directed at a state, each
> plaintiff must prove all of the following:  (1) the defendant committed an
> intentional act; (2) the defendant's act was expressly aimed at that state; and (3)
> the act caused harm which the defendant knew was likely to be suffered in that
> state.
>
> If the defendant did not know a plaintiff was a resident of that state, its act toward
> that plaintiff was not "expressly aimed" at the state.

I declined to offer the requested instruction.  As discussed above, notwithstanding the court's

failure to offer the requested instruction, defendants were clearly entitled as a matter of law to a

trier of fact's determination of the court's personal jurisdiction over the trial defendants in

connection with the trial plaintiffs' claims.  However, in light of the court's findings regarding

personal jurisdiction based on the evidence presented at trial, *supra*, the failure to offer the

requested instruction was necessarily harmless.  Defendants' Rule 59 motion for a new trial is

therefore denied to the extent premised on the court's failure to offer defendants' requested

personal-jurisdiction instruction.

Page 47 - OPINION AND ORDER

### 3.      Defendants' Rule 59 Motion for New Trial:  Evidentiary Rulings

Defendants assign prejudicial error to numerous of the court's evidentiary rulings.  I address each of defendants' arguments in turn.

### a.      Evidentiary Rulings:  PX 105

Plaintiffs' Exhibit 105 is a photograph of a soldier standing in front of bags of brownish material.  The soldier is not a plaintiff in this action.  Plaintiff Ellis testified that he thought he recognized a building in the background of the photograph as being a building at Qarmat Ali. Defendants argue that because Ellis was not certain that the photograph depicted Qarmat Ali, and because the photograph depicted more bags than Ellis remembered seeing at the location in question, the exhibit was inadequately authenticated.  In addition, defendants argue that the exhibit's inclusion was inherently prejudicial because it indicated the presence of large numbers of bags of material.

Despite possible discrepancies in Ellis' memory, his testimony was minimally sufficient to authenticate the exhibit.  Moreover, there was abundant evidence that large numbers of closed and open bags of sodium dichromate were present at the site, so inclusion of the exhibit cannot have been significantly prejudicial.  Defendants' Rule 59 motion for a new trial is denied to the extent premised on admission of PX 105.

### b.      Evidentiary Rulings:  PX 15, PX 15-A

Plaintiffs' Exhibit 15 is a page from KBR's Contingency Support Plan containing redactions and listing operations costs for Iraq's water treatment plants.  Plaintiffs' Exhibit 15-A is the same document without the redactions.  Defendants argue that at closing argument the trial plaintiffs were improperly permitted to make misleading statements regarding the redactions on

Page 48 - OPINION AND ORDER

PX-15, and to suggest that the redactions were made for the purpose of concealing untoward information, when in fact the unredacted version was in possession of the plaintiffs all along. Defendants concede that they made no contemporaneous objection, but argue that they were not required to do so in order to preserve their assignment of error.

I disagree with the defendants that they were not required to preserve their error by contemporaneous objection. Moreover, defendants do not explain why they were unable to rebut any incorrect suggestions regarding the nature of the redactions by reference to the unredacted document, which was at all times in defendants' possession. Accordingly, defendants' Rule 59 motion for a new trial is denied to the extent premised on argument regarding PX 15.

### c. Evidentiary Rulings: DX 514-A

Defendants' Exhibit 514-A is Secretary Geren's response to congressional inquiry regarding Qarmat Ali. I excluded the document from admission at trial, on the grounds that it was hearsay. Defendants argue that I erred in failing to recognize that Geren's correspondence satisfied an exception to the hearsay rule as a statement of the factual findings of an agency following investigation.

As I determined on the record on October 4, 2012, Geren's correspondence was not a report of investigative findings, but rather a provisional statement of opinion issued in response to congressional inquiry. In consequence, the letter does not satisfy the hearsay exception codified as Federal Evidence Rule 803(8). Defendants' Rule 59 motion for a new trial is denied to the extent premised on the exclusion of DX 514-A.

### d. Evidentiary Rulings: Government Indemnity

Prior to trial, on September 18, 2012, I granted defendants' motion (#474-1) *in limine* to

Page 49 - OPINION AND ORDER

prohibit discussion at trial of any statutory or contractual indemnity to which any defendant may be or may claim to be entitled. Defendants contend that the trial plaintiffs violated this ruling to the prejudice of the trial defendants, by questioning witness Colonel Mark Lovell in the presence of the jury regarding the "level of cooperation" between the military and defendants in connection with this action. However, the objected-to line of questioning was not in violation of my ruling. Defendants' Rule 59 motion for a new trial is denied to the extent premised on improper questioning of Colonel Lovell regarding topics related to indemnification.

### e.    Evidentiary Rulings:  Gentry's Testimony

Defendants note that I ordered plaintiffs not to present at trial testimony of Lieutenant Colonel James Gentry of the Indiana National Guard that he believed he was dying of cancer caused by sodium dichromate exposure at Qarmat Ali. Notwithstanding my order, the trial plaintiffs presented that portion of Colonel Gentry's testimony at trial. Defendants concede that I immediately struck the testimony and instructed the jury to disregard it. Defendants take the position that notwithstanding my limiting instruction, a new trial is warranted on the basis of the presentation.

I disagree with the defendants regarding the adequacy of my limiting instruction. Defendants' Rule 59 motion for a new trial is denied to the extent premised on the inadequacy of my instruction to the jury to disregard the objected-to testimony of Colonel Gentry.

### f.    Evidentiary Rulings:  KBR's Form 10-K

Defendants note that I permitted the trial plaintiffs to offer evidence of the net worth of trial defendant KBR, Inc., specifically KBR's Form 10-K. Defendants argue that such evidence was prejudicial, in light of the purported fact that the trial plaintiffs should not have been

Page 50 - OPINION AND ORDER

permitted to proceed against that defendant.  However, in light of defendants' express and

voluntary waiver of their right to litigate the propriety of permitting the trial plaintiffs' claims to

go forward against KBR, Inc., and in light of the fact that plaintiffs were entitled to put on

evidence of the trial defendants' net worth, I find nothing improper in the admission of the Form

10-K.  Defendants' Rule 59 motion for a new trial is denied to the extent premised on admission

of the Form 10-K filed by KBR, Inc.

### g.   Evidentiary Rulings:  2002 U.N. Spreadsheet

Prior to trial, I ordered plaintiffs to redact a demonstrative exhibit to the extent it made

reference to a 2002 U.N. spreadsheet listed as a source of relevant information in KBR's

Contingency Support Plan.  Notwithstanding my order, the trial plaintiffs displayed the exhibit to

the jury without redacting the reference.  I ordered plaintiffs' counsel to cover the reference with

redaction tape.

Defendants argue that the trial plaintiffs' presentation to the jury of the unredacted exhibit

was prejudicial and improper.  I agree with the defendants that the presentation was necessarily

improper and in clear violation of my order.  However, upon analysis, I disagree with the

defendants that the improper presentation was sufficiently prejudicial to warrant a new trial under

Rule 59.  Under all circumstances, the briefly displayed reference to the U.N. spreadsheet was

highly unlikely either to color the jury's perceptions of the admissible evidence or to cause the

jury to reach any conclusions one way or another regarding the trial defendants' conduct.

Defendants' Rule 59 motion for a new trial is denied to the extent premised on improper

presentation of the reference to the U.N. spreadsheet.

### 4. Defendants' Rule 59 Motion for New Trial:  Damage Awards

Defendants challenge on numerous grounds the jury's awards of noneconomic damages and of punitive damages.  On the basis of their arguments, defendants seek either a new trial or, alternatively, remittitur of the jury's damage awards.

Following analysis of defendants' arguments premised on the jury's damage awards, I find no grounds for ordering a new trial of the trial plaintiffs' claims.  Any defects in the jury's damage awards can be cured through remittitur.  I therefore consider defendants' arguments premised on defects in the damage awards below, in connection with defendants' Rule 59 motion for remittitur, and defendants' Rule 59 motion for a new trial is denied to the extent premised on defects in the jury's awards of damages.

### B. Defendants' Rule 59 Motion for Remittitur

The jury awarded each trial plaintiff noneconomic damages in the amount of $850,000, and punitive damages in the amount of $6,250,000.  In the alternative to their request for a new trial, defendants seek remittitur of the jury's awards of both noneconomic damages and punitive damages.  In support of their request for remittitur of the jury's award of noneconomic damages, defendants argue that the award was grossly excessive relative to the evidence of the harm each trial plaintiff suffered, and that the award is in excess of the $500,000 statutory cap set forth in Or. Rev. Stat. 31.710.  In support of their request for remittitur of the jury's award of punitive damages, defendants argue that the jury lacked sufficient evidence to find that any trial plaintiff was entitled to award of punitive damages in any amount and, in the alternative, that the punitive damages award to each trial plaintiff was constitutionally excessive.  I address each argument in turn.

1.        **Remittitur of Noneconomic Damages:  Evidentiary Basis**

Defendants argue that the jury's award of $850,000 in noneconomic damages was
"grossly excessive" to the evidence of each trial plaintiff's injuries.  Defendants urge the court to
conclude that the jury's award was necessarily "irrational" and motivated by an excessive degree
of "sympathy for a suffering plaintiff" rather than by analysis of each trial trial plaintiff's
evidence of injury.

At Article VII, section 3, as amended, the Oregon Constitution provides in relevant part
as follows:

> In actions at law, where the value in controversy shall exceed $ 750, the right of
> trial by jury shall be preserved, and no fact tried by a jury shall be otherwise
> re-examined in any court of this state, unless the court can affirmatively say there
> is no evidence to support the verdict.

Or. Const. Art. VII, § 3.  Under Section 3, the Oregon courts lack authority to reduce the amount
of a jury award of noneconomic damages unless the award is unsupported by evidence of record.
*See Van Lom v. Schneiderman*, 187 Or. 89, 95-99 (1949).  Although the United States Supreme
Court has found Section 3 unconstitutional to the limited extent that it precludes judicial review
of the amount of a jury's award of punitive damages, *see Honda Motor v. Oberg*, 512 U.S. 415,
425-426 (1994), no court has found the provision unconstitutional to the extent it forecloses
judicial review of noneconomic damage awards for excessiveness, and the Oregon courts
continue to apply Section 3 outside the punitive damages context.  As the trial plaintiffs' claims
are governed by Oregon law, under Section 3 and *Van Lom* my review of the jury's award of
economic damages relative to its evidentiary basis is limited to determining whether any
evidence supports the award.

Page 53 - OPINION AND ORDER

Plaintiffs offered evidence that each trial plaintiff suffered some harm in consequence of his exposure to sodium dichromate at Qarmat Ali.  It is immaterial whether certain plaintiffs offered evidence only of minor or temporary physical harms, or whether certain plaintiffs offered only brief testimony regarding emotional distress; only in the complete absence of evidence to support the verdict is the amount of the jury's award subject to review.  Because some evidence of record supports the award of noneconomic damages to each trial plaintiff, this court lacks authority to review the evidentiary basis therefor.  Defendants' Rule 59 motion for remittitur is denied to the extent premised on the excessiveness of the jury's noneconomic damages awards relative to the evidence of the trial plaintiffs' injuries.

### 2.    Remittitur of Noneconomic Damages:  Statutory Cap

Defendants further argue that the jury's award of noneconomic damages must be reduced by operation of the $500,000 statutory cap codified at Or. Rev. Stat. 31.710.  Section 31.710 provides, in relevant part, as follows:

(1)    Except for claims subject to ORS 30.260 to 30.300 and ORS chapter 656, in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000.

(2)    As used in this section:

* * *

(b)    "Noneconomic damages" means subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment.

Page 54 - OPINION AND ORDER

(3)      This section does not apply to punitive damages.

(4)      The jury shall not be advised of the limitation set forth in this section.

Or. Rev. Stat. 31.710.

The Oregon Supreme Court recently provided substantial clarification as to the operation of the statutory cap, in response to questions certified to the court by the Ninth Circuit.  *See Howell v. Boyle*, 353 Or. 361 (2013).  Prior to *Howell*, virtually all Oregon jurisprudence construing the operation of the statutory cap focused on the question whether a jury's award of noneconomic damages was "protected" under the remedy clause of Article I, section 10, of the Oregon constitution, an inquiry which requires determination whether the cause of action in connection with which the award issued was of a kind that existed in 1857, the year the Oregon constitution was adopted.  Numerous pre-*Howell* lower-court decisions stand for the proposition that, where an award is protected under the remedy clause, the Section 31.710 statutory cap may not constitutionally be applied to reduce the award.

It is now clear under *Howell* that the Section 31.710 statutory cap may constitutionally be applied even to "protected" awards, so long as the remedy that remains following reduction of the award is "substantial."  *See Howell*, 353 Or. at 361, 373-374.  In addition, the *Howell* court's discussion of how the substantiality of a post-reduction remedy is to be weighed makes clear for the first time that substantiality is to be determined by reference to the magnitude of the jury's pre-reduction award.  *See id.* at 374-377.  Although the *Howell* court did not describe the "precise contours" of the analysis, it is clear that the reduction of a jury award by 99% does not leave the plaintiff with a substantial remedy, and is therefore constitutionally defective, *see id.* at 375, *citing Clarke v. OHSU*, 343 Or. 581 (2007), whereas the reduction of a jury award by

Page 55 - OPINION AND ORDER

approximately 83% does leave the plaintiff with a substantial remedy, and is therefore

constitutional, *see id.* at 376, *citing Hale v. Port of Portland*, 308 Or. 508 (1989).

Here, application of the Section 31.710 statutory cap would reduce each trial plaintiff's

award of noneconomic damages from $850,000 to $500,000, a reduction of approximately 41%.

While 41% is a significant reduction, the remaining award of $500,000 is clearly substantial both

in absolute terms and as a proportion of the pre-reduction award, and clearly passes constitutional

muster under *Howell*.

In consequence, I conclude that the Section 31.710 statutory cap may constitutionally be

applied to the jury's awards of noneconomic damages in this action.  Defendants' Rule 59 motion

for remittitur is therefore granted to the extent premised on the Section 31.710 statutory cap, and

each trial plaintiff's noneconomic damage award is remitted from $850,000 to $500,000.

### 3.      Remittitur of Punitive Damages:  Entitlement

Oregon statutory law provides that a jury may award punitive damages against a party if

"it is proven by clear and convincing evidence that the party against whom punitive damages are

sought has acted with malice or has shown a reckless and outrageous indifference to a highly

unreasonable risk of harm and has acted with a conscious indifference to the health, safety and

welfare of others."  Or. Rev. Stat. 31.730(1).  Defendants argue that the evidence presented at

trial foreclosed as a matter of law any possibility that the jury might find the trial plaintiffs

entitled to award of punitive damages in any amount.  In support of their position, defendants

note evidence of record tending to establish that certain United States Army Corps of Engineers

officials believed the trial defendants had, under the circumstances, provided adequate warning

regarding environmental hazards at Qarmat Ali.  However, the jury was in addition presented

with evidence that the trial defendants intentionally misrepresented to trial plaintiffs and to other parties the extent of the risk presented by environmental hazards at Qarmat Ali, that the trial defendants misrepresented the date by which they first learned of sodium dichromate contamination at Qarmat Ali, that the trial defendants failed to take reasonable precautions to preserve from harm Oregon National Guardsmen deployed to Qarmat Ali for the purpose of protecting KBR personnel, and that the trial defendants failed promptly to comply with U.S. Army instructions to clean up the site.

A jury could reasonably have found on the basis of the trial evidence that the trial plaintiffs had met their burden to show, by clear and convincing evidence, that the trial defendants showed a reckless indifference to a highly unreasonable risk of harm from sodium dichromate exposure and acted with conscious indifference to the health, safety, and welfare of their National Guard escorts. Defendants' Rule 59 motion for remittitur of punitive damages is therefore denied to the extent premised on the theory that the trial plaintiffs failed to establish their entitlement to award of punitive damages.

### 4.    Remittitur of Punitive Damages:  Proportionality

Finally, defendants challenge the amount of the jury's award of punitive damages to each plaintiff, on constitutional grounds. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). This is because a defendant must "receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose." *BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996). Further, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose

Page 57 - OPINION AND ORDER

and constitutes an arbitrary deprivation of property." *Campbell*, 538 U.S. at 417.

The Supreme Court has established three "guideposts" for determining whether a punitive damage award comports with due process:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418, *citing Gore*, 517 U.S. at 575.

The Oregon courts agree that "[o]n review of a punitive damage award under the Due Process Clause of the Fourteenth Amendment, a court must determine whether the punitive damage award is grossly excessive."  *Williams v. Philip Morris, Inc.*, 340 Or. 35, 54 (2006) (internal quotation marks, modifications omitted), *quoting Parrott v. Carr Chevrolet, Inc.*, 331 Or. 537, 554 (2001).  "Whether the verdict exceeds the gross excessiveness standard is a question of law."  *Id.*, *citing Parrott*, 331 Or. at 555.

Both the United States Supreme Court and the Oregon Supreme Court agree that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *Campbell*, 538 U.S. at 425; *see also Williams*, 340 Or. at 49 (finding that a "9:1" ratio is a maximum value that "will apply in the usual case."

"When reviewing a punitive damages award for excessiveness, the reviewing court must view the facts in the light most favorable to the jury's verdict if there is evidence in the record to support them." *Parrott*, 331 Or. at 556.

In reviewing the jury's award of punitive damages, the first guidepost to be considered is the degree to which the trial defendants' conduct was reprehensible.  Factors bearing on the

reprehensibility of a defendant's conduct include the following:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419, *citing Gore*, 517 U.S. at 576-577.  Viewed in the light most supportive of the jury's verdict, the evidence of record clearly supports the finding that the trial defendants' conduct was highly reprehensible.  The harm suffered by the trial plaintiffs was physical; evidence of record (discussed above) clearly supports the finding that the trial defendants acted with reckless indifference to the health and safety of the National Guardsmen assigned to protect defendants' personnel; the trial plaintiffs relied upon the trial defendants for accurate information regarding the extent of the risk from the environmental hazards they were exposed to; the evidence supports the finding that the trial defendants, by and through their agents or employees, repeatedly mischaracterized the extent of the health risks posed by soidum dichromate contamination at Qarmat Ali; and the evidence of record clearly supports the finding that the trial defendants misrepresentations to the trial plaintiffs were intentional.  The first *Gore* guidepost thus supports a significant punitive damage award.

The third *Gore* guidepost requires the courts to identify comparable civil or criminal sanctions applicable to the complained-of conduct, to consider the severity of the available comparable sanctions, and to evaluate the punitive damage award in light of the severity of the comparable sanctions.  Under Oregon law as it existed in 2003, knowingly causing serious physical injury to another constituted assault in the second degree, a Class B felony.  *See* Or. Rev. Stat. 163.175 (2003).  In 2003, Class B felonies were punishable by severe civil and

Page 59 - OPINION AND ORDER

criminal sanctions, including fines of up to $250,000, *see* Or. Rev. Stat. 161.625(1)(c) (2003), and terms of imprisonment of up to ten years, *see* Or. Rev. Stat. 161.605(2) (2003). The availability of such severe sanctions was sufficient to put the trial defendants on notice that the courts of Oregon would take their complained-of conduct very seriously, and supports a significant punitive damage award.

The second *Gore* guidepost requires the courts to consider the ratio between the compensatory damages award and the punitive damages award. I note in this connection that the Oregon courts have not yet resolved the question whether, in the case where the jury's award of punitive damages has been reduced by the court to the Section 31.710 statutory cap, it is the pre-reduction or post-reduction award to which the award of punitive damages must be compared. *See*, *e.g.*, *Williams*, 340 Or. at 62 ("We need not decide between the 'capped' or 'uncapped' figure, however, because it makes no difference here); *Groth v. Hyundai Precision & Ind. Co.*, 209 Or. App. 781, 792 (2006) ("we need not decide in this case whether the capped or uncapped compensatory damages should be used for purposes of establishing the ratio"). Here, each trial plaintiff's punitive damages award was $6,250,000, approximately 7.35 times the jury's award of compensatory damages, and 12.5 times the statutory maximum to which the jury's award was reduced.

For purposes of ensuring that a punitive damages award be reasonably proportional to the reprehensibility of a defendant's conduct, it would be illogical to compare the jury's award of punitive damages to the court's post-reduction award of noneconomic compensatory damages. The jury's award of compensatory damages is intended to reflect the actual harm caused by the defendant's conduct, whereas the statutory maximum imposed on award of noneconomic

Page 60 - OPINION AND ORDER

damages bears a wholly arbitrary relationship to the actual harm the defendant caused.  The

interest of justice in ensuring the proportionality of punitive damage awards would in no way be

furthered by electing to compare punitive damages with the arbitrary figure rather than with an

available measure of the harm caused by the conduct to be punished.  I therefore conclude that,

where reduction of a jury's award of compensatory damages is by application of Section 31.710,

the Oregon courts would most likely compare punitive damages with the pre-reduction jury

award of compensatory damages.

     The ratio of 7.35 to 1 does not exceed the 9 to 1 maximum applicable under Oregon law

"in the usual case."  Moreover, in light of the first and third *Gore* guideposts, the 7.35 to 1 ratio is

not constitutionally excessive.  I therefore decline to disturb the jury's award of punitive

damages.  Defendants' Rule 59 motion for remittitur is denied to the extent premised on the

theory that the jury's award of punitive damages was excessive.

### III.    Federal Civil Procedure Rule 54(b) Motion for Entry of Final Judgment

     By and through their Federal Civil Procedure Rule 54(b) motion, plaintiffs request that

the court immediately direct entry of a final judgment as to the trial plaintiffs' claims as alleged in

plaintiffs' fifth amended complaint, notwithstanding that all other plaintiffs' claims remain to be

adjudicated.

     As noted above, Rule 54(b) entry of final judgment is appropriate where it will aid

'expeditious decision' of the case."  *Texaco*, 939 F.2d at 797.  The claims as to which final

judgment is to be entered under the rule "do not have to be separate from and independent of the

remaining claims."  *Id.*, *quoting Sheehan*, 812 F.2d at 468.  "However, Rule 54(b) certification is

scrutinized to 'prevent piecemeal appeals in cases which should be reviewed only as single

Page 61 - OPINION AND ORDER

units.'"  *Id.*, *quoting McIntyre v. United States*, 789 F.2d 1408, 1410 (9th Cir. 1986), quoting *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 10 (1980).

Here, plaintiffs argue that immediate appealability of judgment as to the trial plaintiffs' claims will aid the expeditious resolution of all other plaintiffs' claims and/or facilitate settlement of those claims.  Defendants do not disagree with that proposition, but rather oppose plaintiffs' Rule 54(b) motion only to the extent that plaintiffs seek entry of final judgment in favor of the trial plaintiffs, in accord with the jury verdict, whereas defendants take the position that, as argued in support of their Federal Civil Procedure Rule 50(b) and Rule 59 motions, final judgment should instead be entered in the trial defendants' favor.

For the reasons discussed above, I decline to enter judgment in the trial defendants' favor on the trial plaintiffs' claims.  The parties agree that, following resolution of defendants' Rule 50(b) and Rule 59 motions, no just reason for delay in entry of final judgment exists.  Moreover, I agree with the parties that resolution of appeals from this court's decision as to the trial plaintiffs' claims will clearly and significantly expedite final resolution of the remaining plaintiffs' claims, and could potentially obviate the need for further litigation as to those claims before this court.[9]  Plaintiffs' Rule 54(b) motion is therefore granted.

## CONCLUSION

For the reasons set forth above, defendants' Rule 50(b) motion (#630) is denied, plaintiffs' Rule 54(b) motion (#651) is granted, and defendants' Rule 59 motion (#653) is denied as to defendants' request for a new trial and granted in part and denied in part as discussed above as to

---

[9]  The parties have agreed that, in the event I grant plaintiffs' Rule 54(b) motion for entry of final judgment, any party filing appeal therefrom will, to the fullest extent possible, request the Ninth Circuit's expedited review.

defendants' request for remittitur of the jury's award of damages.  The jury award of noneconomic damages to each trial defendant is reduced from $850,000 to $500,000.  Final judgment shall be prepared as to the claims of trial plaintiffs Arnold, Bixby, Bjerklund, Campredon, Ellis, Greer, Hadley, Hedin, Pacheco, Roberta, Seamon, and St. Clair, only.

        Dated this 26th day of April, 2013.

                              /s/  Paul Papak
                              Honorable Paul Papak
                              United States Magistrate Judge